UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

FILED
U.S. DISTRICT COURT
SAVANNAH DIV.
2026 OCT -1 P 2:52
CLERK
SO. DIST. OF GA.

MARVIS IVEY, R.N.,
MARCUS IVEY,

PLAINTIFFS,

VS.

SHAQUAN GAITHER, Individually and officially as Attorney-At-Law, Instructor for Paralegal Studies at Savannah Technical College, Resignation is demanded,

JOHN DOE, Individually and as officer, City of Savannah Police, government human sex traffickers, stalkers, thieves, murderers, sex offenders by members of City of Savannah Police,

DAVID STOKES, Individually and as Warden, Coastal State Prison, O.C.G.A. Sections 42-5-1, 42-5-2, EIGHTH AMENDMENT, US CONST VIOLATIONS, SAFETY AND PROTECTION VIOLATIONS,

TYRONE OLIVER, Individually and as Commissioner, Georgia Department of Corrections, O.C.G.A. Sections 42-5-1, 42-5-2, EIGHTH AMENDMENT, US CONST VIOLATIONS, SAFETY AND PROTECTION VIOLATIONS,

CHRISTOPHER RAY, Individually and as Magistrate, United States District Court, Southern District of Georgia, Savannah Division, government human sex trafficker,

STAN R. BAKER, Individually and as Judge, United States District Court, Southern District of Georgia, Savannah Division, government human sex trafficker,

CIVIL ACTION NUMBER:

**4:26-cv-00266**

**DECLARATORY JUDGMENT OF RIGHTS, EQUITABLE, DAMAGES, BRIBERY,**

SEE **MOTIONS TO RECUSE DISQUALIFIED JUDGES, DEFENDANTS, MALICE MURDERERS, CHRISTOPHER RAY, STAN R. BAKER**

**EVIDENCE OF POLICE INVOLVEMENT AS GOVERNMENT HUMAN SEX TRAFFICKERS**

**CRIMINAL DEFENDANTS JOINED IN CONSPIRACY TO COMMIT MURDERS AGAINST PLAINTIFFS TO BENEFIT CITY OF SAVANNAH GOVERNMENT HUMAN SEX TRAFFICKERS,**

**DURESS, BOTH PLAINTIFFS, USE OF JUDGES SEVERE PLAINTIFF MARCUS IVEY**

**UNITED STATES CONSTITUTION EIGHTH AMENDMENT VIOLATIONS BOTH PLAINTIFFS, POLICE SEX OFFENSES, THEFTS, VIOLENCE**

RYAN FOLEY, Individually and as
President, Savannah Technical
College, Open Records of facilitated
City of Savannah Police government
human sex traffiking attack 09/08/2026,

DEFENDANTS.

**COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiffs Marvis Ivey, R.N., a licensed registered professional nurse, licensed to practice in the State of Georgia and all compact states of this United States of America, close family member of Plaintiff Marcus Ivey file this their Declaratory Judgment of Rights law suit in the interest of the preservation of their lives from the criminally with intent to commit malice murder against plaintiffs for no just cause and solely in their capacity as witnesses against police *government human sex traffickers* as follows:

(a) Shaquan Gaither, Defendant, Attorney-At-Law, Instructor of Paralegal Program at Savannah Technical College accepted bribery of City of Savannah Police *government human sex traffickers* to interfere with Plaintiff Marvis Ivey's attendance in the paralegal program. Shaquan Gaither interrupted Plaintiff Marvis Ivey, R.N.'s studies for two semesters, Spring and Summer semesters with extortion of illegal fees of over $400 paid two semesters in a row. Now that I am in the class, Defendant Gaither is arbitrarily down grading my grades as paid agent for City of Savannah Police *government human sex traffickers*. Defendant Gaither was bribed to commit her criminal acts, extortion, and duress for criminals; Evidence of police criminal influence attached hereto in the removal of Defendant Shaquan Gaither from Instructor position

(b) John Doe, Defendant is an unidentified white male City of Savannah policeman *government human sex trafficker* who participated in a malice attempted murder physical assault brought against Plaintiff Marcus Ivey on July 4, 2026, done in direct retaliation against Plaintiff Marvis Ivey, R.N. who filed suit against Defendant John Doe June 26, 2026 for bribery and other crimes as ongoing and including Defendant John Doe's attack in the Savannah Technical College Library 09/08/2026 while Plaintiff Marvis Ivey, R.N. used the computers. The malice attack included heavy sedation done without Plaintiff Marvis Ivey, R.N.'s consent and done against her will. This attack was videotaped with timely same day Open Records request which has not been honored to date by Savannah Technical College; this same suspect paid Shaquan Gaither to lie, commit extortion of illegal, unconstitutional fees, and, to interfere with Plaintiff Marvis Ivey, R.N.'s attendance at Savannah Technical College, in the paralegal program;

(c) David Stokes, Defendant, is sued in the individual capacity and official capacity as Warden, Coastal State Prison where Plaintiff Marcus Ivey was wrongfully, unconstitutionally, fraudulently prosecuted on police lies of Dekalb County Police *government human sex traffickers* now in conjunction with City of Savannah Police *government human sex traffickers* and through conspiracy assigned to Coastal State Prison for police paid to Staff and prisoners' attempted malice murder. In retaliation against Plaintiff Marvis Ivey, R.N.'s civil suit filed June 26, 2026. City of Savannah police government human sex traffickers paid Staff and prisoners to perform severe physical attempted malice murder against Plaintiff Marcus Ivey on July 4, 2026, while Plaintiff Marcus Ivey spoke on a recorded line with Plaintiff Marvis Ivey, R.N. Defendant David Stokes has wrongfully, unconstitutionally deprived Plaintiff Marcus Ivey of emergency medical attention and treatment for emergency conditions Cyanotic Asphyxia, respiratory blockage, with blackening of his nail bed on one hand and obviously serious underlying injuries which are ongoing. Official Code of Georgia Annotated (O.C.G.A.) § 42-5-2, Eighth Amendment, United States Constitution violations. There has been no protection nor safety provision by Defendant David Stokes for Plaintiff Marcus Ivey to date, Eighth Amendment, United States Constitution violations, Duress. Attempted murder death threats used as duress, ongoing crimes deprivation of medical attention ordered by licensed Georgia professional Registered Nurse, Plaintiff Marvis Ivey, R.N. Demand is made for termination of David Stokes and others including physicians unqualified for their positions. 131 deaths have occurred at Coastal State Prison since 2020.

(d) Defendant Tyrone Oliver is sued in the individual capacity and in the official capacity as Commissioner, over the Department of Corrections, O.C.G.A. §§ 42-5-1, 42-5-2 and should be forced to retire for "deliberate indifference" to ongoing violations of United States Constitutional, Eighth Amendment, Duress, PREA violations without intervention, without provisions for safety refusal to terminate criminal elements Staff and prisoners. Staff as criminals should be terminated and prisoners should be processed to another level of security and removed from medium security. Demand for emergency medical treatment for Plaintiff Marcus Ivey is hereby made.

(e) Defendant Christopher Ray, is sued in the individual and official capacities with request for restraining order for *government human sex trafficker* judicial malpractice abuse of office sex offenses, done against the will of Plaintiff Marvis Ivey, R.N. and without her consent and malice murder attempts with "deliberate indifference" to the acts and attacks used by his office Magistrate judge, United States District Court, Southern District of Georgia and where found shocking, request is made that these papers be filled under seal.

(f) Defendant R. Stan Baker, is sued in the individual and official capacities with request for restraining order for *government human sex trafficker* judicial malpractice abuse of office, ongoing sex offenses, done against the will and without the consent of Plaintiff Marvis Ivey, R.N. done with duress and other crimes including use of heavy sedation crimes request is made that these papers be filled under seal.

2.

Request is made for the three-judge panel to release Plaintiff Marcus Ivey from the

malice death threats, duress, deprivations of emergency medical attention and treatment And enforce Plaintiff Marcus Ivey's rights under federal statute. See "pattern" of ongoing offenses in Georgia prisons with ongoing "deliberate indifference" by officials. Termination of Officials who do not know their jobs is requested by this complaint with relief from government oppression through the lawful process of release. See *INVESTIGATION OF GEORGIA PRISONS*, United States Department of Justice, October 1, 2024 attached hereto and made a part hereof as if fully set out herein by this reference, Exhibit "A."

3.

Another Paster, Lowe of GOD's Temple of Praise has made known his intention to go to Washington, D.C. where high level bribery used to pay off Church debt takes place for the benefit of local, City of Savannah Police *government human sex traffickers.* Washington, D.C. is where high level crime occurs. Plaintiff Marvis Ivey investigated one such pay off of, reported $7.5 million dollars to find common theft. The mortgage was erased, dropped off from Bank of America records in the public records. This was done for Bishop Quincy Carswell.

4.

Recent money grabbers in Washington, D.C. pretended to be at odds for public purposes of deceit. A trillionaire was born of millionaires without mention of the billionaires used to fill the void left by 44 millionaires. It does not add up until the millions of missing and exploited children who are sex trafficked by the United States *government human sex traffickers* from their births.

5.

Bribery is a crime both ways. Defendant Attorney Shaquan Gaither has been paid to corrupt others and being an attorney knew exactly what she was doing was a crime not like some

who pretend that the acts are "legal." Defendant Shaquan Gaither was initially terminated as demanded in the original Complaint which judges were paid to rest their careers on and they too should be terminated. See Defendant Shaquan Gaither's Announcement of another attorney to replace her in the paralegal instructor position, copy attached hereto and made a part hereof Exhibit "B." Their acts like President Trump's acts are shocking, distracting, and based in ongoing sex trafficking of American citizens with large sums placed in luxury apartments and President Trump is the icon. Luxury apartments are built all over Atlanta, Georgia, Savannah, Georgia by, *government human sex traffickers*. Many need to be terminated who refuse to do their jobs. *Government human sex trafficking* is not your job for pay. Demand is made for the necessary terminations until Plaintiff Marcus Ivey gets his emergency medical treatment by all involved and are continuously reported to officials who choose to be in place for the support and upkeep of *government human sex traffickers*.

6.

The Secret Service has access to the President and Bishop Carswell boasted about another President which he had access to Airforce One, a plane. President Trump was told that the Secret Service is not in charge of the United States of America. The people are… Plaintiffs demand the right to sue for damages. We have been consistently stolen from, while others in unlikely positions feel their ship has come in. This level of bribery requires true law enforcement. We have made this request for Declaration of our rights under the acts of the wrongful dismissal of our prior emergency Complaint filed June 26, 2026 by judicial misconduct abuse of office and since then our needs have been met with "deliberately indifference" rather than given the emergency medical attention which Plaintiff Marcus Ivey has dire need.

WHEREFORE, Plaintiffs Marvis Ivey, R.N. and Marcus Ivey hereby request to enforce their rights under:

(A) 28 United States Code Annotated (U.S.C.A.) 3626 Release for Plaintiff Marcus Ivey;

(B) Coastal State Prison is at 200% overcrowding with specific focus on the fact that essential areas like kitchens were not expanded and literal "starvation" of prisoners is occurring as self-reported in Georgia media data release where it was recommended that citizens call the local regulatory agency which would shut the kitchen down and was an inappropriate recommendation.

(C) The correctional officer vacancy rate 70% compound the problems of not knowing what to do with only 30% of staff needed available;

(D) Overcrowding is a serious problem and "starvation" due to lack of adequate food and facilities with the addition of beds exceeding 200% overcrowding is fatal and the death rate proves it up to 45 for this year, unconfirmed;

(E) Plaintiff Marcus Ivey is wrongfully imprisoned, through duress and police lies with excessive bribery including paid witness Erica Bonds to lie. Bonds was given a free government property with a later security deed for $490,500; The citizens are paying a huge price for government human sex trafficking crimes. See Deoxyribonucleic Acid (DNA) test result of Chavronya Grimes the only victim for which Plaintiff Marcus Ivey was fraudulently prosecuted to date. And who suffered no injuries. Erica Bonds DNA was also in Marcus Ivey's favor. And all DNA records were withheld from disclosure for over four years. False arrest under police lies. See Copy of DNA test results of Plaintiff Marcus Ivey and false witness Chavronya Grimes given a county or. citizen owned Lexus SUV, attached hereto as Exhibit "C."

(F) The decision for the release of Marcus Ivey should be made by a Three-judge panel; 28 U.S.C.A 3626;

(G) Judges Defendant Christopher Ray and Defendant R. Stan Baker are disqualified from participating in any way in the decisions requested here;

(H) Equitable relief should be granted from the aggravated stalkers of the City of Savannah Police, paid agents, Defendant Shaquan Gaither, government human sex traffickers;

(I) Defendant David Stokes should be restrained into performance of emergency medical care (breathing problems are always an emergency of the highest priority) required under O.C.G.A. § 42-5-2, (a request to know);

(J) Plaintiff Marvis Ivey's fees should be returned until further notice based on Constitutional requirement: "no tuition, no fees";

Respectfully submitted as true and correct under penalty of perjury this 1st day of October 2026.

Marvis Ivey, R.N.
Mivey3@students.savannahtech.edu
Email only due to City of Savannah Police Stalkers government human sex traffickers.

Exhibit

PARA1100_202616_CR_60164

PARA1100: Introduction to Law and Ethics (60164)

# New announcement from Shaquan Gaither

**Instructor update for this course**

Hello class! I hope you are doing well. I wanted to let you know about an important update regarding this course.

Effective immediately, there has been a change in course instructor. I am pleased to let you know that Attorney Colten Hall will be joining as the Instructor for the remainder of the term.

Please note that the course syllabus has been updated to reflect this change and may also include revisions to instructor information, communication procedures, office hours, and other course-related details. It is important that you review the updated syllabus carefully and familiarize yourself with any changes.

The revised syllabus has been posted in the course materials section. If you have any questions regarding the course, assignments, or expectations moving forward, please do not hesitate to contact Attorney Hall.

Thank you for your attention to this announcement.

PARA 1100 Syllabus - Summer Semester 202616-2.pdf

View Announcement

*Any multimedia items must be viewed online*

Exhibit

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

MARVIS IVEY, R.N.,
MARCUS IVEY,

PLAINTIFFS,

Vs.

BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA, et al

DEFENDANTS.

CIVIL ACTION NUMBER:
~~4:26-CV-00166~~

**MOTION TO CONVENE THREE-JUDGE PANEL FOR THE RELEASE OF MARCUS IVEY WRONGFULLY INCARCERATED**

This motion filed pursuant to 18 United States Code (U.S.C.) 3626 due to the facts that Plaintiff Marcus Ivey has been severely retaliated against as a near relative of Plaintiff Marvis Ivey whose school attendance was originally opposed through police bribery injustice in exchange for extortion of fees from Plaintiff Marvis Ivey and create financial hardship, financial coercion of Defendants City of Savannah Police, its Mayor, Van R. Johnson and Shaquan Gaither, paid offender attorney who performed the actual acts and attacks against Plaintiff Marvis Ivey. In direct opposition and criminal conspiracy retaliation against the filing of Plaintiff Marvis Ivey's lawsuit, June 26, 2026, City of Savannah Police *government human sex traffickers* orchestrated a violent attack against Plaintiff Marvis Ivey's son, Marcus Ivey wrongfully incarcerated and fraudulently prosecuted in police retaliation against Domestic Violence Stalking Protective Relief awarded to Plaintiff Marvis Ivey. See Marvis *Ivey v. Bradley McDaniel*, Civil Number 15CV6932, Superior Court of Dekalb County, Georgia.

The July 4, 2026 violent attack against Plaintiff Marcus Ivey was done in the complete

absence of any staff or with their active participation in the attack against Plaintiff Marcus Ivey. Plaintiff Marcus Ivey remains under unsafe, life-threatening conditions and is not able to request help for himself because of the obvious involvement of corrupt staff. During the attack on a recorded line, Marcus Ivey was removed from the telephone conversation several times for extended periods with activity recorded during those incidents. The attacks were unrelieved and no staff nor did anyone intervene to assist Plaintiff Marcus Ivey. The beatings were performed by multiple offenders, the beatings were unrelieved and done with the intent to severely injure and to kill. Plaintiff Marcus Ivey lost his senses.

Plaintiff Marcus Ivey was made party to this civil action and subpoena served to no avail. Motion to compel is forth coming when new judges are impaneled. Plaintiff Marcus Ivey is unable to participate in any grievance when staff are involved in the grevance due to the life threatening conditions present at Coastal State Prison. The United States Department of Justice's *Investigation of Georgia Prisons* has been filed into the above case as factual to the conditions present systemwide and none have been alleviated causing Coastal State Prison to be in the worst conditions found by the United States. More than 131 deaths have occurred at Coastal State Prison since 2020, as reported by the Georgia Department of Corrections. The Warden, David Stokes and Commissioner Tyrone Oliver have been made parties individually and officially.

The conditions of overcrowding include factors of being one of the largest with corrections officer vacancy rate of 70% combined with a bed status over 200%. Georgia concedes that adding beds does not add to facilities like the kitchen which was designed to respond to 158 per building currently at 268. /the overcrowding is systemwide. Georgia has more than 50,000 prisoners. See United States Department of Justice's *Investigation of Georgia Prisons* copy attached hereto made a part hereof. Georgia Department of Corrections admits to

"starving" the prisoners literally.

Emergency relief was requested in temporary restraining order which was not granted to date. Race-based deprivation of rights to relief are believed to be in operation in the court system along with frank cooperation with and suuport for Dekalb County Police in conjunction with City of Savannah Police's *government human sex traffickers* including Sergeant Brock and Mayor Van R. Johnson.

Reference is made to **AFFIDAVIT IN SUPPORT OF MOTION TO CONVENE THREE-JUDGE PANEL FOR THE RELEASE OF MARCUS IVEY WRONGFULLY INCARCERATED.** Reference is made to United States Department of Justice's *Investigation of Georgia Prisons* copy attached hereto made a part hereof.

Wherefore, Plaintiff files this demand that the Three-judge court be impaneled and Marcus Ivey be released, set free, discharged and acquitted immediately.

Parker;s House
C/O Marvis Ivey, R.N.
120 Fahm Street
Savannah, Georgia 31401
(470) 544-7808

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

MARVIS IVEY, R.N.,
MARCUS IVEY,

PLAINTIFFS,

Vs.

BOARD OF REGENTS OF
THE UNIVERSITY SYSTEM
OF GEORGIA, et al,

DEFENDANTS.

CIVIL ACTION NUMBER:
~~4:26-CV-00166~~

**AFFIDAVIT IN SUPPORT OF MOTION TO CONVENE THREE-JUDGE PANEL FOR THE RELEASE OF MARCUS IVEY WRONGFULLY INCARCERATED**

Before the undersigned Notary Public duly authorized to administer oaths in the State of Georgia appeared Affiant, Marvis Ivey, R.N. who under oath deposes and states:

1.

I am Marvis Ivey, R. N., a licensed registered nurse licensed in all states which participate in the compact. I am of the age of the majority and competent to make this Affidavit based on my personal knowledge of the facts.

2.

The facts stated in the **MOTION TO CONVENE THREE-JUDGE PANEL FOR THE RELEASE OF MARCUS IVEY, WRONGFULLY INCARCERATED** are true and correct.

SWORN TO AND SUBSCRIBED UNDER OATH, this 18 day of August, 2026.

Anthony DeAndre Howard
Notary Public

ANTHONY DEANDRE HOWARD
NOTARY PUBLIC
Chatham County
State of Georgia
My Comm. Expires May 15, 2029

Marvis Ivey
Parker' House, C/O Marvis Ivey, R.N.
120 Fahm Street, Savannah, Georgia 31401

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

MARVIS IVEY, R.N.,
MARCUS IVEY,

PLAINTIFFS,

Vs.

BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA, et al.,

DEFENDANTS.

CIVIL ACTION NUMBER:
~~4:26-CV-00166~~

**EMERGENCY MOTION FOR RECUSAL OF DISQUALIFIED JUDGE R. STAN BAKER**

Plaintiff Marvis Ivey, R.N., licensed registered nurse, licensed to practice in all states where the compact is in effect including licensed in State of Georgi, shows that an emergency condition persists and safety has not been provided for Plaintiff Marcus Ivey in violation of Official Code of Georgia Annotated (O.C.G.A.) Code Sections 42-5-1, 42-5-2. The factual findings of the United States Department of Justice's *Investigation of Georgia Prisons*, (October 1, 2024) prevail without change or action by "deliberate indifference" Georgia officials and is attached hereto and made a part hereof by this reference as if completely set out herein. It is imperative that emergency medical services are provided for Plaintiff Marcus Ivey. Plaintiff Marcus Ivey has persistent, of unknown etiology, cyanosis, though we know that Plaintiff Marcus Ivey suffered severe and extensive trauma over an entire twenty to thirty minutes, July 4, 2026, from police retaliation paid agents, we do not know the extent of injuries. Broken bones are suspected. Plaintiff Marcus Ivey has also had labored respirations which were never addressed. Emergency medical technicians should have been allowed to assess for emergency

thoracic injuries. One symptom of traumatic cyanosis is sudden death. National Institutes of Health (NIH), *Traumatic Cyanosis.* That is obviously the intent of Judges R. Stan Baker and his companion, magistrate Christopher Ray. There is nothing frivolous about the emergency condition of Plaintiff Marcus Ivey being reported to United States district judges the direct result of ongoing police retaliation against Plaintiff Marvis Ivey for her ongoing appropriate complaints against government human sex trafficking predominantly done by whites. The "911" Operator attempted to contact officials at Coastal State Prison. The facts found by the United States Department of Justice, *Investigation of Georgia Prisons* stand, and have no improvement to date.

Coastal State Prison officials are "deliberately indifferent" to their civil rights violations, the patterns of correctiona officer vacancy rates which exceed 70% in the ten largest prisons are valid and heavily impact the overcrowded conditions. Coastal State Prison is one of the largest with 70% need of staff to address overcrowding which stands above 200% is excessive and the cause of unsafe conditions. Georgia Department of Corrections, system report data. No safety has been provided for Plaintiff Marcus Ivey. High quality emergency medical care from experienced physicians must be accessed immediately. Judge R. Stan Baker has already expressed his impartial, racist belief that such as applied to blacks, both Plaintiffs Marvis Ivey, R.N. and Marcus Ivey wrongfully incarcerated through such fraudulent misrepresentations demand his resignation in addition to his recusal. Judge Baker's recusal is needed in the face of his obstruction of justice. Prison officials have been notified with Ante Litem information with return receipt and made parties to this civil action, individually.

Pursuant to 18 United States Code (U.S. Code) Section 455, emergency recusal is sought, demanded. Judge R. Stan Baker has committed attempted murder along with the paid police agents who attacked Plaintiff Marcus Ivey on July 2, 2026. Plaintiff Marcus Ivey is entitled to

release. Therefore, a three-judge panel is hereby requested pursuant to 18 U.S. Code Section 3626.

Therefore, emergency recusal of demented racist judges specifically, Judge R. Stan Baker who himself participates in Defendant City of Savannah Police Department under its Mayor Van R. Johnson's *government human sex trafficking*. This fact will be investigated.

Parker's House
C/O Marvis Ivey, R.N.
120 Fahm Street
Savannah, Georgia 31401

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

MARVIS IVEY, R.N.,
MARCUS IVEY,

PLAINTIFFS,

Vs.

BOARD OF REGENTS OF
THE UNIVERSITY SYSTEM
OF GEORGIA, et al.,

DEFENDANTS.

CIVIL ACTION NUMBER:
~~4:26-CV-00166~~

**AFFIDAVIT IN SUPPORT OF EMERGENCY MOTION FOR RECUSAL OF DISQUALIFIED JUDGE R. STAN BAKER**

Before the undersigned Notary Public duly authorized to administer oaths in the State of Georgia appeared Affiant, Marvis Ivey, R.N. who under oath deposes and states:

1.

I am Marvis Ivey, R. N., a licensed registered nurse in all states which participate in the compact including the State of Georgia. I am of the age of the majority and competent to make this Affidavit based on my personal knowledge.

2.

The statements and facts contained in the **EMERGENCY MOTION FOR RECUSAL OF DISQUALIFIED JUDGE R. STAN BAKER** are true and correct.

SWORN TO AND SUBSCRIBED UNDER OATH this 18 day of August, 2026.

Anthony DeAndre Howard
Notary Public

Marvis Ivey
Parker's House
C/O Marvis Ivey, R.N.
120 Fahm Street, Savannah, Georgia 31401

ANTHONY DEANDRE HOWARD
NOTARY PUBLIC
Chatham County
State of Georgia
My Comm. Expires May 15, 2029

# Investigation of Georgia Prisons

U.S. Department of Justice
Civil Rights Division

U.S. Attorney's Offices for the Northern, Middle, and Southern Districts of Georgia

October 1, 2024

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ........ i

**EXECUTIVE SUMMARY** ........ 3

**INTRODUCTION** ........ 4

**INVESTIGATION** ........ 11

**DEFICIENT CONDITIONS IDENTIFIED** ........ 14

A. The State of Georgia Fails to Reasonably Protect Incarcerated Persons from Violence. ........ 14

1. GDC allows frequent, pervasive violence in the prisons, resulting in serious bodily harm and, in some cases, death. ........ 14
2. GDC's grossly inadequate staffing leaves incarcerated persons unsupervised and hampers staff's ability to respond to violence. ........ 23
3. GDC prisons are unsafe due to aging and inadequately maintained facilities and failure to ensure adequate lock, tool, and key controls. ........ 34
4. GDC's ineffective classification and housing systems expose incarcerated persons to an unreasonable risk of violence. ........ 38
5. GDC fails to control violence even in its segregated housing units and exposes incarcerated persons to an unreasonable risk of harm due to its inappropriate use of segregated housing. ........ 42
6. GDC fails to control illegal and violent activity by gangs and other security threat groups. ........ 46
7. GDC fails to control weapons, drugs, and other dangerous contraband in its prisons. ........ 50
8. GDC fails to report and investigate serious incidents of harm and dangerous activities. ........ 53
9. GDC does not reasonably protect incarcerated individuals, including LGBTI individuals, from sexual harm. ........ 60

B. The State is Deliberately Indifferent to the Risk of Harm to Incarcerated Persons ........ 73

**MINIMUM REMEDIAL MEASURES ........ 79**

A. Short-Term and Immediate Measures ........ 79

B. Violence: Long-Term Measures ........ 85

C. Sexual Safety: Long-Term Measures ........ 91

**CONCLUSION ........ 93**

# EXECUTIVE SUMMARY

After an extensive investigation in Georgia's prisons housing people at the medium- and close-security levels, the Department of Justice (the Department or DOJ) concludes that there is reasonable cause to believe that the State of Georgia and the Georgia Department of Corrections (GDC) violate the Eighth Amendment of the United States Constitution. Consistent with the Civil Rights of Institutionalized Persons Act, 42 U.S.C. §§ 1997 et seq. (CRIPA), we provide this Report to notify Georgia and GDC (collectively, the State) of the Department's conclusions, the facts supporting those conclusions, and the minimum remedial measures necessary to address the violations identified.

## FINDINGS

**The United States provides notice of the following conditions in Georgia's prisons:**

- **Protection from Violence and Harm:** The State fails to protect incarcerated people from violence and harm by other incarcerated people in violation of the Eighth Amendment.
- **Protection from Sexual Harm:** The State fails to protect incarcerated people from harm caused by sexual violence in violation of the Eighth Amendment. The State also fails to adequately protect people who are lesbian, gay, bisexual, transgender, and intersex (LGBTI) from a substantial risk of serious harm from sexual violence and abuse by staff and other incarcerated people.

The State is deliberately indifferent to these unsafe conditions. The constitutional violations are exacerbated by serious deficiencies in staffing and supervision, physical condition and security of the facilities, classification and housing, management of gangs and other security threat groups, control of weapons and other contraband, and incident reporting, response, and investigations. The State has known about the unsafe conditions for years and has failed to take reasonable measures to address them.

# INTRODUCTION

Georgia is the eighth most populous state in the United States and has the fourth-highest state prison population. GDC incarcerates almost 50,000 people in 34 state-operated prisons and 4 private prisons, ranging in capacity from fewer than 500 to more than 2,500 beds.[1] Staffing levels vary across the prisons, with correctional officer (CO) vacancy rates around 50% systemwide and over 70% at ten of the largest facilities. More than 32,000 of GDC's population are classified as medium security and more than 11,600 are classified as close security.[2] Almost 10,000 are serving a life sentence or life without parole; for the remainder, the average sentence is about 26 years. GDC operates on a $1.2 billion budget. GDC's Commissioner is Tyrone Oliver, who took over the role in January 2023, after Timothy Ward, the previous Commissioner, retired. The Commissioner reports to the State Board of Corrections and the Governor.[3]

The incarcerated population in the Georgia prison system faces a substantial risk of serious harm due to failing systems, particularly security staffing, that have been in decline for decades. In the 1980s, Georgia funded prison expansion to address a rising incarcerated population and overcrowding, despite the Commissioner at the time explaining there were not enough COs to meet current needs. This trend, of an increasing incarcerated population and decreasing number of staff, continued into the 1990s. Over the past twenty years, Georgia consolidated some of its prisons, but these actions failed to address the gap between the increasing size of its incarcerated population and unmet staffing needs.

Since 1990, Georgia's prison population has more than doubled, from a little over 21,000 in 1990 to almost 50,000. GDC's average CO vacancy rate was 49.3% in 2021, 56.3% in 2022, and 52.5% in 2023. At many of GDC's close- and medium-security prisons with high levels of violence, CO vacancy rates are even higher. In

---

[1] These 38 prisons include men's medium- and close-security prisons, men's "special mission" prisons (a designation for prisons with programs, medical services, or other special purposes), and women's prisons. In addition to these prisons, GDC houses thousands more people in its custody or supervision at lower-security facilities, including transitional centers and drug treatment facilities. *See* Georgia Dep't of Corrections, Facilities Division, https://perma.cc/DU5Y-W2YF, and https://perma.cc/Q6M4-6SBQ.

[2] *See* Georgia Dep't of Corrections, *Inmate Statistical Profile* at 25 (June 1, 2024), https://perma.cc/P8EG-C5V2. According to GDC, persons incarcerated at the "close" security level "are escape risks, have assault histories, and may have detainers for other serious crimes on file," and "require supervision at all times by a correctional officer." Those incarcerated at the "medium" security level constitute the largest category of GDC's population, and "have no major adjustment problems and most may work outside the prison fence, but must be under constant supervision." *See* Georgia Dep't of Corrections, *About GDC, State Prisons*, https://perma.cc/9M7Z-DUCH.

[3] *See generally* Georgia Dep't of Corrections, *Fiscal Year 2023 Annual Report*, https://perma.cc/NA52-CVBP.

December 2023, 18 GDC prisons had CO vacancy rates over 60%, and 10 of those were over 70%. The circumstances within Georgia's prisons did not develop overnight, but rather represent decades of inaction to address a growing and changing incarcerated population, aging infrastructure, and years of declining staffing rates.[4]

With security staffing at such low levels, violence and criminal activity proliferate in the prisons. GDC fails to stop and to respond appropriately to homicides, life-threatening and other serious violence, and sexual abuse – including of vulnerable LGBTI people. Over the six-year period from 2018 through 2023, GDC reported a total of 142 homicides in its prisons, with 48 in the first three years and a 95.8% increase in the latter three years, with 94 homicides.[5] The rate of homicides in GDC prisons significantly exceeds the most recent available national data on homicide rates in correctional facilities. Although GDC's security staffing saw some modest increases in 2023, with more staff hires than separations for the first time in years, violence remained a constant, with a record 35 homicides in the prisons by GDC's own reported numbers.




[4] In recent years, GDC has taken some steps to address its problems, including advertising heavily for staff, raising starting salaries, sending tactical teams into facilities to conduct occasional large-scale shakedowns, and closing or renovating dilapidated prisons. As discussed later in this report, *see infra* at § B, these steps have been inadequate to address the scope of the harm and risk of harm to incarcerated people and employees in GDC's prisons.

[5] From 2011 through 2018, the number of homicides systemwide in GDC prisons never exceeded nine deaths annually. As discussed elsewhere in this Findings Report, *see infra* § A.8.a, we identified multiple additional homicide deaths that GDC's reported homicide totals fail to reflect.

Our investigation identified hundreds of serious incidents that highlight the systemic violence and chaos in GDC prisons, and GDC's failure to control it. For example, in December 2023, GDC experienced five homicides at four different prisons, and serious incidents at other facilities:

- On December 8, 2023, a man in his 20s was stabbed in the barber shop at Central State Prison, in Bibb County. He received treatment at an outside hospital, returned to the prison, and died after going into cardiac arrest "secondary to stabbing" on December 18.
- The day before, December 17, 2023, another man, also in his 20s, was stabbed to death at Central State Prison; three other incarcerated people were criminally charged in early January 2024 for their roles in his death.
- Between these two deadly stabbings at Central, two other homicides occurred in other prisons. On December 10, 2023, an incarcerated person died after an altercation with his cellmate at Macon State Prison. On December 13, 2023, an incarcerated person at Coastal State Prison, in Chatham County, died after an altercation with other incarcerated persons; he was due to be released in 2024.
- On December 22, an incarcerated person at Telfair State Prison died after an altercation with another incarcerated person.

Meanwhile, December also saw stabbings and other serious incidents at other GDC prisons, including Phillips State Prison, where an incarcerated person whom DOJ had interviewed earlier in 2023 required hospitalization on December 17 for six or more stab wounds. That same day, video circulated on social media of a fire, set by incarcerated persons on the previous day, in the sallyport area of a housing unit at Phillips, while incarcerated people milled around the sallyport.[6]

Violent incidents occur across the GDC system, placing thousands of incarcerated people at substantial risk of serious harm on an ongoing basis. For example:

- Within a span of just four days in April 2023, two brutal assaults occurred in the same facility, Smith State Prison, one resulting in a man's death. On April 5, 2023, an incarcerated man at Smith was discovered dead, possibly strangled to death by his roommate in a segregated housing unit. The local coroner noted the body was badly decomposed, and the man likely had been dead for over two days. Four days prior, on April 1, 2023, another person was assaulted by multiple incarcerated people inside another housing unit at Smith. A video of

---

[6] *See* Human and Civil Rights Coalition of Georgia, Phillips State Prison, Facebook (Dec. 18, 2023), https://perma.cc/RGF6-ETQ4. GDC records confirmed the basic details of this incident.

the assault was uploaded onto social media, where the victim's family saw it several days later.[7] The video showed an incarcerated man sitting on the floor with his hands tied behind his back before a group of men around him punched, kicked, and stabbed him.

- On January 6, 2023, a Lieutenant at the Georgia Diagnostic and Classification Prison (GDCP) responded to a housing unit, where the officer initially found two wounded incarcerated people. One appeared to have broken an ankle after jumping from the upper-level walkway in an effort to escape being assaulted; the other had a laceration to his jaw. Both were transported to a local hospital. Six other incarcerated persons from that housing unit also had assault wounds, including stabbings and lacerations. Subsequently, on the same shift, the same Lieutenant found another stabbing victim in a different housing unit. In all, six individuals were hospitalized that evening from the attacks, which involved gang members attacking rival gang members. Just four nights later, four more incarcerated persons were assaulted in the same housing unit. One of the victims described his attack involving two masked men, one brandishing a "sword" that he used to whip the victim while demanding his CashApp account. A group of other incarcerated persons continued to assault the victim with fists and kicks as he escaped from his cell.[8] This victim and three others were eventually identified by staff the next morning when a Lieutenant observed them with bruises and swollen faces. All the identified victims were transported to a hospital after giving statements indicating they had been attacked by gang members while in their cells.

GDC also fails to protect incarcerated persons from sexual abuse. The lack of staffing, supervision, and systems of accountability gives predators easy access to potential victims. People who are LGBTI are especially vulnerable.[9] Gangs that run housing units often target LGBTI individuals with physical and sexual violence. LGBTI individuals described being beaten and stabbed by others in their housing unit because of their LGBTI status. Others reported receiving threats of violence if they did not leave the housing unit. Yet despite their vulnerability, GDC does not adequately screen, classify, or track LGBTI individuals to ensure their safety. Instead of making

---

[7] *See* Cody Alcorn, *Inmates Record Horrific Beating, Stabbing Inside Georgia Prison Cell*, 11 ALIVE (Apr. 8, 2023, 12:03 AM), https://perma.cc/K2EN-HXAM.

[8] *See* David Morris, *Assault on Human Rights*, MEDIUM (Dec. 13, 2023), https://perma.cc/4EDW-TFDJ.

[9] We recognize that preferred terminology changes over time, and that more inclusive language (e.g., LGBTQI+) may be preferable to many. When we notified Georgia that we were expanding this investigation, we used the term "LGBTI," intending that term to include gender non-conforming, queer, and other identities. We are using the term LGBTI in this report for consistency, with the same inclusive intent.

individualized assessments, GDC houses transgender women with men based on their external genitalia despite the risk this poses to their safety. Investigations into sexual abuse allegations are poor and frequently fail to include witness interviews or consider video evidence. And corrective actions to prevent sexual abuse or protect LGBTI individuals at a systemic level seldom if ever occur. A few examples illustrate these deficiencies:

- In May 2022, a gay man reported that his cellmate had sexually assaulted him. The man stated that the cellmate was part of a gang that had ordered the cellmate to get the man out of his cell because he was openly gay. The cellmate injured the man in the shoulder with a shank, tied him up, and raped him. GDC investigators deemed the matter unsubstantiated. It appears GDC took no further action even though both men told investigators that the man was tied up, that the men had had sexual relations, and that a gang had ordered the cellmate to drive the man out of his cell.

- In March 2021, a transgender woman alleged that an incarcerated man in the protective custody unit ordered her to provide oral sex through the chow port in her cell door to receive a meal tray. The man denied sexual contact with the transgender woman but admitted to taking drugs and sticking his erect penis through the chow port. We received no evidence that GDC took any administrative action despite the man's admission.

Violence and other criminal activity in the prisons affect the surrounding communities as well. The GDC system has become a hub for known criminal activity, endangering other incarcerated persons and the public. District Attorneys from around the state told DOJ that the proportion of violent crimes originating in the prisons, including homicides, has increased in recent years, straining prosecutorial resources. In the past six years, hundreds of GDC officers have been arrested on criminal charges arising out of acts committed in or in relation to the prisons, including acts with victims outside of the prisons. The vast majority were contraband-related arrests, while other charges involved violence, extortion, or sexual assault; gangs with members inside and outside the prisons often played a role. Dozens more officers have been fired, but not arrested, for misconduct related to contraband.[10]

[10] *See, e.g.*, Danny Robbins & Carrie Teegardin, *Hundreds of GA prison employees had a lucrative side hustle: They aided prisoners' criminal schemes*, ATLANTA JOURNAL-CONSTITUTION, Sept. 21, 2023, https://perma.cc/2P34-TXLJ.

Scores of people have been charged or sentenced in high-profile criminal cases arising from illegal conduct by people incarcerated by GDC or by GDC employees that has harmed people inside and outside the prisons. For example:

- In February 2023, the Warden of Smith State Prison, Brian Adams, was arrested on Georgia RICO charges for his alleged involvement in an extensive drug-smuggling conspiracy led by a person who was incarcerated at Smith. The same incarcerated man who allegedly led the drug smuggling conspiracy also has been charged with directing two 2021 murders in the local community: the death of an elderly citizen, Bobby Kicklighter, in his home in January 2021, in an apparently botched murder-for-hire intended to target a different person; and the death of a young woman, Jessica Gerling, a former GDC CO, in June 2021.

- In September 2023, Thomas White, a person incarcerated by GDC, pleaded guilty to multiple criminal counts related to his involvement in a drive-by shooting that occurred in 2021 near a Marietta, Georgia, apartment complex and Home Depot. The shooting resulted in significant damage to two separate units, both of which were occupied at the time of the shooting. Mr. White allegedly used a contraband cellphone from a GDC prison to instruct his free-world associates to commit the shooting.[11]

- In November 2023, 23 individuals, including several individuals who were incarcerated at six different GDC prisons, were charged in a sweeping federal indictment stemming from gang-related crimes committed from inside and outside GDC prisons, including stabbings and assaults committed at multiple GDC prisons in 2020; a shooting death in the outside community in Griffin, Georgia, in December 2020; and a home arson in early 2021. In a separate federal indictment the same month, a man incarcerated at Telfair State Prison received a federal sentence of life in prison for his leadership role in a massive, gang-related drug trafficking conspiracy; a GDC CO also was sentenced in the case, for helping to move contraband into the prison at the incarcerated gang leader's direction.

[11] Press Release, Georgia Office of the Att'y Gen., Four Convicted in Gang-Related Drive-by Shooting (Nov. 1, 2023), https://perma.cc/M82F-VKKW.

Violence in the Georgia prisons has reached a crisis level. The state fails to take appropriate steps to provide reasonable protection from harm to the incarcerated people in its custody. It also fails to protect the public from criminal activities which spill into the outside community. Those incarcerated by GDC, as well as GDC employees, face an ongoing substantial risk of serious harm due to the lack of controls and violent conditions in Georgia's prisons.

## INVESTIGATION

In 2016, DOJ launched a statewide investigation into whether GDC adequately protects incarcerated persons who are LGBTI from sexual abuse by staff and by other incarcerated persons. In 2021, DOJ expanded the investigation to include protection of all incarcerated persons at the medium- and close-security-level prisons from violence by other incarcerated persons.

The investigation was conducted jointly by the Special Litigation Section of the Civil Rights Division of the United States Department of Justice and the United States Attorney's Offices for the Northern, Middle, and Southern Districts of Georgia. As part of the investigation, between 2022 and 2023, DOJ visited 17 GDC prisons – about half of the state prisons – representing geographically and demographically diverse areas throughout the state and correctional populations that are the focus of this investigation.[12] DOJ conducted hundreds of private, one-on-one interviews with incarcerated persons and many more brief conversations while touring the facilities; conducted several dozen interviews with GDC facility staff, investigators, and executive leadership; conducted additional interviews with local coroners, first responders, prosecutors, and employees from other Georgia state agencies; and reviewed tens of thousands of records from GDC, other Georgia state agencies, and third-party entities such as local coroners, EMS providers, and community stakeholders. We also reviewed thousands of additional records, including documents from third parties and stakeholders, court records from third-party cases, historical sources, and public reports.

We worked with four highly qualified expert consultants in conducting this investigation. One is a former high-level state corrections official with decades of experience working in and running state prisons. One is a former law enforcement official who served in a leadership role in a large county jail system, with expertise in data analysis, policy implementation, and staffing assessments. Two are certified Prison Rape Elimination Act[13] (PREA) auditors with specialized expertise in sexual safety in correctional environments, one of whom served as a former inspector general of a state prison system, and both of whom bring expertise in policy development, training, and special

[12] As part of this investigation, DOJ visited the following prisons in 2022 and 2023: Lee Arrendale State Prison, Ware State Prison, Hays State Prison, Walker State Prison, Calhoun State Prison, Pulaski State Prison, Baldwin State Prison, Georgia Diagnostic and Classification Prison, Macon State Prison, Coastal State Prison, Smith State Prison, Telfair State Prison, Rogers State Prison, Dooly State Prison, Wilcox State Prison, Phillips State Prison, and Augusta State Medical Prison.

[13] 34 U.S.C. § 30301 *et seq.* The regulations implemented to enforce PREA, 28 C.F.R. part 115 *et seq.*, collectively referred to as the PREA Standards, require zero tolerance for sexual abuse and sexual harassment of incarcerated persons, and detail a series of policy and practice reforms aimed at reducing correctional sexual abuse and sexual harassment and ensuring adequate response thereto.

considerations affecting incarcerated persons who identify as LGBTI or gender non-conforming.

Shortly after launching the expanded investigation in September 2021, DOJ issued a first request for documents to GDC. GDC refused to produce most of the requested materials until mid-2023, after DOJ issued an administrative subpoena and sought and obtained court enforcement of the subpoena. GDC also severely limited DOJ's access to its prison facilities and to staff interviews until the district court entered a protective order for the documents DOJ had subpoenaed. Prior to the court's entry of the protective order, GDC restricted DOJ's access to areas of the prisons accessible to incarcerated persons and facilitated interviews with incarcerated persons but not with staff.

Even after GDC began to produce the requested records, we encountered challenges in gathering documents. GDC ultimately produced records sufficient for DOJ to make findings, but the agency delayed or objected to production of some of the material, including investigation records. We gave GDC an opportunity to provide records that could have clarified, corrected, or disputed information from other sources, including interviews of staff and incarcerated persons. Although GDC eventually completed production of documents responsive to our first subpoena, which was overseen by a federal court, as of the time of publication of this report, GDC still has not completed production of documents responsive to other requests, including a subsequent subpoena issued in mid-2022 for records related to each of the facilities visited by DOJ. Although GDC ultimately produced over 19,000 records, the process of obtaining records and information from GDC was unnecessarily contentious and lengthy.

Throughout the investigation, we also sought and obtained information from state entities other than GDC, including the Peace Officer Standards and Training Council (POST), which trains and, in some cases, investigates GDC officers; the Georgia Bureau of Investigation (GBI), which conducts some criminal investigations involving the prisons; the State Board of Pardons and Paroles, which serves as a reporting entity for sexual abuse allegations; and the Governor's Office of Planning and Budget.

We also sought and obtained information from third-party sources. These included emergency response companies, local coroners, medical providers, community-based rape crisis centers, legal organizations and law firms representing people in GDC's custody or their survivors, and stakeholders such as community activists, currently and formerly incarcerated people, their loved ones, and current and former employees of GDC. Through these sources, we obtained thousands of pages of documents, some of them official GDC documents obtained by third parties via open records requests.

We also conducted hundreds of interviews with stakeholders. We received more than one thousand letters, emails, and other communications from people who are currently incarcerated in Georgia prisons, as well as their loved ones and grassroots advocates. We are grateful to the many members of the community who met with us and wrote to us to share their experiences.

# DEFICIENT CONDITIONS IDENTIFIED

GDC fails to provide incarcerated persons housed at the medium- and close-security levels with the constitutionally required minimum of reasonable physical safety. GDC also fails to provide incarcerated persons who are LGBTI reasonable protection from sexual abuse. Failure to provide adequate staffing and supervision, to maintain basic correctional operations, and to adequately deter, report, and investigate incidents has created an environment of fear and complacency. Violence, including sexual assaults, stabbings, beatings, and other brutal violence, is a systemic problem in prisons across the state. Staffing levels at prisons housing people at the medium- and close-security levels are inadequate to protect incarcerated people from harm. In many instances, door locks are inoperable or manipulable. Gangs control housing units, directing where other incarcerated people sleep and extorting incarcerated people and their families for money. Contraband weapons, illicit drugs, and cellphones are commonplace across the system. GDC therefore fails to protect incarcerated persons from violence and harm, including sexual violence and harm. GDC's practices also fail to provide reasonable protection to LGBTI people, a vulnerable group in confinement settings, from sexual abuse. Incarcerated persons, GDC staff, and the public are in danger due to GDC's failure to maintain a reasonable level of safety in its prisons.

## A. The State of Georgia Fails to Reasonably Protect Incarcerated Persons from Violence.

### 1. GDC allows frequent, pervasive violence in the prisons, resulting in serious bodily harm and, in some cases, death.

The Eighth Amendment prohibits cruel and unusual punishment, which includes gratuitous levels of violence at the hands of other incarcerated people.[14] The Constitution therefore imposes a duty on the State to take reasonable measures to protect the people in its custody from harm.[15] A reasonable response does not require preventing every instance of harm, but it does require responding in an objectively reasonable manner to known risks, such as by providing adequate supervision of the

---

[14] U.S. Const. amend. VIII; *Farmer v. Brennan*, 511 U.S. 825, 833–34 (1994); *Dickinson v. Cochran*, 833 F. App'x 268, 271 (11th Cir. 2020); *Q.F. v. Daniel*, 768 F. App'x 935, 944 (11th Cir. 2019).

[15] *Farmer v. Brennan*, 511 U.S. 825, 828, 832–33 (1994); *Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312, 1319–20 (11th Cir. 2016); *Dickinson v. Cochran*, 833 F. App'x 268, 271 (11th Cir. 2020); *Q.F. v. Daniel*, 768 F. App'x 935, 944 (11th Cir. 2019).

incarcerated population, proper classification, training of officers, and sufficient searches to limit dangerous contraband.[16] The State fails to meet its constitutional obligations when it takes actions it knows "would be insufficient to provide inmates with reasonable protection from violence" and when there are other means available, but they are disregarded.[17]

Abdicating its constitutional obligations, Georgia has failed to protect people in its custody from violence. The State continues to run its prisons as it has for years, without taking reasonable measures to change course and improve conditions. The consequences reflect systemic breakdowns in basic correctional practices, including staffing and supervision, security systems, contraband control, physical plant, classification, and housing. A loss of control over the prisons has set in, with near-constant, life-threatening violence functioning as the norm.

According to GDC, from 2018 through 2023, 142 people have been killed in GDC prisons, on the

## DEATH AT HANCOCK

On May 22, 2022, following evening chow, an incarcerated person who identified as LGBTI was beaten and stabbed to death by multiple gang members inside a dorm at Hancock State Prison. The victim tried to escape from the attackers by jumping through the stair railings onto the floor below, where the attackers then circled and continued to stab and curse at the victim.

Another incarcerated person was severely injured while attempting to stop the assault. A third incarcerated person stayed with the victim and attempted to apply pressure to the victim's wounds, an act which he said he maintained while GDC staff were delayed in entering the dorm.

According to an incarcerated person who witnessed the attack, the day before the homicide, the victim repeatedly asked to be moved because their life was in danger in their housing unit. The incarcerated person who had attempted to stop the victim's bleeding was transferred to another GDC prison the next day; he claimed that he required protection there because he was targeted by members of the same gang as the assailants.

---

16 *Dickinson*, 833 F. App'x at 272–73; *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1100–02 (11th Cir. 2014); *Bowen*, 226 F.3d at 1320.

17 *LaMarca v. Turner*, 995 F.2d 1526, 1539 (11th Cir. 1993).

**"SHAMEFUL"**

In October 2020, at Georgia State Prison, an incarcerated man was taken to the hospital by ambulance for a cut to his forehead and dark ligature marks around his neck. He reported that his bunkmate had tried to kill him by wrapping a sheet around his neck.

Less than five months later, an ambulance returned to GSP to pick up the same man. This time, he had yellow and purple bruising on the entire right side of his face, a deformity indicating a possible jaw fracture, and multiple human bite marks all over his body. The man was so malnourished that every bone in his spine was bruised. He reported that he had been kicked in the face, people had been stealing his food for months, his bunkmate had been sexually assaulting and raping him, and nobody was helping him. He said that he had not eaten in five days.

The emergency services provider wrote, "This patient is scared. His body is wasting away and covered in signs of abuse. How this has not been noticed by prison staff and tended to before now is shameful."

State's watch. According to GDC mortality reports, in 2018, there were 7 homicides systemwide; in 2019, that number jumped to 13 homicides. Since then, there have been well over 20 homicides in GDC prisons every year, with 28 in 2020, 28 in 2021, 31 in 2022, and 35 in 2023, according to GDC data. And in the first five months of 2024, there were 18 confirmed or suspected homicides in GDC custody, based on GDC's reported homicide totals and other documentation.[18] The rate of homicides in Georgia prisons significantly exceeds the national average. The national average homicide rate in state prisons across the country for 2019 was 12 per 100,000 people. Georgia's rate in 2019 was almost triple, at 34 per 100,000 people, and the numbers of homicides have increased precipitously since then.[19]

In addition to deaths due to violence in the prisons, other serious and life-threatening incidents are exponentially more frequent. Assaults with weapons, fights, sexual assaults, and other violent incidents are common. In interviews at 16 of the 17 GDC prisons we visited in 2022 and 2023, incarcerated people consistently reported that they have witnessed life-threatening violence, including stabbings, and that weapons are widespread in the

[18] GDC's numbers of verified and suspected homicides do not include an additional apparent homicide death in early 2024. *See* Rob DiRienzo, *Man Killed in Georgia Prison Laid There for Hours Before Guards Came, Autopsy Suggests*, Fox 5 Atlanta, (June 10, 2024, 5:58 PM), https://perma.cc/YPW2-5T8V.

[19] The Bureau of Justice Statistics latest report identifying national averages is current up to 2019.

prisons.[20] While GDC incident reports document a longstanding pattern of serious violence inside the prisons, we believe many violent incidents often go unreported when they occur in unsupervised housing units or other areas with inadequate staff supervision. In interviews with DOJ, incarcerated people explained that they do not always report incidents because they do not expect staff to take any action in response. Emails, letters, and calls to DOJ from incarcerated people and their concerned loved ones also reported constant fear for physical safety, as well as incidents of violence that our correspondents had personally experienced or witnessed.

Based on GDC's records, the levels of reported incidents of violence within the GDC system are consistently high. From January 2022 through April 2023, there were more than 1,400 reported incidents of violence, including fights, assaults, hostage incidents, and homicides, across the close-security prisons and most of the medium-security prisons.[21] Over this period, the overall incidence of violence gradually increased. Of these incidents, 19.7% involved a weapon, 45.1% resulted in serious injury, and 30.5% resulted in offsite medical treatment.

These numbers do not capture the full scope of violence within the system. First, violent incidents are consistently underreported due to a lack of staff supervision and other factors, causing some incidents never to be reported at all, as discussed later in this Findings Report. Second, violent incidents are often mischaracterized using inappropriate incident-type categories, resulting in under-counting of violent incidents such as assaults and fights.

[20] One smaller prison we visited, Walker State Prison, was a notable exception, with fewer incarcerated people reporting they feared for their lives, and a much higher proportion of security staff positions filled. Along with more robust programming, the more manageable staffing levels at Walker appeared to allow the prison to operate with less violence and contraband, and more rehabilitative programming, than the other prisons DOJ visited. There have been no reported homicides at Walker State Prison in the past several years. We believe that Walker State Prison, along with a handful of other smaller facilities with better staffing and programming, shows that larger-scale improvement is possible with an appropriate strategy and sufficient resources.

[21] For this analysis, the Department reviewed incident data produced from GDC from January 1, 2022 to April 26, 2023, for Lee Arrendale State Prison, Augusta State Medical Prison, Autry State Prison, Baldwin State Prison, Calhoun State Prison, Central State Prison, Coastal State Prison, Coffee State Prison, Dooly State Prison, Georgia Diagnostic and Classification Prison, Georgia State Prison, Hancock State Prison, Hays State Prison, Johnson State Prison, Macon State Prison, Phillips State Prison, Pulaski State Prison, Rutledge State Prison, Smith State Prison, Telfair State Prison, Valdosta State Prison, Ware State Prison, Wheeler State Prison, and Wilcox State Prison. These constitute 24 of the approximately 34 prisons in the Georgia Department of Corrections housing incarcerated men or women at the close- and medium-security levels.




The risk of life-threatening violence exists across GDC's prisons, with noteworthy spikes in violence at numerous facilities. Over the course of our investigation, no one prison could be singled out as the locus of violence. In 2020, eight homicides occurred at Macon State Prison, more than any other Georgia prison that year. In 2021, the highest number of homicides at any one prison occurred at Smith State Prison. In 2022, Phillips State Prison had the most homicides, five; there were four homicides at Macon that year. In 2023, seven incarcerated people and one CO were killed in homicides at Smith State Prison.[22] In June 2024, an incarcerated person at Smith State Prison used a contraband gun to kill a food-service worker and then take his own life. In March 2024, the Warden of Telfair State Prison was stabbed by an incarcerated person during a disturbance that arose after a shakedown.[23] Other prisons across the system also have seen high levels of homicides and other serious incidents. For

[22] Press Release, Georgia Dep't of Corrections, Correctional Officer Killed (Oct. 1, 2023), https://perma.cc/Q3YM-BN5M.

[23] *See* Carrie Teegardin & Danny Robbins, *Prisoner Stabs Warden at Telfair State Prison*, ATLANTA JOURNAL-CONSTITUTION, Mar. 20, 2024, https://perma.cc/RF9S-ZPL9. GDC records confirm the basic details.

example, in 2020, there was a major riot at Ware State prison, in which incarcerated persons obtained facility keys, let scores of other incarcerated persons out of their housing units, including in restrictive housing units, held officers hostage and stabbed officers, set fires inside a housing unit office and burned a GDC transport cart, and broke into an office and obtained officers' weapons and defensive gear. The riot resulted in several hospital transports, including four officers, one via helicopter life-flight. Although different prisons have been the most violent at different times, what has been consistent is that the total number of homicide deaths systemwide continues to be extremely high.

GDC blames gangs for the violence in the prisons, along with the fact that many of the people in its custody have been sentenced for violent crimes. But the modest increase in the proportion of the men's prison population incarcerated for violent crimes (not including sex offenders) – from approximately 51% in 2016 to 56% in 2023 – does not explain the dramatic rise in violence in the prisons over the past five or so years. And although some of the prisons with high numbers of homicides are among the GDC prisons housing the highest numbers of validated gang members, others that have also seen high numbers of homicides and other serious violence have relatively low gang populations.

**A PLEA FOR HELP**

In August 2022, staff at Pulaski State Prison, a women's prison, received a call from outside of the prison, advising that an incarcerated person was being stabbed in a dorm.

Staff was instructed to tour the dorm for safety and security, and report back. Staff reported that all was secure and there were no problems to report, but later they heard a faint cry for help coming from the window of the dorm.

When staff responded to the cell, they found an incarcerated woman locked in her cell and slumped over the toilet. She had a gash on her head and was bleeding profusely. She was holding her left side, crying, and saying she could not breathe.

The woman had dark red marks across her back and a bruise in the shape of a footprint. She was wearing a medical gown and no underwear. She reported she was assaulted hours ago by more than 10 people, that she was stomped on, hit, and kicked. Incarcerated people forced her into the shower to wash the blood off. She was transported to the hospital.

Moreover, national data and mortality data from comparable states also strongly suggest that Georgia's homicide rate has consistently been much higher than can be explained by GDC's population trends. Regardless, as the Supreme Court has explained, the State, after incarcerating people who have demonstrated criminal and, at times, violent conduct, and "having stripped them of virtually every means of self-protection and foreclosed their access to outside aid," is "not free to let the state of nature take its course."[24]

**REPEAT ASSAULTS AT PHILLIPS**

On August 3, 2020, an officer at Phillips State Prison was conducting rounds in a housing unit when an incarcerated person handed him a note stating that an incarcerated person in another cell had been held hostage for days, was yelling for help, and might be injured. In May 2023, DOJ interviewed the victim, who reported that he had been held and tortured for almost four days, he had been stabbed from behind and his eye was pierced, and he suffered a traumatic brain injury.

Almost exactly a year later, on August 12, 2021, the same assailant assaulted another incarcerated person at the same prison; the victim of the second assault required outside medical treatment at a hospital.

Sexual violence also is a systemic issue across Georgia prisons. GDC reported 635 sexual-abuse allegations in 2022 (the most recent year for which a systemwide PREA report is available), 639 in 2021, 702 in 2020, and 653 in 2019.[25] These numbers likely fail to capture the scope of the harm, as incarcerated people explained that sexual assaults are not reported, either for fear of retaliation from those who assaulted them, or because incarcerated people believe GDC will fail to address their complaints.

In some instances, victims accessing medical attention shed light on the severity of the problem:

- At Pulaski State Prison, in February 2022, an incarcerated woman was transported to the hospital for vaginal bleeding and stomach pain. She alleged that her roommate sexually assaulted her with a hot sauce bottle and that she

---

[24] *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).

[25] These allegations include sexual abuse of incarcerated people by other incarcerated people and by GDC staff.

yelled for an officer, but no one came to the cell to help. She reported continuing to suffer flashbacks to the assault.

- At Smith State Prison, in May 2020, GDC staff informed emergency services responders that an incarcerated person had been tied up, beaten, and waterboarded by his cellmate. The cellmate also inserted multiple bars of soap into the victim's rectum. One bar of soap, covered in stool and blood, had already fallen out. The victim suffered multiple contusions to his face and chest and was bleeding heavily from his nose and mouth. He had ligature marks on his neck and still had makeshift binding around his wrist. He was transported to a local hospital; while he was being moved to an emergency-room bed, two more bars of soap fell out of his rectum. The hospital found that most of his upper teeth had been broken during the assault. One hundred-fifty milliliters of blood was suctioned from his airway.

From within GDC prisons, incarcerated people frequently use contraband cellphones to record assaults or to contact family and friends of incarcerated people. Incarcerated persons and their loved ones report that other incarcerated people have been assaulted or threatened with violence in efforts to extort money from family or loved ones outside the prisons, and GDC's own homicide investigations have uncovered evidence of extortion. Desperate, members of the community have reached out to GDC, calling to get their loved one to safety, but the problem persists. Over the past several years, a steady stream of contraband cellphone videos and photographs appearing to show assaults, incarcerated people with injuries, weapons, and incarcerated people who seem to be under the influence of illicit drugs – all while inside Georgia prisons – have been shared to social media, the press, and community stakeholder groups, painting a picture of lawlessness and disorder inside GDC prisons.

Even when GDC had ample notice that DOJ would be visiting their prisons, several serious incidents occurred during, immediately before, or in the immediate aftermath of our site visits, including the following:

- Shortly before DOJ visited Wilcox State Prison for a site visit in June 2023, a video shot on a contraband cellphone circulated on social media, appearing to show an incarcerated person assaulting another incarcerated person outdoors on a prison walkway, while an officer watched. GDC records confirm that multiple officers, including those in supervisory positions, brought an incarcerated person who served as a "warden's orderly" to the victim's housing unit to help move the victim to another part of the prison. The victim already had been assaulted by another incarcerated person inside his housing unit. Prison staff then allowed the assailant to strike the victim and to use a cart to drag the victim, who was lying limp, along an outdoor walkway, with one bare

foot dragging on the pavement. Two Wilcox COs were terminated from GDC employment shortly thereafter.

- DOJ conducted a two-day site visit at Rogers State Prison in March 2023. Shortly after DOJ left the facility on the first day, in the early evening, an incarcerated person was assaulted by another incarcerated person, requiring outside medical attention at a hospital. Between that night and the following morning, there was another violent incident in a different housing unit, also resulting in serious injuries. The following day, DOJ interviewed two incarcerated people who said the second incident occurred in their housing unit, that it was a gang-related fight involving multiple knives, and that at least one individual was stabbed and taken to the hospital.

- On March 27, 2023, Smith State Prison went into lockdown immediately before a DOJ site inspection. GDC imposed the lockdown because of a fight with weapons early that morning following the serving of a Ramadan breakfast inside the D-2 dorm. Seven individuals required hospitalization, two by air evacuation. The melee allegedly began when members of various gangs retaliated against an incarcerated person self-identifying as a Muslim for a previous incident while there were no officers in the dorm. The Incident Response Team took about an hour to respond. Several incarcerated persons were seriously injured, requiring two medical airlifts and five ambulance transports to hospitals. These incidents occurred less than two months after the warden of this facility was arrested for his alleged participation in gang contraband smuggling.

- Shortly after DOJ interviewed several incarcerated people on-site at Coastal State Prison in the fall of 2022, one of the people we interviewed, a transgender woman with a diagnosis of gender dysphoria and a history of mental health issues, died of an apparent suicide.

- On June 27, 2022, the second day of DOJ's site visit to Ware State Prison, an incarcerated person there was blindfolded, tied up, beaten, and burned by other incarcerated people. He went to the medical unit where he was diagnosed with first- and second-degree burns. DOJ interviewed him the next day and observed burns on his body and injuries to his face. The victim said that he reported the assault to staff, but they did nothing. After the interview, DOJ informed GDC that the victim likely needed mental health and medical attention. The victim subsequently was moved to medical housing.

- Shortly after DOJ's visit to Ware, we learned that another man we had interviewed there had died days later. On June 29, 2022, in an interview at

> Ware State Prison, an incarcerated person reported that he had gone almost a year without a mattress. That week, he was blocked from going to the bathroom by another incarcerated person, who chased him with a broom and a rock. He defecated in his pants. He described experiencing post-traumatic stress disorder, said that GDC was worse than his time seeing combat in the military, and explained that drugs are easy to acquire in the facility. Four days after the interview, he died from a drug overdose. On July 3, 2022, incarcerated persons at Ware found him slumped over a second-floor cell block railing. He was left there for several hours because there were no officers in the control center and staff failed to come to the building. Video shot by incarcerated people on a contraband cellphone showed this man's apparently unconscious body draped over an upper-tier railing for an extended period of time. In the video, the individual holding the camera says, "we have an inmate here that is dead . . . for the past two-and-a-half hours. It's crazy. This is crazy." The victim's cause of death was acute methamphetamine toxicity.

GDC likewise failed to protect individuals interviewed by DOJ from violence in the months and years after facilitating those interviews. In late May 2024, an incarcerated man whom DOJ interviewed at Macon State Prison in early 2023 reportedly died by homicide at Augusta State Medical Prison, where he had been transferred. The victim was attacked on multiple occasions in the years prior to his death. Two other incarcerated people and a GDC CO have been criminally charged.

### 2. GDC's grossly inadequate staffing leaves incarcerated persons unsupervised and hampers staff's ability to respond to violence.

Incarcerated people in GDC's custody are at substantial risk of serious harm due to severe understaffing in Georgia prisons. In the past several years, staffing in GDC prisons has been too low to provide reasonable supervision. Vacancies and turnover are high, especially among security staff who are directly responsible for supervising incarcerated persons. GDC has failed to improve its dire staffing problems. Maintaining adequate staffing levels and ensuring supervision of the population are critical components of a safe and secure prison facility, particularly protection from harm including from violence and sexual abuse. Failure to maintain sufficient staff and supervision may show deliberate indifference to substantial harm in prisons, in violation of the Eighth Amendment.[26]

---

[26] *See Marbury v. Warden*, 936 F.3d 1227, 1235 (11th Cir. 2019) (explaining that deliberate indifference may include evidence of "pervasive staffing and logistical issues rendering prison officials unable to address near-constant violence, tensions between different subsets of a prison population, and unique risks posed by individual prisoners or groups of prisoners due to characteristics like mental illness"); *Dickinson v. Cochran*, 833 F. App'x 268, 272–73 (11th Cir. 2020); *Q.F. v. Daniel*, 768 F. App'x 935, 946

GDC leadership has long presided over a system with severe staffing shortages, with systemwide CO vacancy rates over 50% since mid-2021 – too low to operate reasonably safe and functional facilities.[27] Beginning in the mid-2010's, a downward trend in staffing numbers already had begun. From 2014 to 2018, GDC's annual average CO vacancy rate climbed from almost 11% to over 18%. Between 2018 and 2023, GDC staffing levels fell precipitously, reaching a systemwide CO vacancy rate of 60% in April 2023, with over 2,800 vacant officer positions. GDC claims that, by the end of 2023, they were hiring more security staff than they lost and were no longer netting negative hiring numbers. Nevertheless, GDC's systemwide correctional officer vacancy rate remains above 50%. Indeed, as of the end of 2023, GDC still had over 2,800 unfilled CO positions.[28]

**GDC is operating most of its close- and medium-security prisons with more officer posts vacant than filled.**

Moreover, GDC's most violent prisons have much higher staff vacancy rates than the systemwide average. In April 2023, the vacancy rate was over 60% at 20 medium- and close-security prisons; twelve of these prisons had vacancy rates above 70%. By the end of 2023, CO vacancy rates remained in the same range at GDC's most dangerous prisons. In December 2023, the vacancy rate was over 60% at 18 medium- and close-security prisons; ten of these prisons had vacancy rates above 70%. Most of the GDC facilities with much lower CO vacancy rates were less violent, lower-security facilities such as transitional centers.

---

(11th Cir. 2019). *See also, e.g.*, *Alberti v. Klevenhagen*, 790 F.2d 1220, 1227–28 (5th Cir. 1986) (upholding district court's finding that inadequate staffing and supervision, among other factors, led to a pattern of constitutional violations); *Van Riper v. Wexford Health Sources, Inc.*, 67 F. App'x 501, 505 (10th Cir. 2003) ("When prison officials create policies that lead to dangerous levels of understaffing and, consequently, inmate-on-inmate violence, [there is a violation of the Eighth Amendment.]").

[27] Our analysis of GDC's staffing inadequacies is based on our review of GDC records, interviews with GDC facility staff and leadership officials, and our observations in the facilities. For the most part, our assessment of staffing vacancies is based on GDC's existing allotted positions and current staffing plans. Other than facility staffing plans, which GDC produced for numerous facilities, we requested, and GDC has not produced, any staffing analyses that GDC may have conducted. Such a comprehensive staffing study and review needs to be conducted as part of any remedy for the State's staffing and retention deficiencies.

[28] Although the COVID-19 pandemic exacerbated GDC's hiring and retention problems, it did not create them. GDC's severe understaffing predates the pandemic. By February 2020, three close-security men's prisons had CO vacancy rates near or over 50%. Turnover, likewise, already was an issue; in January 2020, GDC hired 146 COs and lost 175; in February 2020, GDC hired 134 COs and lost 131. During this pre-COVID period, violence levels in GDC prisons began to rise significantly. For example, in 2019, the number of homicides in GDC prisons jumped to 13; the number had been in the single digits for the previous several years.

## DEATH AT CALHOUN

In February 2023, an incarcerated person was found dead in his restrictive-housing cell at Calhoun State Prison, leaning against the door and wrapped in a mattress padding. About thirty minutes after a GDC officer noticed that the man had not moved for hours, emergency responders were called.

They arrived at the prison at 1:04 p.m., but due to delays waiting for staff to open the prison gates, they were not inside the prison until 1:11 p.m. They confirmed the death and reported that the coroner was needed. Upon arriving, the coroner also had to wait at the prison gate, as no one was there to let him in.

The coroner reported that the incarcerated person's cell was a mess: the mattress torn up on the floor, food trays strewn about. The body was stiff; the coroner believed the person had been dead for seven to eight hours before he was found. Speaking to emergency dispatch later, the coroner said there was "some shit that ain't right about this inmate."

Prior to this person's death, no one had entered his cell for two days. The flap in the door had been locked shut earlier that week. Incarcerated people reported to DOJ that the deceased person had thrown water out of his cell flap and that staff had shut off the water supply to his room, closed the flap, and did not deliver meals to him. His cause of death was dehydration with renal failure.

The reality of these high vacancy rates is that GDC is operating most of its close- and medium-security prisons with more officer posts vacant than filled, resulting in inadequate security and supervision. In December 2023, at eleven close- and medium-security GDC prisons, 100 or more officer positions per facility remained vacant. In fact, between October 2022 and the end of 2023, more than 15 state prisons housing individuals at the medium- and close-security levels saw a net *loss* in filled CO positions, while several others saw increases only in the single digits. In interviews with DOJ in late 2023, staff at large men's prisons housing incarcerated people at the close-security level reported that high CO vacancy rates over 60%, as well as significant vacancies among supervisory security staff, persisted. GDC's purported attempts to address its increasingly dire staffing shortages remain far short of addressing the problem.

Despite modest salary increases and job advertising, GDC has not taken reasonable, proportionate steps to ensure prison staffing that is adequate to protect incarcerated persons from harm. Following a recent salary increase, COs currently make starting salaries in the $40,000 – $44,000 per year range, depending on the security level of the facility at which they

work. Notably, GDC's Human Resources Director acknowledged that GDC still "lag[s] behind in the salary market," so pay remains "a factor." Commissioner Oliver also acknowledged that in addition to compensation, ensuring that the work is a "calling" and that officers have "passion" for their jobs are important to retention. In interviews with DOJ, GDC officials also said they hope that a relatively new contract with a consulting firm to help GDC become "certified as a great place to work by 2027" will increase officer retention through staff training and workshops. However, morale and working conditions for GDC security staff appear to remain a challenge. For example, in employee morale surveys conducted at several facilities in 2023, employees cited as the "worst" aspects of their jobs or as the "biggest challenges" facing GDC, factors including "retaining quality staff," "staff morale," "work environment," and the "safety and security of facilities."

With a systemwide CO vacancy rate over 50%, GDC cannot, and does not, staff the most critical posts or conduct other basic correctional operations in its prisons. According to GDC policy, for a prison to maintain normal operations, allotted posts at the Priority 1, 2, and 3 levels must be filled; of these, Priority 1 posts are considered critical. For example, at the prisons that house incarcerated persons at the medium- and close-security levels, it is generally required that each housing unit be staffed by two or more officers in 24/7 Priority 1 (or otherwise designated as mandatory) posts, with additional Priority 1 posts assigned around the facility, including those stationed at the front entrance and patrolling the perimeter. According to GDC, all incarcerated persons classified as close security – over 11,000 incarcerated people, about 23% of GDC's total population – always require supervision by a CO.

Yet GDC leadership and facility staff acknowledged, and our review of staffing documents confirms, that, at several prisons, Priority 1 posts are consistently and frequently vacant, leaving officers unable to conduct required rounds and other duties, let alone directly supervise the population. Facility staffing records document deviations from mandatory staffing requirements, acknowledging that, due to CO staffing shortages, the minimum requirement of CO coverage cannot be met, and that sergeants and unit managers need to assist with basic housing unit coverage. In practice, however, GDC does not have enough staff, even including supervisory staff, to cover its Priority 1 posts at many of the prisons we visited. GDC documents and our interviews with prison staff illustrate the staffing triage that has become common across the system. Staff at several GDC prisons have adopted a practice of assigning one CO to single-handedly supervise two buildings at a time, each comprising two or more housing units and hundreds of incarcerated people, for an entire 12-hour shift. For example:

- At a large close-security men's prison known for gang problems and violence, a sampling of staffing rosters from day and night, weekday, and weekend shifts in mid-2023 confirmed that the prison is consistently staffed with well under half the security staff needed to ensure coverage of Priority 1 posts. On every shift roster we reviewed, there was at least one, and sometimes up to four, officers assigned to two buildings at a time; in other words, each of those officers was single-handedly responsible for nearly 400 beds. Although for a period of time GDC had assigned additional Special Operations officers to assist with coverage of this prison, those additional officers were reassigned away from the facility, with no plans to replace them. The Regional Director responsible for this facility acknowledged that, in practice, the staff assigned to multiple posts are required to switch posts every 30 minutes to check on incarcerated persons in multiple buildings, leaving units and entire buildings unsupervised during those times.
- At another large men's prison, a sampling of staffing rosters from 2023 showed that facility leadership consistently assigned officers to cover multiple housing units on the same shift, and that on some shifts supervisory security staff were assigned to cover officer posts in housing units. A medical employee who worked at the facility reported there have been times when only two officers were available to cover the entire compound. At times, this employee reported, the perimeter officer would need to vacate the perimeter post to cover security posts inside the facility.
- A shift supervisor at a large medium-security men's prison, whom we interviewed in mid-2023, reported that in a given month, there is unlikely to be a single day on which each building in the prison is covered by at least one officer.

GDC's investigations make clear that staffing shortages place security staff in an untenable position and have contributed to homicides and other serious assaults. For example, an investigation of a homicide at a GDC men's prison in 2021 found that no staff checks had been done after 9:20 p.m. the night before the death; the body was found the next morning around 9:00 a.m. In 2022, at a close-security men's prison, an incarcerated man was killed after being assaulted while handcuffed. The investigation found that the officer on duty was single-handedly supervising a control center as well as both sides of the housing unit building where the homicide took place.

Other incidents reveal that when security staff is stretched this thin, incarcerated people are at greater risk of harm. For example, on a weekend day shift in August 2023, at a large men's prison, one officer was assigned to three separate buildings due to staffing shortages. In the late afternoon, this officer had to leave the prison to escort

a stabbing victim from another building to the hospital; the victim had been stabbed 32 times in his back, head, and stomach. The next day, the same officer was again assigned to three separate buildings due to staffing shortages. The staff logbook from the building where the stabbing took place contains no entry of the stabbing, indeed, there are no entries at all after 8:54 a.m. on the day of the stabbing. Staff logbooks indicate that, the very next day, no officer was assigned to that building for the second shift, again due to staffing shortages. For six of the next eight days, the building's logbook has no entries at all. Despite a stabbing requiring hospital care, GDC failed to improve staffing in the affected housing units the very next day, and continued the status quo of little-to-no supervision in the affected units over the weeks following that incident. This account of GDC's continued inadequate supervision and violence among the population is illustrative of GDC's systemwide staffing problems.

During DOJ's 17 facility site inspections, our experts observed GDC's short staffing in person. While our teams were accompanied by several Special Operations officers brought in to facilitate our visits, generally a smaller number of facility-based staff were present. It was not uncommon on our tours for GDC to temporarily assign dozens of Special Operations staff to the facility, to allow our group to tour the facility and to facilitate incarcerated people's movement to participate in interviews with DOJ. GDC insisted on setting all of DOJ's site visits several weeks or months in advance to facilitate preparations, and repeatedly informed us that our group could not split up while on-site, due to the security challenges multiple escorts would pose. As a result, GDC did not permit DOJ to tour spontaneously and observe normal operations in the prisons. However, we still observed evidence of inadequate staff supervision. For example, in most of the 17 prisons we toured, our experts repeatedly noted that control centers in housing units appeared to be unmanned and found little evidence that they were consistently occupied (e.g., officers' personal belongings, computer equipment such as a mouse or working monitor).

Similarly, GDC records confirmed that, day-to-day, across the close- and medium-security prisons, staffing shortages are a constant challenge for the officers who are working. The security staff tasked with running a prison with insufficient backup are forced to cut corners on important prison functions including rounds and wellness checks, as well as proper documentation and recordkeeping. For example, in a sampling of internal GDC audits from 2023, in 12 out of 13 prison audits, staff failed to properly document required 30-minute cell checks in segregated housing units, with auditors noting that there were lengthy periods of time with no documented checks, or evidence that the checks had been documented before or after the fact, instead of

contemporaneously.[29] One officer reported that staff often are unable to conduct the searches mandated by policy. Without adequate supervision, incarcerated people are at greater risk of violence and other harm due to unchecked gang activity, assaults, extortion, and access to weapons and drugs.

Not only does GDC fail to adequately staff its prisons, it also fails to take reasonable steps to mitigate its staffing shortages. One way to attempt to mitigate the danger posed by housing units with minimal or infrequent officer presence on the ground is to monitor video in the housing units. Yet at multiple facilities, security and leadership staff reported to us that surveillance video in the housing units is not monitored in the housing unit control centers or from central control. While the warden generally has access to housing-unit surveillance video, the shift supervisor and lower-level security staff do not. The result of these practices is that nobody is supervising the population in real time.

GDC's consistent failure to ensure that even minimum staffing levels are met leads to unsafe prisons. With housing units left unsupervised for sustained periods of time, incarcerated persons can engage in illicit activities, including exchanging contraband, abusing drugs, making homemade weapons, fetching contraband via drone drops, and engaging in violent assaults. Violent incidents are more likely to occur. Gangs and other threat groups tend to step in to fill the void in leadership, telling people where they can or can't sleep and exerting control over prison life. When security staff are not present to report incidents, perpetrators may not be held accountable and can continue to cause harm to others. Appropriate follow-up, such as reassigning someone to another housing unit for protection or reclassifying someone who perpetrated an assault, may not occur.

GDC's failure to ensure staff presence, supervision, and enforcement of rules and policy in the prison housing areas contributes to an unsafe environment. Efforts to enforce prison rules and ensure incarcerated people are where they are supposed to be also falter without adequate staff. In hundreds of interviews, incarcerated persons reported to DOJ that officers and other staff are in the housing units infrequently and that housing units and entire buildings often are completely unsupervised. This results in the proliferation of contraband and violence, as well as other rule violations that impede orderly and safe correctional operations. For example, incarcerated persons and staff consistently reported that it is common for incarcerated persons to sleep in beds other than those to which they are assigned, often because other incarcerated persons who have more power in the housing units tell people where to sleep, and

[29] In an internal proposal identifying areas of concern, a GDC official who oversees compliance matters noted that GDC is failing to accomplish appropriate internal training and highlighted short-staffing challenges in the unit that conducts these facility audits.

officers do not notice or fail to correct the relocation. This practice illustrates how GDC staff are not in control of the population.

In the event of an emergency, without adequate staffing, the ability to respond in a timely manner is severely hindered. If an assault or other violent or medically urgent incident occurs while staff are not present, the delivery of critical medical treatment to the injured person or persons may be significantly delayed. For example, in mid-2023, an incarcerated man at a large men's prison died after he was badly injured in a fight with another incarcerated person in a housing unit. A supervisory member of the medical staff recounted that a nurse who responded to the incident was "distraught" after the man died, because, in the immediate aftermath of the assault, medical personnel were not permitted to enter the housing unit due to insufficient security staff to escort them.

We also received reports of concerned loved ones calling the prison to report an ongoing or recent incident of life-threatening or other serious violence occurring in unsupervised areas. In these cases, other incarcerated people have used contraband cellphones to call loved ones, who in turn call the facility to report the assault. GDC incident reports likewise document incidents where staff was alerted to an emergency by a call from outside the prison.

GDC records and EMS reports demonstrate how understaffing causes avoidable delays in providing medical care in emergencies. For example, GDC records on four deaths of incarcerated persons in 2021 describe bodies that were discovered by staff after the onset of rigor mortis, indicating that hours had likely passed since the individual had died. In interviews with DOJ, multiple EMS directors identified delays in reaching patients in the prisons, which were apparently due to GDC staffing inadequacies. For example, one EMS director said that security staffing shortages appear to affect the ability of EMS teams to reach incarcerated people in need of emergency medical care. This EMS director estimated that EMS teams are delayed an average of 30 minutes during emergency responses to a GDC prison, waiting for security staff to open the three gates necessary to access the prison's medical department. The EMS director also said that overnight staffing appears to be a significant issue, noting that there have been instances where it appeared that an emergency had occurred during the night shift, but prison staff had not requested EMS until the next day. The EMS director also described difficulties in obtaining security escorts for EMS hospital transports due to security staff shortages.

Numerous incidents from across the system highlight how understaffing has contributed to delays in necessary medical care reaching incarcerated persons who have been harmed in violent incidents. For example:

- In June 2022, emergency services responded to Coastal State Prison for an unresponsive person. When they arrived, after some delay, they were taken to a cell where an incarcerated man lay dead on the ground. The body had rigor mortis, and was "pale and cool to the touch." GDC staff informed emergency responders that the man was in rigor when they got to him and that they found a syringe near his bed. The cause of death was an overdose.

- On August 20, 2021, emergency services responded to Georgia State Prison for a stab wound. An incarcerated person reported that he was hog tied all night, stabbed, and then released in the morning after being tied up for over eight hours. Emergency responders noted indentations on the incarcerated person's arms and legs where he was tied. He was airlifted to a hospital.

- On December 8, 2020, emergency services responded to Georgia State Prison for an incarcerated person suffering burns to 90% or more of his body. The incarcerated person reported that he was using the phone, laid it down onto the metal flap of his door, and then it caught fire. The fire ignited his clothes and then burned his body. Emergency responders observed burns on his chest, abdomen, back, armpits, left hand, groin, penis, testicles, buttocks, legs, and feet. The man was in extreme pain. Staff reported that the incident was suspected to have happened around 4:00 p.m. to 5:00 p.m., but the incarcerated person was not brought to the medical unit until around 10:24 p.m., just prior to calling emergency services. Transport to the hospital was delayed because prison security staff did not have an officer ready to go. The incarcerated person was eventually airlifted to a hospital.

- An incarcerated person was stabbed multiple times on May 23, 2022, at Ware State Prison. There was no security staff in the dorm, so other incarcerated people beat on the window to draw the attention of staff. It took half an hour for someone to respond. The victim was taken to the hospital, where he was diagnosed with a collapsed lung from a stab wound. After five days in the hospital, he returned to Ware and was locked down in isolation. He was never interviewed about the incident.

Given these delays, it is commonplace for incarcerated people to tend to their own injuries and medical needs after a fight or an assault. We interviewed incarcerated people who reported cleaning and dressing their own or others' wounds in unsupervised prison areas, using things like toothpaste, coffee grounds, dirt, and makeshift bandages to dress open wounds; medical records corroborated some of these accounts. For example, in an incident report from a large close-security men's prison in August 2023, an officer reported that he was approached in an outdoor area of the prison in the middle of the night shift, by three incarcerated men wheeling

another incarcerated person on a cart to the medical unit. The officer reported that after calling 911 he escorted the victim to medical, where his homemade wound dressings were removed to expose large cuts on his stomach and upper arm. The victim was not alert and intermittently losing consciousness. The officer also noted that the incarcerated people likely exited their housing unit through a fire-exit door and cut a large hole in fencing to reach the medical unit.

Understaffing causes other systemic deficiencies as well. Reporting and recordkeeping is severely hindered by the lack of staff. For example, security staff from different facilities reported that in some cases an officer covering two separate buildings carries a logbook from building to building to log during their shift. At another facility, security staff call logbook entries to central control, where they are logged by the officer on duty there. Our review of prison records confirmed that in many instances logbooks are labeled for more than one housing building. Failing to maintain a logbook at a dedicated security post is not sound correctional practice, and jeopardizes prison safety and control. The purpose of a logbook is for staff to record what is occurring on the security post. The practice of carrying a logbook from one building location to another can result in information not being recorded for the post. Security staff arriving at a post, on rounds or otherwise, may assume there is no logbook, or may not obtain critical information from the logbook. Similarly, if one logbook is maintained in central control, and entries must be called in, correctional staff will have limited access to the logbook, both for purposes of entering information and reviewing entries from prior shifts. Additionally, moving logbooks around the prison as a matter of course can result in the logbook being damaged, misplaced, or taken by incarcerated persons.

Understaffing also can lead to infrequent security and wellness checks and failure to properly document security rounds and other central functions of correctional security staff. GDC's internal facility audits confirm serious failures in security-related documentation and recordkeeping in multiple operational components that directly affect safety. For example, the audits found evidence that supervisors had cleared counts despite discrepancies, and that count packets, count slips, and other documentation related to counts were inaccurate. The 2023 facility audits also identified delays in submitting incident reports; inaccuracies and discrepancies in documentation related to contraband control; incomplete documentation and logs for visitor records and facility entry; inconsistent implementation of required checks and documentation thereof in segregated housing areas; failure to maintain appropriate lists and other records of chemicals, tools, and other materials that could be used for illicit purposes; and inadequate inspection procedures, resulting in irregular performance of required tests.

The audits also indicate that wellness checks are not conducted as required by policy. For example, 2023 internal compliance audits of operations in segregated housing units in several GDC prisons found evidence of improper documentation of thirty-minute checks in administrative segregation: instead of documenting thirty-minute checks next to each cell door when they occur as required for the safety of individuals in these units, officers likely had back-filled the check logs at the end of a shift.

Adequate security staffing and supervision are essential to a minimally safe and secure prison. GDC's failure to ensure adequate staffing in the prisons contributes to harm from violence and to unsafe facilities across the state.

### 3. GDC prisons are unsafe due to aging and inadequately maintained facilities and failure to ensure adequate lock, tool, and key controls.

Working locks, systems to monitor the use of tools and keys, and adequate preventive maintenance are essential components of prison security. If a prison facility is not physically secure, incarcerated people, as well as employees and visitors, are at an unacceptable risk of harm due to uncontrolled movement. Additionally, damage to facility hardware and infrastructure poses risks to incarcerated persons' physical safety, as furniture and fixtures can be dismantled to make weapons, holes in ceilings and walls can be used to gain access to unauthorized areas or to hide contraband, and dilapidated and unsanitary conditions can lead to internal tension. GDC fails to maintain its prisons in reasonably safe and secure condition, placing incarcerated people and others inside and outside the facilities at unacceptable risk.



*A hole in the wall at a men's prison in 2023.*



*Damaged shower door in a housing unit at a GDC men's prison in 2023.*

GDC's internal facility audits, as well as information DOJ obtained from facility site inspections and interviews with staff and incarcerated people, establish that GDC does not take the steps necessary to maintain secure prisons, including timely preventive and corrective maintenance. Problems with lock functionality are documented in GDC's internal audits of multiple prisons. Leadership has acknowledged that aging facilities raise challenges across the system, with the average GDC prison over 30 years old and reaching "end of life," according to a recent public presentation by the Commissioner.

Staff from several prisons reported that incarcerated people are able to manipulate cell-door locks, damage door hinges, and otherwise tamper with security hardware and infrastructure; incarcerated people then are able to exit cells unauthorized, and even exit housing units to go to different areas of the prison at all hours. One warden told DOJ that door locks in his large facility are frequently "popped"; a captain at the same facility said that incarcerated people pop the locks of their cells "all the time," and sometimes of the housing units. According to staff at another prison, doors in the medical unit, including doors that lead to the administrative offices, have not had working locks for at least 17 years, and incarcerated people walk into the staff breakroom and steal food from the refrigerator on a regular basis. During site visits, DOJ experts repeatedly observed malfunctioning lock indicator lights, padlocked doors, and improperly secured areas.




*Engaged padlocks on restrictive housing unit cell doors in a close- security GDC prison in 2022. An officer at this prison later told DOJ that padlocks are not used on cell doors at this prison.*

Frequently, GDC fails to promptly fix things that break in its facilities – even when the thing that is broken is as central to prison operations as a lock or key. A 2023 GDC facility audit found that staff failed to submit maintenance requests for broken keys. Staff at the same prison explained in an interview with DOJ that the officer designated to perform lock-and-key duties is frequently pulled from that assignment to cover security posts, and therefore is unable to maintain the lock-and-key system at the prison. Staff from GDC prisons said that getting broken locks fixed is

a perennial challenge due to issues including short staffing, not having a locksmith on staff at the prison, or challenges obtaining parts to fix old locks.



*Exposed wiring and damaged fixtures in areas accessible to incarcerated persons at a GDC prison in 2022.*

Our observations during facility site inspections, as well as information received from staff interviews, confirm that GDC sometimes inappropriately uses padlocks on cell doors, apparently due to broken primary locks. Using padlocks on cell doors is a violation of national correctional standards, and GDC's fire safety inspections have identified doing so as a violation. This practice exposes incarcerated people to an unacceptable risk of harm in the event of a fire or other emergency, because of the additional time it would take to evacuate.[30] GDC's staffing shortages and inoperative fire safety systems (e.g., fire detectors and alarms) further exacerbate that risk. When

[30] Inadequate fire safety systems expose incarcerated persons to unacceptable risk of harm in fire-related emergencies. While DOJ's investigation focused on violence, we consider all fires, whether or not intentionally set by incarcerated persons, to present serious life safety risks in GDC prisons. We observed and staff reported serious problems with prison fire safety systems. In some prisons, entire systems or most alarms are nonoperational due to GDC's failure to fix them. For prisons or areas within prisons with inoperable fire alarm systems, prison staff is required to conduct fire watch rounds every 30 minutes; our review of logbooks and audits confirmed these rounds do not always occur with the required frequency. In our expert's view, the GDC official tasked with managing the system's fire safety program does not have sufficient authority to make necessary improvements to fire systems in the prisons, exposing incarcerated persons to an unreasonable risk of harm.

asked about padlock use, staff responses were inconsistent. Some staff acknowledged that padlocks are sometimes used on cell doors when the primary lock is malfunctioning. However, other staff reported that padlocks are not used on cell doors; in some cases, this claim contradicted our own observations while touring the prisons at which those staff members worked. For example, during one prison site visit, DOJ observed and photographed padlocks on doors in three occupied housing units, where an officer we later interviewed said padlocks were not used. DOJ observed padlocks on doors in other housing units and prisons throughout our investigative site visits in 2022 and 2023.

Incarcerated people interviewed at multiple prisons likewise reported issues with door security in housing units. These issues include cell-door locks that are manipulated to "pop out" of cells, doors that are jammed to stay open or closed, and other tampering with basic door-locking mechanisms. Other incarcerated persons reported that staff leave doors and fence gates unlocked, allowing free movement within housing units – and sometimes out of units and into unauthorized areas of the prison compound. Non-working door control panels pose a significant safety risk, as doors must be unlocked manually and there are often no staff present in the housing units.

GDC acknowledges that it has problems maintaining secure door locks, and informed DOJ during several facility site inspections that various housing units were temporarily closed due to a rolling "lock hardening project" in the facilities. GDC leadership staff also informed us of lock upgrades that are underway.

However, such projects are not sufficient to address GDC's entrenched security problems. Locks likely will remain an issue, even after being "hardened" or replaced, because GDC does not have sufficient security staff to supervise incarcerated persons and prevent further damage to and manipulation of door locks. Additionally, GDC does not have sufficient security and maintenance staff to maintain



*Holes in ceilings in areas accessible to incarcerated persons at a large GDC men's prison in 2022. GDC acknowledged that some holes DOJ observed at this facility were caused by "inmate vandalism."*

renovated locking systems or otherwise maintain facilities after fixing broken fixtures, windows, walls, ceilings, and other components of facilities.

We were told repeatedly by incarcerated people, including those who work maintenance details and are responsible for facility repairs, and some staff that an enormous amount of repair work was undertaken prior to DOJ's site visits to each prison. Despite these efforts, during site visits, our experts observed physical building and maintenance issues that affect security, including broken or exposed electrical outlets and wiring, metal fixtures, large holes or patched areas in ceilings and walls, and small holes and cracks in walls and windows.

GDC also fails to comply with its own policies to regularly evaluate, test, and document the condition of its security infrastructure and systems. Internal audits confirm that GDC fails to take necessary steps to ensure its prisons are secure. For example, several 2023 facility audits found that GDC fails to perform required checks of windows and doors to ensure they have not been cut or modified. Several facility audits also found that GDC fails to maintain accurate key and tool inventories and to document key counts and checks. For example, one 2023 facility audit of a close-security men's prison noted inconsistencies in accounting for and inventorying tools, and a lack of consistent control and documentation regarding chemical agents, weapons, and inventory. GDC's failure to maintain control of such sensitive equipment as keys and tools exposes the population (and staff) to an unreasonable risk of harm, because discrepancies and failures to follow policies in these areas can compromise the physical security of the facilities' doors and gates and can facilitate the use of weapons and other contraband.

### 4. GDC's ineffective classification and housing systems expose incarcerated persons to an unreasonable risk of violence.

GDC's classification and housing systems do not function properly. GDC does not conduct timely and accurate classification and segregation reviews due to staffing shortages and the incomplete data in GDC's automated systems. Moreover, GDC does not enforce classification housing assignments, enabling gangs and other security threat groups (STG) or other incarcerated individuals to dictate housing assignments and other aspects of daily life.

GDC has a computerized classification system, the "Next Generation Assessment" (NGA) tool. GDC officials explained that the NGA tool was developed for GDC, and that it uses data entered into GDC's correctional management database to calculate a security-level score for each incarcerated person. Thus, individuals' security scores should be updated based on new STG information, incident reports, disciplinary reports, and other inputs as they are entered into the system. A computerized system

like this can be an effective tool, but it must be combined with individual classification and re-classification reviews by staff, and the system must receive relevant updated information such as serious incident occurrences.[31]

GDC fails to ensure that classification reviews are conducted by qualified staff. We found that staff do not consistently implement the agency's own classification timelines and procedures, such as those that mandate classification and segregation reviews and counselor meetings. GDC's internal audits from several prisons in 2023 found delayed initial counseling sessions, inconsistent or inadequate scheduling and completion of counseling sessions, and incomplete classification documentation. These shortcomings may in part be due to understaffing of counselors, who are tasked with conducting

## CONSEQUENCES OF HOUSING AND CLASSIFICATION FAILURES

In May 2022, a 21-year-old man was killed by his cellmate at Calhoun State Prison following multiple failures in GDC's classification and housing systems.

The homicide occurred after staff moved the assailant out of segregation, to general population, and then back to segregation without following classification and housing assignment procedures. When staff moved the individual back to segregation, he requested to be placed in a particular cell, and staff housed him there with a cellmate. The next day, the two cellmates told an orderly that they wanted to be separated, which the orderly communicated to an officer.

One day later, an orderly saw the individual being beaten by his cellmate. The man died. The autopsy revealed blunt force trauma injuries and a stab wound to the neck.

GDC closed its criminal investigation without a thorough administrative review into a breakdown of its classification process. An administrative review should have addressed the staff errors, as well as errors in housing records, and indications of personal connections between a staff member and gangs.

There was no evidence of discipline or counseling in the personnel files of three employees whose errors were identified in the investigation as relevant to the man's death.

[31] Such computerized classification systems also must be validated for the specific incarcerated populations and periodically re-validated. In addition, housing audits should be done to ensure the system output is in place in the facilities. GDC personnel claimed that the NGA tool has been validated, although GDC did not provide us with a specific date or year that any such validation took place. It appears the last validation was at least a few years ago, and it is unclear whether GDC plans to re-validate the system, and if so when. Despite our repeated requests, GDC did not provide documentation to confirm such validation or re-validation testing or to explain the criteria, formulas, and other scoring mechanisms the system uses to determine custody levels.

classification reviews. In a review of data from 16 GDC prisons from January 2022 to August 2023, we found that most of the prisons reviewed failed to fully staff allotted counselor positions, and several had counselor staffing rates in the 50% range or lower. Without adequate counselor staffing, GDC cannot ensure that incarcerated persons are classified and reclassified properly and that their housing assignments are reasonably safe and appropriate for their security level and other housing needs.[32]

Even if GDC had the staff to effectuate classification and reclassification, GDC's computerized system is only as good as the data upon which it relies. The NGA tool relies on information from the State's incident reporting and records databases, which have significant data reliability issues. The State's staffing problems and operational issues with incident reporting and follow-up (discussed elsewhere in this Findings Report) mean that serious incidents often are unreported, misreported, or inadequately investigated.

Finally, failures in basic correctional practices undermine housing based on an appropriate classification system. For example, at multiple facilities we visited, we repeatedly observed counts in which security staff failed to verify the identity of each person counted or that the person was living in their assigned cell. GDC audits and interviews with incarcerated persons at most of the facilities we visited further underlined GDC's widespread failure to conduct appropriate counts as frequently as policy and accepted correctional practice require. In documentation of counts produced by GDC, there was no documentation of roster counts (i.e., counts requiring verification of the bed occupant's identification) that would evaluate whether incarcerated individuals are living in their assigned cells.

At almost every prison we visited, incarcerated people consistently reported that many of them

**DANGEROUS HOUSING ASSIGNMENTS**

On October 3, 2022, a validated STG member was placed in a segregation cell with a non-gang member who was classified as sexually aggressive.

Putting two individuals with these classification factors together in a segregation cell is risky and would not normally be defensible under a classification scheme.

The STG member killed the cellmate.

[32] Incarcerated persons sometimes never receive an opportunity to personally participate in their classification reviews. They then can end up in segregation, or with a new classification status, without ever receiving documentation of the change. Some incarcerated persons reported that months, and even years, go by without them ever seeing the staff responsible for classification reviews.

are not actually living in their assigned cell or using their assigned dormitory bed. At some prisons, we received reports that incarcerated people who have been prevented from occupying their assigned beds – often by gangs or other STGs or by other incarcerated people with inordinate power in the housing unit – are forced to sleep on a bedroll in the dayroom or other common area or closet, unable to locate an alternative bed.

Staff interviews corroborated these reports at some prisons. For example, one shift supervisor we interviewed admitted that she often found incarcerated people openly sleeping in beds other than the ones to which they are assigned, but that she does not write up disciplinary reports for them as long as they agree to go back to their assigned bed when she asks them to. She acknowledged that once staff leaves the housing unit "they're going to go back." After GDC began producing cell-assignment rosters during our site visits, we started checking the names of individuals standing in front of cells during our escorted site visits. We confirmed that the official cell-assignment records were not reliable. At one large medium-security prison, our expert found that about 67% of the individuals surveyed in several different general population housing units were standing in front of cells other than those identified as theirs on GDC's roster.

Ensuring that incarcerated persons are accurately counted, and that they are where they are supposed to be, are basic tenets of sound correctional practice. If people are permitted to reside in beds or cells other than where they are assigned, safety and security are compromised. Officers are unable to efficiently locate and track incarcerated persons. And individuals may end up living in a location that is less safe for them than the one to which they were assigned.

When staff do not control housing assignments, gangs often decide where people sleep. With such control, gangs can further increase their influence over housing units by isolating or excluding members of other gangs, non-members, and disfavored individuals (e.g., LGBTI persons or persons with special needs). In other cases, incarcerated people put themselves or others "on the door" – meaning they tell staff that they or another incarcerated person needs to be moved – to segregation or a different housing unit; the person is then reassigned and sometimes cited for "refusing housing." In other words, incarcerated persons tell others where they can live, and everyone, including staff, simply comply.

### 5. GDC fails to control violence even in its segregated housing units and exposes incarcerated persons to an unreasonable risk of harm due to its inappropriate use of segregated housing.

GDC responds to known threats of harm to incarcerated people by placing them in segregated units that pose additional risk of harm, which could discourage those at risk of harm from seeking GDC's assistance.

"Segregation" refers generally to any practice or program that involves (1) removal from the general population, whether voluntary or involuntary; (2) placement in a locked room or cell, whether alone or with another incarcerated person; and (3) the inability to leave the room or cell for most of the day, typically 22 hours or more.

GDC has multiple segregation programs, collectively designated as Administrative Segregation, which are intended to serve diverse functions. Incarcerated persons can be placed in segregation pending an investigation or disciplinary hearing for a violation of facility rules, or as a sanction for rules violations. Under GDC policy, no incarcerated person can be placed in disciplinary segregation for more than thirty days. GDC also uses segregation for "protective custody." GDC policy permits placement of individuals in segregation, voluntarily or involuntarily, if they are particularly vulnerable or at risk of harm by other incarcerated individuals. GDC also uses segregation in "Special Management" units. These units segregate incarcerated individuals who commit or lead others to commit violent, disruptive, predatory, or riotous actions, such that segregation is necessary to ensure the safety, security, or orderly operation of the facility, or protection of the public. We found two problems with GDC's use of segregation as a response to violence by incarcerated persons.

#### a. GDC fails to protect incarcerated people from harm in segregation units.

Segregation units in Georgia's close- and medium-security prisons are not safe for the individuals housed there. We found deficiencies in staffing, classification, and basic security measures, such as working locks, that all contribute to unreasonable and preventable harm to incarcerated individuals.

Across the state, segregation units are too understaffed to provide adequate protection from harm. Incarcerated persons described such severe staffing shortages that no one was present to pass out meals, and incarcerated persons had to resort to passing out trays themselves, and to beating on windows and yelling to summon staff assistance, when necessary. GDC's 2023 internal audits found severe lapses in staff and supervisor rounds in segregation units in at least nine prisons. At one medium-security men's prison, for example, the audit found long gaps between checks and some days with no checks at all, and noted that all check sheets reviewed by the auditor were incomplete.

The lack of staffing poses a significant risk of harm to the individuals housed in segregation. Although GDC uses segregation to separate vulnerable individuals from general population, we found that segregation units at multiple prisons are unsafe due to lack of supervision.

Problems resulting from understaffing are compounded by failures to maintain secure facilities. We received consistent reports at GDCP that staff frequently fail to lock the cell doors in segregation. Even when doors are locked, they are reportedly not secure; one incarcerated individual at GDCP admitted to "popping" out of his cell one morning because he did not receive a breakfast tray and reported that incarcerated individuals in segregation regularly manipulate their door locks and exit the cells. Similarly, in Rogers State Prison, we received reports of incarcerated individuals moving freely within the segregation unit and individuals housed in other units gathering there.

The safety of incarcerated individuals in segregation is further compromised by systemically flawed housing decisions. GDC is failing across the agency to properly conduct classification and segregation reviews, which can result in individuals being placed in cells with people who are likely to victimize them. For example, in one instance, a person incarcerated at Baldwin was assaulted in his housing unit by members of the Gangster Disciples gang with a lock in a sock. Following the assault, the victim was placed in segregation in a cell with an individual from the same gang that had attacked him.

In another instance, an individual was killed in a segregation unit in Calhoun State Prison by his cellmate, a known gang member. A later investigation showed that the assailant requested that staff place him in the victim's cell. A lieutenant approved the placement. The placement was not reviewed by a Unit Manager as required by procedure.

In a third instance, an individual incarcerated at Calhoun State Prison was killed by his cellmate. An officer had previously reported that the two men should not have been in the same cell because of the STG status of both, and because the assailant was significantly bigger (seven feet tall and 340 pounds). A supervisor failed to verify the room status of the men, and an officer failed to respond to an orderly's report that the men wanted to be separated because they were not getting along. A day later, another orderly saw the assailant beating the victim with a fan motor in a net bag. The victim later died of multiple blunt force traumas and a stab wound to the neck.

### b. GDC facilities misuse segregation, imposing punitive conditions on victims and potential victims of violence and sexual abuse.

GDC uses segregation for improper purposes when responding to threats of violence or incidents of harm. Specifically, we found numerous instances where victims of sexual assault or other violence were placed in segregation in inhumane conditions for an extended or indefinite period. Subjecting victims or potential victims of sexual abuse or violence to such conditions effectively punishes people who already are vulnerable and can discourage people from reporting violent incidents or from seeking protective custody.

Segregation can cause severe psychological damage, especially when it involves near-complete isolation and sensory deprivation, or when the segregation extends for a prolonged period of time.[33] For that reason, PREA Standards state that individuals alleged to have suffered sexual abuse and those at high risk of sexual victimization "shall not be placed in involuntary segregated housing unless an assessment of all available alternatives has been made, and a determination has been made that there is no available alternative means of separation from likely abusers."[34] Any use of involuntary segregated housing for victims must be fully documented and justified.[35] Similarly, individuals who are victims of other types of violence should not be held in punitive or inhumane conditions for the presumptive purpose of keeping them safe. Contrary to the purpose of these correctional principles, GDC uses segregated housing as de facto protective custody, including for victims of sexual abuse.

We received numerous reports from individuals who were held in segregation after being victimized. Often, the only choice these individuals face is placement in

---

[33] *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1236 (M.D. Ala. 2017) ("Mental-health and correctional professionals have recognized that long-term isolation resulting from segregation, or solitary confinement, has crippling consequences for mental health."); *see also Georgia Advoc. Off. v. Jackson*, No. 1:19-cv-1634-WMR-JFK, 2019 WL 12498011, at *10 (N.D. Ga. Sept. 23, 2019) ("It is widely recognized that 'solitary confinement poses an objective risk of serious psychological and emotional harm to inmates, and therefore can violate the Eighth Amendment.'") (quoting *Porter v. Clarke*, 923 F.3d 348, 357 (4th Cir. 2019)), *modified*, No. 1:19-CV-1634-WMR-RDC, 2020 WL 1883877 (N.D. Ga. Feb. 26, 2020), *and order vacated, appeal dismissed as moot*, 4 F.4th 1200 (11th Cir. 2021), *vacated*, 33 F.4th 1325 (11th Cir. 2022).

[34] 28 CFR §§ 115.43, 115.68. To place such individuals "automatically[] or routinely" in involuntary segregation "or restrict their access to programming or other available activities . . . can be experienced as punitive." PREA Standards, § 115.68 Post-Allegation Protective Custody, NAT'L PREA RES. CTR., https://perma.cc/EXB6-7R7Q. Although non-compliance with a PREA Standard alone is not sufficient to support a finding of a constitutional violation, the PREA Standards provide evidence of "contemporary standards of decency," which "demarcate when a prisoner has satisfied the objective element of an Eighth Amendment claim." *Sconiers v. Lockhart*, 946 F.3d 1256, 1270–72 (11th Cir. 2020) (Rosenbaum, J., concurring); *see also Bearchild v. Cobban*, 947 F.3d 1130, 1144 (9th Cir. 2020); *Crawford v. Cuomo*, 796 F.3d 252, 259–60 (2d Cir. 2015).

[35] 28 C.F.R. § 115.43(d).

segregation as a sanction for "refusing housing" to avoid going back to a unit with their attackers. One incarcerated individual at Ware, who was sexually assaulted, stayed in segregation for a month after reporting the assault. He was then moved back into a housing unit, but after experiencing problems with gang members there, the facility put him in administrative segregation for refusing housing. At the time of our interview, he had been in segregation for nine months. Another incarcerated individual was placed in a suicide-watch cell at Hays after he was assaulted, suffering a cut to his eye. All his property had been stolen by other incarcerated individuals, and he was held naked in the suicide cell with no mattress or blanket. After he continuously beat on the suicide-cell window, staff moved him to administrative segregation for refusing housing.

GDC's systemic practice of placing people in segregation in unjustifiable circumstances is made significantly more harmful because conditions in segregation are frequently inhumane and severely punitive.[36] At Rogers State Prison, for example, incarcerated individuals described being held in kiosks and shower cages for up to a week when segregation cells were unavailable. Some individuals described having to defecate and urinate in the cages. One incarcerated person at Rogers reported that he had gone six weeks without a shower and received no outside recreation. Incarcerated individuals at GDCP also reported that they spent weeks in segregation without being afforded out-of-cell recreation. Likewise, incarcerated individuals at Wilcox State Prison reported that in segregation they did not receive any required services, programs, or outside recreation.

Frequent review of an individual's placement in segregation is essential to mitigate the potential harms of segregation and ensure that no one is held there for longer than necessary. Across the agency, we found that facilities are not routinely reviewing individuals' placements in segregation. Incarcerated individuals describe not learning the reasons for their placement in segregation; many do not receive segregation paperwork and do not participate in their reviews. As a result, there appears to be insufficient control over how long individuals remain in segregation, which exacerbates the harms identified above.

---

[36] "[T]here is a line where solitary confinement conditions become so severe that its use is converted from a viable prisoner disciplinary tool to cruel and unusual punishment." *Thomas v. Bryant*, 614 F.3d 1288, 1310–11 (11th Cir. 2010) (quoting *Gates v. Collier*, 501 F.2d 1291, 1304 (5th Cir. 1974)). The Eleventh Circuit has recognized, for example, that segregation can violate the Eighth Amendment when the conditions are grossly unsanitary, *Quintilla v. Bryson*, 730 F. App'x 738, 745–47 (11th Cir. 2018), or when an individual is held for an excessive period of time in punitive conditions. *Sheley v. Dugger*, 833 F.2d 1420, 1428–30 (11th Cir. 1987).

**6. GDC fails to control illegal and violent activity by gangs and other security threat groups.**

The State's gang problems are well publicized.[37] GDC officials repeatedly acknowledged that gangs are a consistent, evolving problem and contribute to violence in the facilities. Although the State acknowledges that gang problems contribute to prison violence, the State has not taken sufficient remedial action to limit gang-related violence, criminal activity, and gang control over prison life.[38] This gang problem poses a serious threat to incarcerated persons, staff, and the community at large.

Breakdowns in GDC's basic security procedures have opened a path for gang control over much of the prison system. Gang-related criminal activity exists across the GDC system, with some of the larger gangs operating sophisticated networks across several facilities and in the free world. GDC's STG program lacks a strategic, centralized approach and largely leaves the individual facilities to deal with gang issues as they arise. Instead of adopting proactive strategies sufficient to keep gang conflicts and criminal activity from proliferating, the State responds situationally, taking a reactive approach to prosecution and detention of gang members, without other essential gang program components.

**GANG WAR AT MULTIPLE PRISONS**

In September 2022, following the homicide at Phillips State Prison of a young man who was a member of the Bloods, a gang war erupted at multiple other GDC prisons.

With Bloods attacking Crips in the several days that followed, twenty incarcerated people were hospitalized following gang-related violence, including 13 from Macon State Prison on October 2, 2022, 5 from Ware State Prison on October 1, 2022, and 2 from Coffee State Prison on October 1, 2022.

The staff tasked with monitoring and responding to gang activities have little day-to-day role in classification decisions, housing assignments, GDC's computerized classification system (i.e., NGA), and population risk management. At the central-office level, a

---

[37] *See, e.g.*, Danny Robbins & Carrie Teegardin, *Hundreds of GA Prison Employees Had a Lucrative Side Hustle: They Aided Prisoners' Criminal Schemes*, ATLANTA JOURNAL-CONSTITUTION (Sep. 21, 2023), https://perma.cc/2P34-TXLJ.

[38] *See Lane v. Philbin*, 835 F.3d 1302, 1307–08 (11th Cir. 2016) (explaining a substantial risk of harm exists where a prison dorm consisted predominantly of gang members and non-gang-affiliated people were robbed and stabbed).

small number of personnel are assigned to investigate, track, and respond to incidents involving more than 14,000 validated STG members in the system. These STG program managers rely on facility-level staff to gather intelligence and handle day-to-day STG-related issues. GDC personnel reported that facility wardens bear responsibility for managing gangs in their facilities, and the wardens in turn typically have a sergeant assigned to STG monitoring. These STG sergeants report directly to their respective facility wardens, and they are expected to maintain contact with the systemwide STG coordinator, including by conducting threat assessments for some incidents. Facility STG sergeants maintain lists of STG-affiliated individuals, and when GDC "validates" an incarcerated person as STG-affiliated, that information becomes part of the individual's profile in GDC's data management system. In theory, GDC's automated-risk-screening instrument then considers STG membership in determining security classification, and a team of officers monitor and investigate STG activities. In practice, however, staff are not organizing or leveraging STG information with accuracy and timeliness sufficient to protect incarcerated people from harm. Even when staff recognize there may be an STG issue and make classification and housing changes, the lack of staff and failure to ensure incarcerated persons live where they are assigned undermine the classification process.

The heavy delegation of gang management to the local facilities leaves too much room for inconsistency and mismanagement, and fails to effectively leverage information collected at the facility level to develop and implement a dynamic, strategic, systemwide plan to prevent and respond to gang-related activity and violence. The agency holds meetings to discuss STGs and other operational matters. Based on records of these meetings produced by GDC, and on information provided by leadership and facility staff in interviews, these meetings appear to be relatively informal, with no official minutes; while GDC officials discussed threat assessments that facility STG sergeants sometimes conduct at the request of central office STG coordinators, GDC did not provide details or produce written records of these assessments. We therefore have reason to believe that these relatively informal channels constitute the limited means of information sharing between intelligence components and the facilities, and that they are insufficient to manage the complex gang-related challenges facing the State in its management of gangs in its prisons. Breakdowns in staffing, classification, and management prevent adoption of any well-coordinated gang tracking and management program like the one required by the State's policies.

GDC's staffing shortages exacerbate existing STG-management challenges. In some cases, GDC has failed to keep STG sergeant roles filled, despite the risk of gang-related violence. For example, on June 23, 2023, a gang fight broke out at Dooly State Prison. Around the same time, the STG sergeant's position had been vacant for three

months. While other staff filled in, the lack of personnel with extensive, specialized gang experience was problematic.

GDC's staffing shortages also enable gangs to have unusual levels of control over entire housing units. In many of the prisons, improper supervision and mixing of gang members lead to a pattern of constant retaliatory violence. Gangs additionally have undue influence because the prisons lack enough staff to provide basic levels of housing supervision; inexperienced staff working with minimal training also can be vulnerable to gang pressures. Understaffing also affects programs for incarcerated persons that might help alleviate gang pressures. The prisons do not have enough staff to prevent or, often, even respond to the most blatant gang activities and violence, let alone provide programs such as exercise, rehabilitation, or gang intervention.

The prisons' contraband problems also illustrate the scope of the gang problem. Gangs have significant control over the introduction of contraband, including drugs and cellphones, as well as other items that are currency in prisons, like commissary items and food. Incarcerated persons, both STG-affiliated and non-affiliated, reported that practically all gang members "have to" own weapons, sometimes multiple weapons. Gang rivalries and violence lead to weapons manufacturing and distribution. Gangs use funds from illicit prison activities to corrupt officials and further their illegal enterprises.[39]

Additional examples of the problem's scope and the State's ineffective gang program include the following large-scale incidents that led to multiple serious injuries and death:

- Hours after the arrest of Smith State Prison's Warden, Brian Adams, was announced on February 8, 2023, a gang fight broke out in a housing unit at Smith. Nine incarcerated persons were injured from stabbing wounds, six requiring hospitalization, with two of those sent out by airlift. Incarcerated persons videorecorded the fighting, and the footage was posted on social media. It showed groups of incarcerated persons chasing and stabbing others. Almost 90 minutes elapsed between when staff first observed the fighting and when the first wounded person was airlifted to a hospital.

- In early February 2022, after a Bloods gang member was stabbed inside a housing unit at Ware State Prison, members of the Bloods gang attacked "Hispanic" gang members on the yard. At least eight gang members were

[39] *See supra*, Introduction (discussing prosecutions related to contraband and often involving gangs).

involved in the melee, from which 11 knives were later found. Seven men were injured with stabbing wounds, four of them requiring hospitalization.

- In March 2023, as an officer entered a housing unit at Macon State Prison to collect the dinner trays, four incarcerated individuals, all members of the Bloods gang, moved past her and onto the yard outside, ignoring her instructions to return to their dorm. They ran to the kitchen area where they stabbed an incarcerated person working there. The victim later died. A GDC Lieutenant observed that incarcerated persons in the adjacent housing unit were obtaining weapons and then began to fight. The intensity of the fighting led officers to deploy seventy-five pepper balls and several other munitions in an effort to control the dorm. Eleven incarcerated persons were stabbed, with six of them needing transport to hospitals; the majority of those injured were Bloods. The first ambulance was called just over an hour after the fighting had begun.
- On a morning in mid-June 2022, a large gang fight between Gangster Disciples and Bloods erupted at Dooly State Prison, involving gang members from multiple housing units. Four windows were broken in the melee, and seven incarcerated people were transported to outside hospitals for lacerations and puncture wounds. Staff were overwhelmed by the sheer number of incarcerated persons participating in the uncontrolled fighting.

In sum, gangs have unacceptable levels of control over large sections of Georgia's prison system. Inadequate policies and programs have allowed gangs to dictate where individuals live, who eats, who showers, who gets a job, and how units operate. Gang conflicts then lead to serious violence.[40]

[40] GDC also does not provide an effective off-ramp for incarcerated people to renounce or disavow STG membership, which effectively encourages STG members to remain affiliated for protection and other benefits.

### 7. GDC fails to control weapons, drugs, and other dangerous contraband in its prisons.

GDC's contraband controls fail to address the scope and complexity of the problem of contraband in the prisons, particularly weapons, illicit drugs, and unauthorized electronics (e.g., cellphones). Inadequate staffing and supervision, combined with ready access to contraband sources, allow incarcerated people to easily purchase, manufacture, possess, openly display, and use weapons, cellphones, and drugs.[41] As a result, the volume of contraband in the prisons remains high, and the existence of weapons, cellphones, and drugs, and the marketplace surrounding these items, places incarcerated persons – as well as GDC employees and the general public – at risk.

GDC records reveal that a steady stream of contraband is recovered from the prisons on an ongoing basis. Between November 2021 and August 2023, GDC recovered 27,425 weapons, 12,483 cellphones, and 2,016 illegal drug items; during the same time period, GDC documented 262 drone sightings and 346 fence-line throw-overs. GDC officials acknowledged that the agency's problems with contraband are extensive in scope and related to gang problems, and that the prevalence of contraband places the population at risk.

Contraband can be smuggled into prisons in various ways; staff have been caught bringing contraband in through standard entry points, and civilians have been arrested attempting to throw packages of contraband over exterior fences or using remote-controlled aerial devices to perform "drone drops". Contraband weapons can be smuggled in, or, given the opportunity, incarcerated persons can make "shanks" – homemade knives – and

**CONTRABAND ARRESTS**

In June 2021, the Calhoun County Sheriff's Department arrested 20 people in one week for trying to introduce contraband, including cellphones and methamphetamines, into Calhoun State Prison.

In September 2022, a former Calhoun correctional officer received a five-year federal prison sentence for attempting to smuggle two pounds of methamphetamine and eight cellphones into the prison.

[41] *See Dickinson v. Cochran*, 833 F. App'x 268, 272–75 (11th Cir. 2020) (explaining a lack of proper classification system, inadequate officer supervision, and failure to limit the introduction of contraband with proper training was sufficient to establish deliberate indifference to an incarcerated person's constitutional rights).

other weapons by dismantling and sharpening metal objects and other materials found inside the prisons.

GDC officials touted efforts to increase shakedowns and other contraband searches, and they produced records of some facility shakedowns, forensic analyses of confiscated electronics, and targeted searches; however, the system continues to falter. While GDC claims its shakedowns are evidence that they are doing *something* to address contraband, the sheer volume of contraband continuing to be recovered from GDC prisons demonstrates that any efforts to combat contraband in the prisons have been insufficient to address the problem.




*Photographs posted on Facebook by GDC showing contraband including weapons, drugs, and electronics recovered in GDC shakedowns in 2022.*

Serious deficiencies in day-to-day prison operations contribute to the ongoing prevalence of contraband. At the most basic level, prison staff are not conducting routine, day-to-day searches of individuals and areas. Searches should include routine and surprise searches of housing units, random pat-downs of incarcerated persons moving between areas, and careful inspections for physical security breaches. Searches also should be sufficiently thorough to identify and remove contraband from searched areas. GDC's own policies require some such safeguards, but in practice facility staff do not comply with the policies with the consistency required to address the problem.

In 2023, GDC internal audits of several prisons found inadequate or incomplete facility-wide searches, failures in reporting procedures for incidents involving contraband, incomplete documentation of searches, irregular handling of discovered contraband, and inconsistency in inspecting packages for contraband. GDC policy requires regular full prison searches; the audits indicate that such searches and inspections are not

conducted as frequently as required by policy, and are not taking place regularly or according to appropriate procedures. After a major incident, or as part of a special operation, GDC may call in a tactical team to conduct a search, but afterwards, staff go back to their regular practices. The lack of routine attention to security searches is a serious flaw. The types of searches the State publicizes are too infrequent and belated for a problem of such scope.

GDC's staffing, supervision, and management deficiencies contribute to the failure to adequately control contraband. GDC does not have the number of staff needed to implement a system of regular searches and security checks. With large portions of the population unsupervised for long periods time, incarcerated people have opportunities to make weapons, abuse drugs, and engage in a black market for contraband. Additionally, our review of staffing rosters and interviews with prison staff showed that officers working perimeter posts are sometimes assigned to other Priority 1 posts on the same shift, or fully re-assigned to interior duties for periods of time or entire shifts, leaving the perimeter more vulnerable to contraband introduction.

The State's severe staffing shortages also contribute to staff vulnerability to criminal schemes involving incarcerated persons and STGs; GDC routinely places staff in stressful, challenging environments without sufficient support from other officers and supervisors. For years, the State has wrestled with staff corruption related to contraband. Hundreds of employees have been arrested, including the warden of Smith State Prison in 2023, for crimes related to contraband.[42] We also identified problems with employee background-check and screening processes in GDC employee personnel files. For example, concerns about criminal histories, financial problems, and possibly gang-affiliated associates were identified in the background-check process, but the individual had been hired without any documentation in their file of mitigating circumstances or why their hiring was appropriate despite the identified concerns.

Day-to-day incident reporting and investigative deficiencies also result in failures to systematically root out dangerous contraband. In our review of GDC reports, it was not uncommon for an incident that involved a weapon to have no corresponding weapon recovered noted. Nor did GDC's investigations consistently or thoroughly examine the factors that contribute to the prevalence of contraband in the prisons. Based on interviews with GDC officials, when contraband is intercepted, those directly involved may be identified and prosecuted, but GDC does not have formal procedures in place

---

[42] *See* Danny Robbins & Carrie Teegardin, *Hundreds of Georgia Prison Employees Had a Lucrative Side Hustle: They Aided Prisoners' Criminal Schemes*, ATLANTA JOURNAL-CONSTITUTION (Sept. 21, 2023), https://perma.cc/2P34-TXLJ; Associated Press, *At least 360 Georgia prison guards have been arrested for contraband since 2018, newspaper finds*, AP NEWS (Sept. 25, 2023), https://perma.cc/H39T-N6EL.

to ensure that investigative follow-up occurs to identify additional involved incarcerated persons or staff.

At most of the prisons we visited, incarcerated people reported that contraband is widely available. Dozens of incarcerated persons readily knew how much various street drugs and electronics cost on the prison black market. Assaults and extortion attempts result from debts. At facilities across the system, there appears to be widespread access to weapons. Numerous interviewees at more than a dozen Georgia state prisons reported widespread possession of knives, machetes, hatchets, and other weapons. The State's data, which captures only contraband that has been found and confiscated, supports these reports; GDC itself acknowledges that thousands of weapons have been found in its own investigations and searches.

In sum, GDC fails to take reasonable steps to control dangerous contraband. Weapons and other items that contribute to unacceptable levels of violence are commonplace at most of the facilities we reviewed, and black markets for drugs, electronics, and other contraband proliferate. State officials point to technological advances (e.g., drones, smartphones) and large, sophisticated gangs as the reasons for their difficulties controlling contraband – essentially, the State characterizes contraband control as a moving target. The State also claims they are taking steps to control contraband because they arrest contraband smugglers and conduct mass searches. However, the constant flow of contraband underscores that these efforts have been insufficient.

### 8. GDC fails to report and investigate serious incidents of harm and dangerous activities.

Systemic deficiencies in incident reporting and investigation practices contribute to a pattern or practice of constitutional violations.[43] GDC's reporting and investigation practices are inadequate to detect, document, respond to, and deter violence and sexual abuse among the population. Our investigation revealed systemic underreporting and failures to document and accurately track incidents. We also identified systemic deficiencies in GDC's investigations practices, which lead to a pattern of failures at the facility level to properly respond to incidents and prevent future incidents with similar causes. And we found that GDC rarely documents formal after-action reviews or root-cause analyses for major incidents, including homicides, to

[43] *See Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1102 (11th Cir. 2014) (explaining prison officials violate the Eighth Amendment when they fail "to take any action to investigate, mitigate, or monitor [a] substantial risk of serious harm").

assess how major incidents were allowed to occur and how the risk of future incidents can be mitigated.

### a. GDC fails to ensure that incidents are accurately reported and documented.

GDC fails to document and track incidents of violence among its incarcerated population. To maintain security in a prison, documentation of all incidents that are out of the ordinary is important. These include incidents of violence as well as rule violations, discovery of contraband, medical episodes, and anything else that is out of the ordinary. GDC policy requires that incident reports be created and reported to the Regional Director for all incidents, including major incidents such as deaths, serious injuries, allegations of sexual assault or sexual harassment, disturbances, and riots, as well as minor incidents such as non-serious injuries and minor property damage. Accurate and complete reporting is critical to orderly, safe, and secure prison operations, because it ensures facility staff and leadership know what is happening and can address any issues and identify necessary follow-up or corrective steps.

But GDC's reporting is far from complete. Indeed, incidents of violence likely are significantly underreported. Because housing units in prisons across the system often are completely unsupervised, violent incidents and other incidents, such as property destruction and illicit drug use, occur without any staff observation. Incarcerated people also reported to our team that they had witnessed or experienced violent incidents and other incidents that are out of the ordinary, and had not reported the incidents to staff, because they had no faith in GDC's systems and believed that doing so would be fruitless.

Additionally, GDC fails to ensure incarcerated persons have access to paper and electronic forms and to GDC staff to report incidents, raise concerns about how incidents were handled, or request assistance.

Nor does GDC make strategic use of information in incarcerated persons' grievances, which sometimes highlight dangerous conditions that should be, but are not, addressed. GDC routinely rejects grievances for minor procedural issues, even in cases where the grievance raised potentially serious concerns about the safety of incarcerated persons. In a period of approximately six months in 2023, GDC documented 1,481 grievance appeals, approximately 480 of which were rejected for failure to follow procedural requirements for filing grievances, such as timeliness, raising multiple issues in a single grievance, or grieving a "non-grievable" issue. For example, in February 2023, an incarcerated person at Calhoun State Prison filed a grievance alleging that he had been removed from his housing unit to "the hole" because of safety concerns, that they had been the victim of attempted extortion, that

they recently had witnessed a serious assault of another incarcerated person, and that there was significant gang-related violence in the housing unit. The grievance and subsequent grievance appeal were rejected as untimely, with no further notation of follow-up steps to ensure review by counselors and no further notation as to whether the issues were sent to appropriate channels to be addressed.

In some cases, we identified apparent discrepancies, incomplete records, or timing issues with GDC's recordkeeping for incidents that are reported, all of which hinder GDC's ability to accurately report and respond to violent incidents. Notably, GDC's mortality data categorizes many deaths that obviously were homicides as having an unknown reason or unknown verified cause of death. According to GDC, this unknown category reflects deaths for which GDC has not yet received a copy of the death certificate to verify the cause of death. But deaths reported as unknown by GDC include deaths that GDC's own incident reports categorize as homicides, and which GDC says are being investigated as suspected homicides. GDC officials also informed us that apparent homicides may be reported as undetermined or unknown deaths pending autopsy results or other pending investigative activities. Eventually, when the investigation is complete, the manner or cause of death will be accurately recorded as a homicide. But it can take months or years before GDC receives a final autopsy report for deaths.

In the meantime, GDC inaccurately reports these deaths both internally and externally, and in a manner that underreports the extent of violence and homicide in GDC prisons. GDC reported in its June 2024 mortality data that, for the first five months of 2024, there were 6 homicides, even though at least 18 deaths were categorized as homicides in GDC incident reports, and GDC assured us these suspected homicides were under investigation. GDC's June 2024 mortality data also still classified at least 2 homicides from 2021 as having an "unknown" cause of death; these deaths therefore are still excluded from GDC's official count of homicides for that year. GDC's incident reports, GBI autopsy records, and EMS records make clear the deaths were homicides, one a stabbing by another incarcerated person, and the other from asphyxiation after being held in a chokehold by another incarcerated person.

Even when GDC eventually correctly identifies a death as a homicide in its mortality reports, delays in doing so result in months or years during which GDC's official mortality data severely undercounts homicides in the prisons, even when it is clear from evidence already in GDC's possession that the death was a homicide. For example, in late February 2022, GDC's Office of Professional Standards (OPS) found a death that occurred in early January 2022 to be a homicide, yet the death was reported in GDC's mortality data as undetermined until two years later, when it was eventually correctly classified as a homicide. Another death was classified for two years as

undetermined even though GDC records referred to it as a homicide, and video footage showed two other incarcerated persons beating the man before his death. In total, we identified seven deaths from 2022 that GDC categorized as undetermined or natural until eventually categorizing them as homicides in 2024, although other official records made clear much earlier that the deaths were homicides. The State cannot confront and address the serious violence in its prisons – including high rates of homicides– if it does not accurately track and account for deaths that occur on its watch. GDC's homicide-reporting practices shield the State from public accountability for homicides in the prisons.

In addition to underreporting, we identified systemic issues with the accuracy of incident reporting across GDC facilities. One problem appears to be that GDC's internal reports fail to consistently track the same types of incidents, presenting questionable statistics on incidents of violence, such as fights and assaults, in reports to facility wardens, regional directors, and central office leadership. Systemwide reports of serious incidents that are generated for executive leadership underreport the systemwide numbers of serious incidents. Accurate and timely reporting is essential to basic correctional operations, and such a pattern of discrepancies raises serious concerns about GDC operations supervisory review.

We also identified numerous instances at multiple prisons in which GDC staff completed an incident report for a violent incident, and in which the incident narrative made clear that the incident was an assault or fight, but where the incident report did not code the incident as an assault or fight. Instead, the incident was recorded as another relevant incident type that did not necessarily denote violence – e.g., injury, disruptive event, or special hospital transport. Thus, while some incidents may be reported by staff, they are still likely to be excluded from violent incident totals, thereby misrepresenting the scope and extent of violence in GDC prisons. This issue with incident reporting prevents GDC from fully accounting for levels of violence in its prisons, and indicates a failure by facility leadership and supervisory staff to appropriately review incident reports.

**b. GDC fails to ensure that incidents are adequately investigated.**

Even when incidents are accurately reported, GDC systems for investigating violent incidents, and for reviewing incidents to identify the factors that contribute to violence, are inadequate to protect incarcerated persons from harm. GDC's primary investigative division, OPS, is responsible for internal investigation of serious incidents

in the facilities, including felonies related to deaths, assaults, riots, and drugs.[44] But throughout Georgia prisons, many violent incidents are not investigated by OPS at all.

According to GDC's incident report records from 22 GDC prisons, less than 10% of fights and less than 23% of inmate-on-inmate assaults from January 2022 to April 2023 were forwarded by the facility to OPS for investigation. Even for incidents involving a serious injury, less than 12% were forwarded for investigation; of incidents involving a weapon, less than 6% were forwarded for investigation. Incidents not forwarded by the facility to OPS included a January 2023 assault at a close-security men's prison in which an incarcerated person was treated at an outside hospital after another incarcerated person attacked him with a 10-inch homemade knife, and a March 2023 assault at another close-security men's prison in which two incarcerated people required medical treatment for lacerations on their faces, and one was taken by ambulance to a hospital for medical treatment.[45]

When OPS does investigate an incident, we identified deficiencies in GDC's investigations policy and practice, including in OPS's criminal investigations. For example, we found that OPS's files lacked comprehensive investigation reports, that interview questions exhibited apparent bias, and that investigators failed to identify and interview potential witnesses. Investigators sometimes failed to return to key witnesses for follow-up interviews, or interviewed suspects too early in an investigation.

**INEFFECTIVE INVESTIGATIONS**

In March 2020, the assault of one incarcerated person by another incarcerated person at Coastal State Prison was forwarded to OPS for investigation.

We were unable to locate any records indicating that such an investigation took place.

The same individual reentered the prison system in 2022 and strangled his cellmate to death at GDCP.

The victim was an older man who used a wheelchair serving a sentence for a non-violent charge.

[44] Most investigations are referred to OPS from the facilities; OPS also can initiate criminal investigations absent such a referral. In a small number of cases, at the request of GDC, the GBI, a separate state agency, handles investigations of crimes involving GDC. For most deaths of incarcerated persons requiring an autopsy, GBI's Office of the Medical Examiner conducts the autopsy.

[45] While it is possible that OPS may open investigations in some cases absent a referral from the facility, OPS opens most of its investigations based on facility referrals. And regardless, the absence of any documented reference by facility leadership to an investigation indicates that facilities may not be adequately apprised of any subsequent investigative process or outcomes.

Additionally, GDC does not conduct adequate administrative investigations of serious incidents. Although OPS's mission includes conducting both criminal and administrative investigations, OPS's investigations division is focused on criminal investigations, and it has a systemwide practice of closing investigations as soon as it determines whether criminal charges will be brought. This practice is problematic, especially because GDC is not conducting thorough administrative investigations of serious incidents, and because local district attorneys prosecute only a small fraction of crimes that occur in the prisons. At the facility level, although wardens are required to review incident reports, there is no consistent or formal process for investigating incidents administratively to identify necessary corrective actions. GDC therefore fails to investigate significant incidents in the prisons simply because no criminal charges result.[46]

Nor do GDC's Facilities Division, or the facilities themselves, conduct appropriate after-action reviews of serious incidents to identify contributing factors, root causes, or necessary follow-up to mitigate the risk of future similar incidents. GDC policy requires that, for certain major incidents including deaths, riots or disturbances, escapes, and medical emergencies, a critical incident debriefing must be conducted and documented. Conducting such reviews is critical to allow for identification and correction of deficiencies that jeopardize safety.

Although we repeatedly requested documentation of critical incident reviews or root cause analyses, and asked GDC officials and facility staff to describe any processes for conducting such reviews, GDC did not produce documentation that demonstrated any consistent systemwide practice of thorough review of critical incidents. The investigation files that GDC produced to us did not contain documentation of any after-action review, or of an investigation resulting in quality assurance reviews or corrective actions.

GDC informed us that any corrective actions, discipline, or follow-up to incidents is determined at the facility level, by wardens and other facility leadership, and the only

---

[46] While other GDC and State entities also serve investigative functions, they do not fill the gap in administrative investigations. GDC Internal Affairs, another division within OPS, conducts administrative investigations, but these largely are based on allegations of unlawful staff misconduct, such as sexual harassment, discrimination, and use-of-force incidents. POST, a separate state agency, also investigates GDC employees. POST investigates some cases of involuntary officer terminations, suspensions, and alleged criminal involvement. *See* Georgia Peace Officer Standards & Training Council, *Investigations Division*, https://perma.cc/L9WB-LZWU. These investigations sometimes identify policy violations or other deficiencies that contributed to harm to incarcerated persons, although interviews with GDC officials did not identify POST investigations as a significant motivator of corrective action at GDC operational levels. Even in sexual abuse cases, for which the PREA Standards clearly require an administrative investigation separate from a criminal investigation, GDC did not produce records to confirm that the requisite administrative investigations are occurring. These PREA-specific investigative deficiencies are discussed below in Section A.9; the discussion in this section relates to investigations more generally.

centrally maintained result of any facility-based incident investigation would be memorialized in GDC's incident reporting system. In our review, wardens' comments in incident reports did not meet the requirements of GDC's policy for critical incident debriefings or fulfill other investigative or after-action review purposes. In interviews, facilities division officials and facility wardens also described informal post-incident meetings, with no documentation or minutes. These practices are not sufficient to ensure that appropriate follow-up occurs to identify and correct systemic problems that may have led to one incident and may lead to other similar incidents in the future.

GDC's policies do not sufficiently outline the steps that should be taken to properly investigate incidents, including for administrative investigations of policy violations and other contributing factors that affect the safety of incarcerated persons. Indeed, GDC informed us that there are no centralized policies or procedures governing facility-level investigations or incident reviews. The lack of such policies or procedures may explain why GDC staff we interviewed were confused about these topics.

GDC also does not have appropriate channels for information-sharing between OPS and the facilities. Facility wardens and Facilities Division officials explained that they do not receive investigation reports or summaries and that OPS only informs the facilities of investigative results on a case-by-case basis, or upon request; to the extent it occurs, this information-sharing appears to be largely verbal and informal. While a need for investigative independence would likely justify limiting access to entire investigative files, the low level of information-sharing between OPS and the facilities, and the lack of formal channels for doing so, is not adequate to ensure appropriate follow-up. Indeed, the OPS director cited a "communication breakdown" between OPS and the Facilities Division, prior to his tenure, and explained that he believed more information should be shared on a regular basis.

Thus, even when criminal investigations uncover potential quality improvement issues, corrective actions may not be taken. For example, OPS's investigation of a 2022 homicide at Calhoun State Prison (discussed earlier in this report) identified multiple policy violations and other errors by staff that contributed to inappropriately housing the victim with the person who allegedly murdered him in their shared cell. Employee documentation for the three security staff members identified in the investigation did not include any mention of the homicide, or any discipline or counseling as a result of the errors identified, and subsequent performance evaluations were largely positive.

**9. GDC does not reasonably protect incarcerated individuals, including LGBTI individuals, from sexual harm.**

For many of the same reasons GDC fails to protect incarcerated persons from physical violence generally, it also fails to protect their sexual safety. GDC's inadequate staffing and supervision practices lead to an environment where sexual violence among incarcerated people is rampant, and often is not appropriately detected, documented, or investigated. In this environment, incarcerated people who are LGBTI are particularly vulnerable to sexual abuse and to a substantial risk of serious harm from sexual abuse.[47] GDC does not sufficiently screen for vulnerabilities or risk of harm related to LGBTI status, and does not classify or house LGBTI individuals appropriately to avoid risk of serious harm. And GDC seldom takes appropriate remedial action apart from bringing criminal charges in a small subset of cases. Still more incidents go unreported.

**a. GDC allows rampant sexual violence among incarcerated people to go unchecked in the prisons.**

Sexual harm is widespread in GDC prisons. In 2022, the year with the most recent data available, GDC documented 456 allegations of sexual abuse, including sexual violence, between incarcerated individuals, of which 35 were found to be substantiated. The actual number of sexual assaults and other incidents of sexual abuse may be significantly higher. In general, survivors of sexual abuse are less likely to report their abuse to the authorities than victims of other violent crimes.[48] Only 21% of sexual assaults in the United States were reported to the police as of 2022.[49]

Systemic deficiencies allow sexual violence among the incarcerated population to occur unchecked in the prisons. Staff are absent from housing units for long stretches of time,[50] and cell locks fail, allowing incarcerated persons to leave their cells and enter others' cells. This places everyone in the housing unit at heightened risk of sexual violence.[51] For example:

[47] In a correctional setting, sexual abuse includes not only violent acts such as sexual assault, but also genital contact, sexual touching, attempts or solicitation to engage in sexual acts, any display of uncovered genitalia or certain other body parts, and voyeurism. *See* 28 C.F.R. § 115.6.

[48] Alexandra Thompson & Susannah N. Tapp, *Criminal Victimization, 2022*, at 6, BUREAU OF JUSTICE STATISTICS (Sept. 2023), https://perma.cc/2HD4-FFXH.

[49] *Id.* Sexual violence also can lead to severe physical and mental harm, with some individuals experiencing mental health crises of symptoms of trauma such as flashbacks.

[50] *See supra* § A.2.

[51] *See supra* § A.3 (discussing building maintenance and security issues).

- A man at GDCP complained to GDC that, in December 2022, six men came into his cell and extorted him for money. Four of the men left, but two men stayed in the cell, forced the man's cellmate to leave, and then forcibly penetrated the man's mouth. The men then locked him in the cell for about 13 hours before his cellmate was able to notify staff the next day. The man was taken to the hospital for wounds to his left ear and puncture wounds to his eye. GDC investigators recommended closing their investigation into the incident for lack of evidence when a sexual assault nurse examiner (SANE) was unable to detect the presence of seminal fluid.

- In January 2023, at Autry State Prison, a man alleged that his roommate held a knife to his throat, told him to get undressed, and then raped him. Investigators found that the roommate had a weapon that matched the description the man provided. A chemical examination of a rectum swab indicated the presence of seminal fluid, and the man was found to have bruising to his anal area. Despite this, the final OPS investigative report incorrectly determined that no seminal fluid was detected, and the allegations were not substantiated.

Incarcerated individuals at multiple prisons reported they had been raped or coerced into sexual contact with other incarcerated persons when security staff were absent or not adequately supervising housing units:

- A transgender woman at ASMP reported that, one night in March 2023 when there was only one officer, she was held at knifepoint and sexually assaulted after count.

- In March 2021, a man from Georgia State Prison who had to be hospitalized due to physical injuries and food deprivation reported his cellmate had been sexually assaulting and raping him over time.

- In March 2023, a man at ASMP allegedly popped the lock of his cell, exited, entered the cell of another man, and raped him.

- We also received a report that incarcerated individuals at Ware State Prison had used window "goop" to pack a lock and then pop it with a spoon, and that this led to a rape.

## SEXUAL VIOLENCE AT ASMP

In May 2022, a correctional officer at Augusta State Medical Prison found a large hole in the wall between two cells. The officer handcuffed an incarcerated person who was in the wrong room, and then another incarcerated man came out from under the bed, bleeding from his head.

The man with the bleeding head, who appears to identify as LGBTI, reported that the other man had struck him in the head with a metal object and sexually assaulted him, forcing him to perform oral sex. He was hospitalized for head trauma, requiring 26 staples for closure, and received treatment for a rib fracture and finger fracture.

Although there were floor officers assigned to each side of the dorm and camera coverage inside the building, staff apparently did not notice anyone digging the hole in the wall, nor were they present to observe the attack after the assailant broke through the wall into the other cell. Investigators found blood on the the floor, on the wall, and on the victim's bed.

OPS closed its investigation into the incident, and in doing so noted that no seminal fluid was detected in the man's anus or mouth.

Furthermore, many housing units lack working cameras or have cameras that are not actively monitored, making it easier for people to prey on other incarcerated persons. One man reported that he was raped by three men in a prison dormitory; the investigation noted there was no video from the relevant housing unit. In reviewing another PREA allegation, investigators noted that some dorm cameras were smeared with a waxy substance and others were not working for eight-and-a-half hours, making it impossible to view what happened during the relevant period. Documentation for many sexual assault investigations, including those that allegedly occurred in common areas, contain no discussion about whether camera footage was reviewed or existed. Likewise, because many individuals cannot sleep safely in their assigned cells,[52] they are especially vulnerable to sexual violence

[52] *See supra* §§ A.2, 4 (discussing staff supervision, classification and housing).

in the places where they do sleep. In August 2021, a man at Valdosta State Prison reported that another incarcerated person choked him and forcibly penetrated his mouth in the cell where the man had been sleeping, which was not his assigned cell. He had been in this cell for about a week and was repeatedly physically abused by the other incarcerated person during that time.

GDC's investigations into sexual violence allegations are poor, and its investigation process dissuades victims from coming forward. Incarcerated individuals reported that they frequently have no easy way to report sexual abuse, including because there are no working phones in their units or because officers refuse to accept their complaints. We confirmed that some phones were not working, and it was not always possible to dial the PREA hotline during visits to the facilities. Many incarcerated persons reported that GDC never investigated their sexual assault allegations or that staff never interviewed them about those allegations. Other incarcerated persons said they never received rape kits after reporting sexual assaults. One person who made a PREA report said that staff "laugh at that down here," and that "[e]ither you be strong or you die, because the officers don't care." GDC's records further reflect that proportionately few people are referred to counseling after making sexual abuse allegations.

GDC also fails to investigate PREA allegations made through grievances. GDC rejected most or all PREA-related grievances that it produced to us on procedural grounds rather than weighing their substance. For example, it rejected one grievance alleging a threat of sexual assault, stating that OPS would take no action because the incarcerated person allegedly failed to follow proper procedures for filing the grievance, though the grievance response indicated that the matter would be referred to the sexual assault response team (SART) for investigation. A transgender woman filed a grievance after an individual in her unit exposed himself to her and after being physically attacked. She asked to be moved to another dorm, one more appropriate for her as a transgender person. But GDC rejected her grievance, stating that housing decisions had to be handled through a classification appeal, and PREA allegations needed to be handled by SART. There was no indication of whether GDC referred the allegations for SART investigation as the PREA Standards require.[53]

GDC frequently places individuals who report sexual violence in solitary confinement or otherwise subjects them to isolation without adequate justification when they report sexual violence. GDC does this even though PREA Standards and GDC's own policy prohibit involuntary segregation based on vulnerability to sexual abuse, including

---

[53] 28 C.F.R. § 115.52(f)(2) ("After receiving an emergency grievance alleging an inmate is subject to a substantial risk of imminent sexual abuse, the agency shall immediately forward the grievance (or any portion thereof that alleges the substantial risk of imminent sexual abuse) to a level of review at which immediate corrective action may be taken").

sexual violence, unless there are no alternate housing options and there is a documented justification.[54] The risk of being placed in isolation for reporting sexual abuse can deter people from doing so. Solitary confinement can cause serious, long-lasting psychological harm. A transgender woman who was placed in isolation after filing PREA complaints asked to be moved from isolation. The request was rejected because of her history of PREA complaints, and because the isolation area was deemed to be the safest available housing for her at the time. She died by suicide in the isolation unit the very next day.

In addition, sexual violence is still prevalent in isolation areas, and GDC places some people in lockdown with individuals who sexually abuse them. One transgender woman stated that she was placed in lockdown with a man who masturbated in front of her, and later held a sharp stick to her throat and raped her twice, on two different nights. After reporting that her cellmate had sexually assaulted her, the woman was taken to medical and then placed in a different lockdown unit.

GDC's investigations into sexual violence allegations are defective at every level, contributing to GDC's systemic failure to prevent, detect, and respond to sexual violence. This was reflected in a review by outside consultants in May 2022, which GDC commissioned to review its PREA investigations. Of 388 PREA investigations reviewed, the consultants found that none met all applicable PREA Standards. And we found that GDC's PREA investigations continued to exhibit the deficiencies that the review identified, even after GDC had received the results of the review.

These deficiencies begin with the onsite SART unit at each individual facility that conducts its own sexual abuse investigations. Yet SART investigators interviewed in late 2023 told us that they received little to no specialized training regarding investigations. The Statewide PREA Coordinator also told us that SART units often do not have the resources needed to investigate, in which case they will mark an investigation as unsubstantiated and refer it to OPS, the office with the legal authority to conduct criminal investigations.[55] But even these SART referrals to OPS – which

---

[54] 28 C.F.R. § 115.43(a) ("Inmates . . . shall not be placed in involuntary segregated housing unless an assessment of all available alternatives has been made, and a determination has been made that there is no available means of separation from likely abusers. If a facility cannot conduct such an assessment immediately, the facility may hold the inmate in involuntary segregated housing for less than 24 hours while completing the assessment."); 28 C.F.R. § 115.43(d) ("If an involuntary segregated housing assignment is made pursuant to [this standard], the facility shall clearly document: (1) the basis for the facility's concern for the inmate's safety; and (2) The reason why no alternative means of separation can be arranged."); SOP 208.06(IV)(D)(9), https://perma.cc/8XP4-793M (stating individuals at high risk of sexual victimization "shall not be placed in involuntary segregation based solely on that determination unless a determination has been made that there is no available alternative means of separation from likely abusers").

[55] *See supra* § A.8.b.

are required by PREA wherever the allegations involve potential criminal behavior[56] – do not always occur. Instead, in practice, SART units effectively screen out investigations that should be more fully investigated.

SART investigators also have discretion about whether to seek physical evidence of alleged sexual assaults. According to policy, a sexual assault nurse examiner (SANE) is supposed to be "immediately notified, and an appointment scheduled for the collection of forensic evidence" within 72 hours after an alleged sexual assault involving penetration.[57] SART investigators frequently refuse to contact a SANE because 72 hours have passed since the alleged sexual assault and the report. But consistent with advancing DNA technology, many jurisdictions now obtain a SANE evaluation as long as the alleged sexual assault was within the preceding 120 hours, not 72 hours.[58] In addition, SART determines whether to contact a SANE for sexual assault allegations where there is no apparent injury. A healthcare staff member at one large facility reported that, in some cases, healthcare and security staff "battle" over whether to contact a SANE who can detect physical evidence of an assault.

**<u>CASE CLOSED</u>**

In February 2022, facility-based SART investigators concluded an incident did not need to be investigated because of lack of penetration.

In this incident, an incarcerated individual allegedly entered a transgender woman's cell with his penis in his hand, pushed her down on the bed, and attempted to rape her.

The warden and statewide PREA coordinator concurred with SART's finding that the allegation was unfounded, and the SART team did not notify OPS for further investigation.

OPS does not conduct thorough sexual abuse investigations. OPS investigators routinely recommend closing an investigation when a visible injury or seminal fluid is

---

[56] 28 C.F.R. § 115.22(b).

[57] SOP 208.06 Attachment 5, Procedure for SANE Evaluation/Forensic Collection.

[58] U.S. DEP'T OF JUST. OFFICE ON VIOLENCE AGAINST WOMEN, A NAT'L PROTOCOL FOR SEXUAL ASSAULT MEDICAL FORENSIC EXAMINATIONS, ADULTS/ADOLESCENTS, at 7–8 (2d ed. Apr. 2013).

not detected without considering other potential sources of evidence such as video footage or potential witness accounts. For example, a man at a large medium-security prison told staff that, in February 2023, his cellmate forced his penis into his mouth about 10 times over the course of four days, refused to allow him to eat during that time, and beat him with his hands. The man's pants were bloodstained, he had bruises on his face, and he had multiple mouth injuries including a torn frenum. No seminal fluid was detected. (The man reported that his cellmate made him brush his teeth after each sexual assault.) No prosecution was recommended, and the matter was closed administratively based on insufficient evidence from the sexual assault kit and because the man declined to continue pursuing the investigation. But victims of sexual assault often decide not to participate in investigations for confidentiality or safety reasons, and their lack of participation should not by itself justify ending an investigation.

Additional deficiencies with GDC's sexual violence investigations include the following:

- GDC sometimes closes investigations even when physical evidence is available. It closed multiple investigations for lack of evidence even where chemical tests found the presence of semen in the alleged victims' anus. OPS also closed an investigation into an incident where DNA of the alleged attacker was identified on the alleged victim's clothes.

- Investigators do not fully review available surveillance video footage, for example, often reviewing an inappropriately narrow time range from available footage or noting that available video failed to show an alleged act of sexual assault, without addressing whether other camera footage could corroborate an allegation.

- Investigation summaries often contain no discussion of interviews with victims or assailants, and reveal other inappropriate investigatory techniques, including overly brief interviews and, in some cases, interviewing the suspect too early in an investigation.

- Investigations into sexual assault allegations often are substantially delayed.

- GDC fails to provide standardized guidance, protocols, or training for how to conduct these investigations. This results in, or is likely to result in, inconsistencies and investigative failures that are never reviewed or detected.[59]

---

[59] When we requested PREA investigations, GDC informed us that only the OPS investigations – not the SART investigations and other materials completed for PREA matters – were considered "investigations" by GDC. While we ultimately were able to review the SART investigations and other materials completed for PREA matters, GDC's apparent unwillingness to categorize these investigative materials as

Critically, investigation narratives contain inadequate descriptions about what happened. Many investigative files did not contain adequate reasoning or evidence to support the investigation's outcome. For example:

- In March 2023, a man with serious mental illness at GDCP was found catatonic with a large bruise on his head and his boxers – which were covered in blood – pulled down below his knees. The rape kit did not detect the presence of seminal fluid. No prosecution was recommended, and the matter was closed administratively. The investigative files failed to discuss interviews or review of surveillance footage to determine whether a sexual assault might have occurred.

- In March 2023, at ASMP, a man alleged that another incarcerated person entered his cell, threatened him with a knife, and forcibly penetrated the victim's mouth over the course of two hours. Despite writing that the allegations were substantiated in the narrative of the report, the SART investigators checked a box stating that the allegations were unsubstantiated. When OPS later investigated, it only noted that SART had found the incident to be unsubstantiated. As a result, the district attorney declined to prosecute, and OPS closed its investigation administratively.

- One SART investigation concluded that an individual's allegation that his cellmate at Dooly State Prison sexually assaulted him must be false because the two men were assigned to different cells, apparently failing to consider the possibility that the cellmate was not in his assigned cell, notwithstanding the frequency of these arrangements, as noted above in Section A.2.

In addition, GDC's sexual violence investigations focus on whether criminal conduct has occurred but do not identify appropriate administrative corrective actions. Investigations that appear to warrant administrative remedies, such as staff discipline or retraining, are closed without any such administrative action once it is determined that criminal charges will not be pursued. Although facility wardens can take administrative action (including disciplinary action) based on sexual violence investigations, we received no information indicating that wardens ever do so.

GDC also does not provide adequate oversight to prevent, detect, and respond to sexual violence in its prisons. GDC has a central PREA Unit that oversees PREA investigations and compliance with the PREA Standards and with GDC's PREA policies across the State. But the office has just three employees, far fewer than would

---

investigations is likely to exacerbate the investigative inconsistencies and recordkeeping deficiencies discussed in this Findings Report.

be needed to oversee PREA affairs adequately for a system of GDC's size. GDC also does not take corrective actions to investigate or mitigate high concentrations of sexual abuse allegations. The Statewide PREA Coordinator noted that PREA allegations appear to be more common when the weather is warmer, but stated that GDC cannot control the weather. She also observed that PREA allegations rise during football season – possibly because debts accrued from betting on games fuel sexual and other violence – but articulated no plan to act on this knowledge. Although the PREA unit uses tools to track certain investigations, its own tracking logs show it keeps no notes on and receives no notifications about many sexual abuse allegations. The PREA Unit does not make recommendations for changes to facility staffing plans as would be expected for a system of GDC's size. For example, they do not recommend relocating a PREA counselor to a unit to have more staff presence there, nor do they recommend improving camera coverage in areas with reduced staffing.

Rather than take appropriate steps to protect incarcerated persons, GDC's insufficient staffing and supervision, poor facility conditions including broken locks and cameras, unsafe housing decisions, and poor investigation practices place incarcerated persons at substantial risk of sexual violence by other incarcerated individuals.

**b. GDC does not reasonably protect LGBTI individuals from a substantial risk of serious harm from sexual abuse.**

The Eighth Amendment requires that prison officials protect all incarcerated people from sexual abuse by assessing risks facing individual incarcerated people and taking reasonable steps to keep them safe.[60] Prison officials must consider the special vulnerabilities of incarcerated LGBTI individuals to protect them adequately.[61] Courts have looked to compliance with PREA Standards to determine whether prison officials have violated the Eighth Amendment.[62] This is because specific correctional practices

---

[60] *Farmer v. Brennan*, 511 U.S. 825, 843–45 (1994); *Sconiers v. Lockhart*, 946 F.3d 1256, 1259 (11th Cir. 2020) ("Some things are never acceptable, no matter the circumstances. Sexual abuse is one.").

[61] *Farmer*, 511 U.S. at 831, 849 (finding that a transgender individual pleaded sufficient facts to avoid judgment as a matter of law where she alleged her placement in general population left her "particularly vulnerable to sexual attack" and that prison officials placed her there "despite knowledge that the penitentiary had a violent environment and a history of inmate assaults, and despite knowledge that petitioner . . . 'project[ed] feminine characteristics'"); *see also* 28 C.F.R. 115.41(d)(7) ("Whether the inmate is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming" is among the criteria used when determining whether the incarcerated person is at risk of sexual victimization).

[62] Although noncompliance with a PREA Standard alone is not sufficient to support a finding of a constitutional violation, the PREA Standards provide notice to jurisdictions of their obligations to protect incarcerated persons from sexual abuse and sexual harassment. Courts have also looked to the PREA Standards to determine contemporary standards of decency when evaluating Eighth Amendment claims. *Sconiers*, 946 F.3d at 1270–72 (Rosenbaum, J., concurring) (finding PREA and other state legislative enactments to be reliable evidence of contemporary standards of decency) (citing *Crawford v. Cuomo*, 796 F.3d 252, 260 (2d Cir. 2015)).

are necessary to reasonably protect all incarcerated persons from sexual abuse, and because incarcerated persons who are LGBTI may warrant additional tailored protections related to screening, classification, housing, and other aspects of correctional management and operations. We identified acts of sexual violence and abuse targeting particularly gay men, transgender women, and men perceived to be gay, bisexual, or gender non-conforming in men's prisons.[63] GDC's failure to take precautions, many of which are required by PREA, puts all LGBTI indivdiuals in GDC's custody at substantial risk of serious harm from sexual abuse, while likely masking the actual harm inflicted on this vulnerable population.

Nationwide, 12.2% of non-heterosexual incarcerated persons in state and federal prisons report being sexually victimized by another incarcerated person, compared to 1.2% of heterosexual incarcerated persons.[64] Nearly 35% of transgender incarcerated persons in state and federal prisons report having been sexually victimized in custody.[65] Transgender incarcerated persons are nearly ten times as likely to experience sexual abuse by other incarcerated persons as the general incarcerated population, and nearly six times as likely to experience sexual abuse by staff.[66]

GDC's failure to control gangs and other STGs makes many prisons particularly dangerous for LGBTI individuals, who described being targeted with sexual and physical abuse by STGs or gangs because of their LGBTI status. For example, one transgender woman housed in a men's facility described herself as the "possession" of rival gangs that used her for sex and fought over access to her for that purpose. She said that staff did not do anything about the gangs' use of her body for sex.

---

[63] We also found incidents of serious harm involving sexual violence among incarcerated people in women's prisons, although without direct evidence that individuals were targeted on the basis of sexual orientation or gender identity. Because GDC records often do not specify whether the alleged victim in a sexual abuse incident is LGBTI, we do not know the extent of harm inflicted on incarcerated people who are LGBTI. GDC's failure to obtain or properly track this information in no way lessens its responsibility to protect these individuals from the risk of harm from sexual abuse, nor can it impede DOJ from enforcing that responsibility.

[64] Allen J. Beck, et al., Bureau of Justice Statistics, *Sexual Victimization in Prisons and Jails Reported by Inmates 2011-12, National Inmate Survey, 2011-12*, at 18 (May 2013), https://perma.cc/3SDY-DY5R.

[65] Allen J. Beck, Bureau of Justice Statistics, *Supplemental Tables: Prevalence of Sexual Victimization Among Transgender Adult Inmates, 2011-12*, at 2 (Dec. 2014), https://perma.cc/L4EN-5VX3.

[66] *See* Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey*, at 192, NAT'L CTR. FOR TRANSGENDER EQUALITY (Dec. 2016), https://perma.cc/UJ3R-A5V8. Some studies find that the rate is even higher. *See* Valerie Jenness, et al., Ctr. for Evidence-Based Corr., *Violence in California Correctional Facilities: An Empirical Examination of Sexual Assault*, at 2 UNIV. OF CALIFORNIA, IRVINE (2007), https://perma.cc/V9GL-NEPA (finding sexual assault is 13 times as prevalent among transgender individuals as the general population (4.4% to 59%) in California state prisons).

We also received many reports of LGBTI individuals being stabbed, beaten, or threatened with physical or sexual violence by gangs because of their LGBTI status. Individuals who said they had been sexually victimized told us they did not report it because of fear they would be targeted for snitching. And gang members who reported having no personal prejudice against LGBTI individuals reported pressure from their gangs to target them because their gangs did not condone LGBTI or gender-nonconforming identities. Sometimes gangs refuse to allow LGBTI individuals to live in the same housing unit as them. Numerous incarcerated persons reported that gangs tell LGBTI individuals to leave their housing unit or else be subjected to violence. In these cases, staff often defer to gangs and move them to other housing units.

The conditions in GDC facilities and the reports we received concerning violence targeting LGTBI people demonstrate that GDC should be taking measures to protect LGBTI individuals from being preyed upon while in custody. But GDC's screening and classification systems fail to protect LGBTI individuals despite their heightened vulnerability. PREA Standards require prisons to screen all incarcerated persons during intake for their risk of being sexually abused or sexually abusive towards others and to use that information to inform housing assignments with the goal of separating the vulnerable from the abusive.[67] Staff must assess as part of screening whether the individual "is or is perceived to be" LGBTI,[68] and use screening information to make "individualized determinations about how to ensure the safety of each [individual]."[69]

Instead, GDC's systems for security-level and housing-facility assignments rarely consider a person's LGBTI status. GDC facilities neither consistently screen for self-reported LGBTI status or other vulnerabilities nor make individualized housing assignments for LGBTI individuals to ensure their safety. The screenings that do occur routinely fail to consider an individual's past history of victimization or harming others to appropriately assess their risk level. Nor do they take LGBTI individuals' own views about safety into consideration. Incarcerated persons who did report some kind of PREA screening often said it happened in a group setting that lacked confidentiality, making candid responses unlikely.

In many cases, GDC fails to identify individuals who are LGBTI at all or else does not track LGBTI individuals after their initial risk assessment, including in the PREA screening that is supposed to occur 30 days after someone arrives at a facility (but

---

[67] 28 C.F.R. § 115.42(a); National Standards to Prevent, Detect, and Respond to Prison Rape, 77 Fed. Reg. 37109 (June 20, 2012) (explanatory text).

[68] *Id.* § 115.41(d)(7).

[69] *Id.* § 115.42(b).

which rarely occurs). This makes it impossible to protect LGTBI people adequately. PREA audits of individual GDC facilities reported the presence of far fewer LGBTI individuals than would be expected based on the proportion of LGBTI individuals in the general population and most correctional settings. For example, the 2020 PREA audit report for one women's facility stated there was just one woman who identified as a lesbian out of a population of more than 400.

GDC houses transgender and intersex individuals in men's or women's prison facilities strictly based on the individual's external genitalia and regardless of the person's gender identity, diagnosis, appearance, transition status or vulnerabilities. The Statewide PREA Coordinator confirmed that, at least between December 2022 and December 2023, all transgender individuals in GDC's custody were housed in accordance with their external genitalia, and not based on their gender identity. And of the dozen-plus transgender and intersex individuals who spoke with us at GDC facilities, none were housed at facilities that accorded with their gender identity. GDC's practice of housing transgender individuals exclusively based on external genitalia is inconsistent with PREA Standards and GDC's own policy, both of which ban assignments on that basis alone.[70] Both also require prison officials to determine, case-by-case, whether to assign transgender individuals to men's or women's facilities.[71] GDC is not doing this case-by-case determination. This failure puts transgender individuals – who have "particular vulnerabilities" to sexual abuse in correctional settings[72] – at heightened risk of harm. Many of the transgender individuals who spoke to us reported having been sexually assaulted or threatened with sexual abuse or violence; several told us about being compelled to provide sexual favors in exchange for protection from others. GDC's failure to conduct individualized

---

[70] PREA Standards, Frequently Asked Questions: Does a Policy that Houses Transgender or Intersex Inmates Based Exclusively On . . . , NAT'L PREA RES. CTR. (Mar. 24, 2016), https://perma.cc/2KHR-ZWX3 ("Any written policy or actual practice that assigns transgender or intersex inmates to gender-specific facilities, housing units, or programs based solely on their external genital anatomy violates . . . standard [115.42(c)]."); SOP 220.09 IV(C)(2) ("Transgender offenders may not be assigned to gender-specific facilities based solely on their external genital anatomy.").

[71] 28 C.F.R. § 115.42(c); SOP 208.06(IV)(D)(5) ("In deciding whether to assign a Transgender or Intersex offender to a male or female facility and in making other housing and programming assignments, the Department shall consider on a case-by-case basis whether a placement would ensure the offender's health and safety, and whether the placement would present management or security problems. . . ."). Facilities must also seek out and give "serious consideration" to the transgender individual's own views with respect to her or his own safety. 28 C.F.R. § 115.42(e).

[72] *See* National Standards to Prevent, Detect, & Respond to Prison Rape, 77 Fed. Reg. 37109 (June 20, 2012) (explanatory text).

housing assessments for those individuals or to take steps to mitigate their risk of sexual victimization violates the Eighth Amendment.[73]

GDC's handling of sexual abuse complaints by LGBTI individuals places them at further risk of harm. As discussed above in section A.9.a, a transgender woman placed in isolation after making a PREA complaint died by suicide the next day. Another transgender woman reported being raped in the shower at Coastal State Prison and placed in the "hole" for two to three weeks afterward before being transferred to another facility. A gay man also reported being placed in the "hole" three weeks after reporting a sexual assault at Coastal. In other cases, LGBTI individuals have no choice but to request being placed in isolation – thereby subjecting themselves to harsh conditions deleterious to their physical and mental health – because it is the only available option to protect them from physical and sexual abuse at the hands of other incarcerated persons in their housing units.

One LGBTI individual who was hospitalized after a physical assault that left them covered in blood filed a grievance asking for a change in housing. In their grievance, they noted their LGBTI status and history of being sexually abused, and they stated that theywere afraid for their safety. GDC denied the grievance, stating that the grieving individual was in administrative segregation for refusing housing and that protective custody would be considered only if the person made a specific request for it. Under the PREA Standards, GDC was required to determine whether the person making the grievance was at substantial risk of imminent sexual abuse and document its determination and any action taken in response.[74] But we found no indication that GDC did so. Nothing in the records reflects that the allegation was forwarded to OPS for investigation, that GDC re-screened the person for PREA victimization, or that GDC considered alternative housing for safety.

Because of these failures in its screening, classification, and investigation processes, LGBTI individuals in GDC custody are especially vulnerable to sexual abuse and the substantial risk of serious harm from sexual abuse.

---

[73] *See Crawford*, 796 F.3d at 260.

[74] 28 C.F.R. § 115.52(f)(2).

**B. The State Is Deliberately Indifferent to the Risk of Harm to Incarcerated Persons.**

An official acts with deliberate indifference when that person "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[75] Prison officials must know that their conduct, either acts or omissions, put incarcerated people at a substantial risk of serious harm.[76] A court may conclude that "a prison official knew of a substantial risk from the very fact that the risk was obvious."[77]

The State has been aware, for years, of the violence in its prisons, and of the operational and management problems that contribute to the high levels of violence, including chronic understaffing, easily accessible contraband, and dominant STGs. The State also has been aware of the sexual abuse in its prisons, and of the particular risk of sexual abuse to LGBTI incarcerated people. Under the Eighth Amendment, GDC has a constitutional duty to respond reasonably to substantial risks of harm of which it is aware.[78] GDC has been aware of serious and persistent risks of harm to the people in its custody, perpetuated by its conditions, but has failed to take reasonable, proportionate actions to address the violence and sexual abuse in its prisons.

GDC has known for decades that it had staffing issues and a growing incarcerated population that, if not properly addressed, would lead to a crisis. Adequate staffing is critical to providing essential supervision and security in prisons. As early as 1985, the GDC Commissioner represented that there were not enough COs and that salaries were too low. In 1999, GDC again noted the mounting issue: "While the number of GDC employees remains steady, the total number of offenders continues to rise." By 2006, GDC's annual report acknowledged staffing had continued to decline: Staffing numbers are lower today than they were in 1999, even though the population has increased by around 12,300 people, or 31%. In 2019, GDC emphasized that, "Retention of Correctional Officers (COs) continues to be a challenge" and "[b]etween FY 2017 and FY 2019, CO turnover increased from 27.2% to 42.1%." While there

---

[75] *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

[76] *Wade v. McDade*, 106 F.4th 1251, 1253 (11th Cir. 2024).

[77] *Farmer*, 511 U.S. at 842.

[78] *See Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312, 1320 (11th Cir. 2016) (explaining that a prison official is deliberately indifferent under the Eighth Amendment "when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk"); *accord Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014).

have been some fluctuations over the years, for several years GDC has failed to hire and retain enough staff to keep the population safe.

Several recent lawsuits against GDC have alleged constitutional violations, including failure to protect incarcerated people from harm. Reportedly, GDC has spent almost $20 million since 2018 to settle claims involving death or injury to people incarcerated in its prisons.[79] In 2021, GDC settled a lawsuit brought by the parents of an incarcerated transgender person who alleged that their child's suicide was the result of GDC's deliberate indifference. In 2023, GDC agreed to a $5 million settlement in a case in which an incarcerated person died after COs left him locked in his cell with his mattress on fire; the medical examiner ruled the death a homicide.[80] In 2023, GDC settled a lawsuit brought by an incarcerated man's family, after he was strangled to death by his cellmate at Macon State Prison in 2020, a consequence, the family alleged, of GDC's deliberate indifference. Since 2019, GDC has been subject to a consent decree in a civil rights class action challenging conditions of confinement in the Special Management Unit; in April 2024, the court overseeing the consent decree held GDC in contempt for failing to comply with court orders and imposed monetary sanctions until GDC comes into compliance.[81] In a state-court lawsuit against GDC, GDC's former medical contractor alleged in its pleadings that GDC's failure to control violence in the prisons led to extraordinarily high medical costs for trauma care.[82]

Moreover, the State is aware, through its own data, that violence and threats of violence are widespread in the prisons. GDC leadership officials are sent a selected portion of the data that facilities collect in incident reports and other documentation. For each facility, a monthly report containing statistics, including those related to violent incidents, is generated for review by the warden and regional manager. GDC executive leadership officials receive reports of emergencies and serious incidents

---

[79] *See* Carrie Teegardin, Danny Robbins, & Jennifer Peebles, *Prison System Failures Cost Georgia Taxpayers Millions*, ATLANTA JOURNAL-CONSTITUTION (Feb. 1, 2024), https://perma.cc/8LXH-5DPG.

[80] *Loyal v. Georgia Dep't of Corrections*, 1:22-cv-00084-JRH-BKE (S.D. Ga.); *see* Danny Robbins & Carrie Teegardin, *Georgia prisoner died after being left for hours in smoke-filled cell*, ATLANTA JOURNAL-CONSTITUTION (Feb. 1, 2024), https://perma.cc/KAE9-JWDB.

[81] *See* Revised Contempt Order, Doc. No. 485, *Daughtry v. Emmons, et al.*, No. 5:15-cv-41-MTT (M.D. Ga. Apr. 23, 2024).

[82] 1st Am. Pet.for Declaratory J. and Injunctive Relief Ex. 3, at ¶¶ 6, 8, *Wellpath v. Georgia*, No. 24CV006556 (Fulton Cnty. Superior Ct. June 5, 2024) (Wellpath executive testifying that GDC's "historically low correctional officer staffing levels . . . materially impacted Wellpath's ability to provide care to patients in a safe manner" due to problems including "inmate on inmate violence," and that "the levels of inmate on inmate assaults in the facilities covered by the Contract were exponentially higher than those in other facilities served by Wellpath" in other states). The lawsuit has been dismissed on grounds unrelated to the allegations of low staffing and high violence. *See* Final Order, *Wellpath v. Georgia*, No. 24CV006556 (Fulton Cnty. Superior Ct. June 27, 2024).

across the system; for example, from January 2022 through April 2023, these reports available to GDC leadership included 1,045 incidents of violence, including assaults, fights, and homicides. GDC facilities also produce comprehensive reports of statistics monthly, including the number of assaults, deaths, and uses of force. While leadership explained these reports used to be reviewed, GDC had not held an executive-level meeting to review these reports in over a year as of late 2023, due to "other priorities." One member of GDC's leadership stated they did not believe assessing trends is beneficial because of the inability to predict what's going to happen. However, the trends within GDC have shown an increase in violence, and GDC continued its failure to provide adequate supervision, appropriate classification, and other steps to protect incarcerated people.

State officials are likewise aware of factors that increase the risk of sexual abuse in GDC facilities, particularly for LGBTI individuals. A May 2022 audit report that GDC commissioned by outside consultants found that *zero* of 388 surveyed PREA investigations complied with all applicable PREA Standards. The Statewide PREA Coordinator told us she was aware of this audit. Even so, GDC's PREA investigations did not correct the deficiencies set forth in that report a year after the report was issued. For example, SART investigators still do not receive specialized investigator training that is essential to investigate sexual abuse allegations adequately. Nor are there policies and procedures in place to ensure staff conduct adequate administrative investigations. In addition, GDC's screening, classification, and housing assignment systems fail to consider adequately the LGBTI status of incarcerated individuals and indicia that someone is especially vulnerable or at heightened risk of abusing others, creating an obvious risk of serious harm to those individuals.[83] State officials are also aware of GDC's practice of housing transgender individuals based solely on their external genitalia in violation of PREA, with no consideration of the preferences or particular vulnerabilities of those individuals.

Although the State has acknowledged that GDC prisons face challenges, including staffing shortages, gangs, and contraband, officials take the position that these are typical problems in all correctional systems – when the incarcerated population is violent, there will be violence. GDC officials and staff repeatedly expressed a sense of inevitability, blaming gangs, mental health problems, and a high population of "violent offenders." In 2022, the GDC Commissioner told a reporter that 30 homicide deaths

---

[83] *See Williams v. Bennett*, 689 F.2d 1370, 1375 (11th Cir. 1982) (finding prior litigation established that deliberate indifference may be found when prison officials make "no realistic attempt . . . to separate violent, aggressive inmates from those who are passive or weak") (alteration in original) (internal quotations and citation omitted); *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 82–84 (6th Cir. 1995) (noting that certain categories of incarcerated persons have particular vulnerabilities and finding the failure to consider those vulnerabilities in housing assignments may constitute deliberate indifference).

per year of people in his care and custody should not be considered "as bad" given "the population we're dealing with."[84] According to GDC's mortality data, there were 31 homicide deaths in its prisons in 2022, and 35 in 2023. But despite this increasing number of homicides in recent years, GDC's 50-page slide deck presenting an "Agency Overview" to the State Board of Corrections in September 2023 included only a small chart acknowledging that there had been 38 homicides and 40 suicides of people in its custody in the previous Fiscal Year.

Line-level facility staff expressed a similar acceptance. For example, one medical employee reported that every Monday morning they saw an influx of patients escorted to medical by security staff, with reports of violent assaults over the weekend, when security staffing was especially scarce. The medical employee said that security staff report in a matter-of-fact tone that the victims have been "beat up," "tied up," assaulted, or used in an extortion scheme. This employee also reported that, after medical employees raised concerns, an executive from GDC's medical contractor met with facility leadership to discuss ongoing security issues. Another medical employee said he became "desensitized" due to the frequency of medical emergencies, including assaults and deaths, in one of the close-security men's prisons.

The State likewise has been on notice of systemic deficiencies that contribute to harm in its prisons. Year after year, the State continues to collect enormous amounts of contraband, including weapons, drugs, and electronics, from within prisons across the system. While the State continues to publicly announce the results of contraband searches and charges in high-profile cases related to crimes in the prisons, it fails to change its approach, while illegal schemes continue to thrive and contraband continues to proliferate. The State also has been on notice of deficiencies in its investigations practice; in May 2022, GDC received the results of an external commissioned review of its PREA investigations practice, identifying numerous deficiencies in its investigations.

We recognize that, since DOJ expanded this Investigation in 2021, the State has taken some steps toward addressing some of the problems identified in this Report. However, the steps that the State has taken have been inadequate to address its problems and provide minimally adequate constitutional protections from harm. The State has publicly touted its efforts to improve staffing. These efforts included raising CO salaries, adding a lower-level "CO Tech" position, and filling hundreds of CO and CO Technician positions between November 2022 and January 2024. The State's 2025 budget also includes a one-time $1,000 salary increase for COs, and proposes a

[84] As discussed above in section A.1, the rate of homicides in GDC prisons is significantly higher than the national average.

new "Correctional Officer 3" rank position.[85] GDC officials explained that they have hired advertising agencies and a consulting firm for targeted assistance with recruitment and staff morale and retention. Yet, as discussed earlier in this report, GDC's systemwide officer vacancy rate is still around 50%, and several of the larger and most dangerous prisons have staffing vacancy rates above 60 or 70%, leaving the population unsupervised much of the time.[86]

GDC also has acknowledged its facilities are in dire need of repair. It has closed some facilities and undertaken renovations in others. For example, in early 2022, GDC closed Georgia State Prison, a notoriously violent and dilapidated prison. In 2023, GDC announced plans to close or repurpose Lee Arrendale State Prison, and began to implement plans to open a larger, renovated women's prison in McRae, Georgia, to which most of the Lee Arrendale population would be moved. The State also recently allocated funds for a new state prison in Washington County, to replace the current Washington State Prison, as well as some increased funding for facility maintenance and repairs statewide.[87] GDC also temporarily closed Autry State Prison for renovations, and has undertaken renovation projects, including lock "hardening" and other improvements, at other prisons. However, without major improvements in staffing, supervision, and accountability systems, maintenance problems and vandalism will persist.

State officials also acknowledge that contraband in the prisons is a major problem. Recently, the State enacted a statute imposing harsher punishments for COs and incarcerated persons convicted of contraband-related crimes. GDC also claims to have increased facility shakedowns and other contraband monitoring, such as interception of attempts to introduce contraband into the facilities. While GDC frequently touts the results of its searches and shakedowns, contraband continues to stream into the prisons, endangering incarcerated people, staff, and outside communities. State officials also have undertaken some efforts to increase spending on contraband intervention technologies. In particular, GDC leadership and State officials have undertaken public-facing lobbying efforts seeking to expand the use of cellphone mitigation technology, including "jammers," in the prisons. Although illegal

---

[85] Governor Brian P. Kemp, *The Governor's Budget Report Amended Fiscal Year 2024 and Fiscal Year 2025*, at 151, https://perma.cc/T53G-TU76.

[86] *See supra* § A.2.

[87] *See* Georgia General Assembly, HB915, Supplemental Appropriations, State Fiscal Years July 1, 2023 – June 30, 2024, at 197, https://perma.cc/U8LP-UD9Y. However, dozens of GDC prisons are roughly as old as or older than Washington, and serious problems with the physical condition of GDC's facilities persist due to the aging buildings, ongoing maintenance problems, and failure to adequately supervise the population, as described elsewhere in this Findings Report.

cellphone use undoubtedly contributes to GDC's inability to control illicit activity in the prisons, cracking down on contraband technology is only one facet of a successful approach to contraband control and gang control in a correctional setting. Appropriate and effective classification, housing, supervision, disciplinary systems, and administrative investigations all are other critical components of effective contraband control.

The State recently announced that it retained high-profile consultants to conduct a comprehensive one-year assessment of GDC and to "identify current strengths, opportunities, and recommendations to enhance operational efficiency and effectiveness," and to "begin implementation support."[88] While a full-scale review and strategic plan will be an essential part of correcting ongoing constitutional harm, including the violations discussed in this Findings Report, any results of this new consulting engagement would be years in the future, and would depend on a serious commitment from the State to acknowledge and address its systemic failure to protect GDC's incarcerated population from harm.

Through their own data and public attention, GDC has been aware that systemic deficiencies within its system increase the risk of harm to the people in its custody.[89] The State's efforts have been inadequate, as evidenced by the ongoing harm and significant risk of serious harm in the prisons, as described throughout this Findings Report. It is plainly evident, from not only the staffing levels and crime in the prisons but also by the prevalence of harm, that Georgia exposes the people it incarcerates to a substantial risk of serious harm, and that GDC's policies and practices have failed to address the pervasive problems.[90] Georgia has known of the substantial risk of serious harm presented by widespread violence and sexual abuse in its prisons, but rather than address the violence, it has failed to take reasonable steps to address those unconstitutional conditions.

---

[88] Press Release, Office of the Governor, Gov. Kemp Announces GDC Assessment as Next Phase of Public Safety Improvements (June 17, 2024), https://perma.cc/4KU4-5CA6.

[89] In the midst of its awareness of pervasive violence problems, the State has been disclosing less to the public about conditions and harm in the prisons, providing more minimal updates and, generally, only high-level information to the press regarding inquiries about deaths, violence, and other harm in the prisons. The families of incarcerated people who are injured in violent incidents have reported they have received partial or delayed information, if any, from GDC about their loved ones.

[90] Prison officials are deliberately indifferent where they have taken actions they knew "would be insufficient to provide inmates with reasonable protection from violence" and there were other means available that were disregarded. *LaMarca v. Turner*, 995 F.2d 1526, 1539 (11th Cir. 1993).

# MINIMUM REMEDIAL MEASURES

To remedy the constitutional violations identified in this Findings Report, we recommend that the State implement, at minimum, the remedial measures listed below.

### A. Short-Term and Immediate Measures

1. Contact the National Institute of Corrections (NIC) to request technical assistance to develop and implement a strategy and timeframe to assess conditions in GDC prisons that need immediate attention.

2. Seek technical assistance from NIC to conduct a comprehensive strategic planning analysis to address systemwide violence and sexual abuse in Georgia's prisons and implement a long-term strategic plan with periodic progress assessments and anticipated outcomes. The strategic plan should address the deficiencies and factors identified in this Findings Report and should analyze data and trends available across GDC's divisions. The strategic plan should include, but should not be limited to, the following:

    a. Develop a comprehensive reporting and analytic strategy to enable GDC to use data to manage the corrections system and individual prisons.

    b. Use data and analytics to develop and implement an improved dashboard to assist GDC central office and prison management in determining where to focus their attention.

    c. Review GDC divisions to assess the information and data maintained and ensure it is shared appropriately with other divisions in managing their areas, i.e., Field Operations and OPS.

    d. Assess the long-term viability of the prison facilities across the system, and develop a long-term plan for the appropriate use, maintenance, and renovation of all prison facilities in the GDC system.

    e. Assess current population needs and projected population trends to identify incarcerated persons who could be moved from prisons to lower-security facilities or local oversight.

<u>Staffing and Supervision</u>

3. Assess the skills, qualifications, and training of facility and GDC leadership, and provide ongoing professional development for all personnel in supervisory and leadership positions.

4. Within reasonable time frames, properly screen, hire, and fully train sufficient COs to staff all mandatory posts in all GDC facilities, and to bring all GDC facilities within 90% of currently allotted posts (i.e., 10% or lower CO vacancy rate).

   a. GDC should consider all feasible immediate steps to ensure coverage of all mandatory posts, including training and assigning as temporary supplemental correctional security staff personnel from other agencies to provide adequate staffing and supervision to the prisons until GDC sustainably and consistently can staff its own prisons with full-time, permanent COs and supervisory security staff.

   b. GDC also should consider the feasibility of temporarily or permanently reassigning staff from facilities with lower vacancy rates and lower violence levels to facilities with higher vacancy rates and higher violence levels.

5. Ensure every mandatory post is filled. Declare and document emergencies any time a mandatory post in any prison is not staffed.

6. Ensure that correctional staff conduct regular security rounds, on an irregular, unannounced schedule, at appropriate time intervals, in all living areas. Ensure that all such rounds are appropriately documented, and that the documentation is reviewed on a regular basis by facility leadership and GDC leadership. Deficiencies in complying with these requirements should be addressed immediately.

7. Ensure that correctional staff conduct and document all required counts. Ensure that all official counts include verification of the identity of every incarcerated person with their picture identification card and that they are living at their assigned bed. Deficiencies in complying with these requirements should be addressed immediately.

8. Assess the feasibility of aligning low-risk, nonviolent incarcerated persons to minimum-security facilities or to other forms of supervision. In doing so, the State should consult with not only GDC but also with other State agencies to achieve any feasible population realignment (e.g., Board of Pardons and Parole).

Incident Response, Reporting, and Investigations

9. Develop and implement a plan to ensure that all incidents are timely, accurately, and thoroughly documented in incident reports, facility reports, and all reports collecting or summarizing incidents to regional and central office leadership.

10. Implement a quality assurance program that includes complete, interdisciplinary morbidity/mortality reviews of all deaths, attempted suicides, and other critical incidents; is adequately maintained; examines for patterns and trends; and identifies and corrects systemic deficiencies.

Classification and Housing

11. Conduct a review of restrictive housing unit practices and remedy all noncompliance with GDC SOP 209.06 Administrative Segregation (effective February 19, 2021) and applicable legal standards including PREA.

12. Revise GDC's classification and housing procedures and practices to avoid subjecting victims to housing conditions that deter reporting of violence or sexual abuse, including placement in segregation, isolation, or restrictive housing, when they seek assistance or protection from harm.

13. Ensure that housing classification audits are conducted at least once per month in all prison housing units, to ensure that every incarcerated person is living at their assigned bed location. Ensure these audits are documented, that the documentation is reviewed by facility leadership and GDC leadership, and that all necessary remedial actions are promptly taken.

# Official Report

Division of Forensic Sciences
Georgia Bureau of Investigation
State of Georgia

Headquarters
DOFS Case #: 2016-1015515
Report Date: 08/15/2017

George Herrin, Jr., Ph.D.
Deputy Director

ASCLD/LAB-International
Accredited Testing Laboratory

**Requested Service:** DNA Typing
Agency: DeKalb Co. Police Department
Agency Ref#: 16049062
Requested by: KD McNeil

**Case Individuals:**
Subject: Marcus Ivey
Victim: Chavronya Grimes

**Evidence:**

On 05/23/2016, the laboratory received the following evidence from the DeKalb Co. Police Department via Lockbox.

| | |
|---|---|
| 2016-1015515-001 | Sealed sexual assault evidence collection kit of Chavronya Lache Grimes |
| 2016-1015515-001B | Envelope labeled as containing cervical swabs |
| 2016-1015515-001C | Envelope labeled as containing rectal swabs |
| 2016-1015515-001D | Envelope labeled as containing oral swabs |

On 07/18/2016, the laboratory received the following evidence from the DeKalb Co. Police Department via Lockbox.

| | |
|---|---|
| 2016-1015515-002 | Sealed package containing buccal swabs identified as collected from Marcus Ivey |

**Results and Conclusions:**

DNA isolation procedures were performed on the above items.

Amplification procedures for the STR loci D3S1358, vWA, D16S539, CSF1PO, TPOX, D8S1179, D21S11, D18S51, D2S441, D19S433, TH01, FGA, D22S1045, D5S818, D13S317, D7S820, SE33, D10S1248, D1S1656, D12S391, D2S1338, the YSTR locus DYS391, the Y indel locus, and amelogenin locus were performed. Amplification products were classified using electrophoretic separation.

The DNA obtained from the cervical swabs (item 1B) contained the DNA profiles of at least two individuals.

The first DNA profile obtained from the cervical swabs (item 1B) matches the profile of Chavronya Grimes using the loci D3S1358, vWA, D16S539, CSF1PO, TPOX, D8S1179, D21S11, D18S51, D2S441, D19S433, TH01, FGA, D22S1045, D5S818, D13S317, D7S820, SE33, D10S1248, D1S1656, D12S391, D2S1338 and amelogenin locus.

The second DNA profile obtained from the cervical swabs (item 1B) could not have been contributed by Marcus Ivey.

Due to the circumstances of the case, the second DNA profile obtained from the cervical swabs (item 1B) is not eligible for entry into the DNA database (CODIS).

Due to the absence of quantifiable human male DNA in the rectal swab (item 1C) using the Investigator Quantiplex HYres Kit on the Applied Biosystems 7500 real time PCR system; PCR amplification procedures were not performed on the rectal swab (item 1C).

Only those items discussed in the results above were analyzed for this report. The above represents the interpretations/opinions of the undersigned analyst. Evidence analyzed in this report will be returned to the submitting agency. Biological evidence (body fluids and tissues) and fire debris extracts will be destroyed after one year. This report may not be reproduced except in full without written permission of the laboratory.

Technical notes and data supporting the conclusions and findings in this report are maintained within the laboratory case records.

This case may contain evidence that must be preserved in accordance with O.C.G.A. § 17-5-56.

Mackenzie Kilkeary
Forensic Biologist
404-270-8508
Mackenzie.Kilkeary@gbi.ga.gov

Related Agencies:

Stone Mountain Judicial Circuit
DeKalb Co. District Attorney

End of Official Report

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

MARVIS IVEY, R.N.,
MARCUS IVEY,

PLAINTIFFS,

Vs.

BOARD OF REGENTS OF
THE UNIVERSITY SYSTEM
OF GEORGIA, et al.,

DEFENDANTS.

CIVIL ACTION NUMBER:
4:26-CV-00166

**AFFIDAVIT IN SUPPORT OF EMERGENCY MOTION FOR RECUSAL OF DISQUALIFIED JUDGE R. STAN BAKER**

Before the undersigned Notary Public duly authorized to administer oaths in the State of Georgia appeared Affiant, Marvis Ivey, R.N. who under oath deposes and states:

1.

I am Marvis Ivey, R. N., a licensed registered nurse in all states which participate in the compact including the State of Georgia. I am of the age of the majority and competent to make this Affidavit based on my personal knowledge.

2.

The statements and facts contained in the **EMERGENCY MOTION FOR RECUSAL OF DISQUALIFIED JUDGE R. STAN BAKER** are true and correct.

SWORN TO AND SUBSCRIBED UNDER OATH this 18 day of August, 2026.

Anthony DeAndre Howard
Notary Public

Marvis Ivey
Parker's House
C/O Marvis Ivey, R.N.
120 Fahm Street, Savannah, Georgia 31401

ANTHONY DEANDRE HOWARD
NOTARY PUBLIC
Chatham County
State of Georgia
My Comm. Expires May 15, 2029

# MINIMUM REMEDIAL MEASURES

To remedy the constitutional violations identified in this Findings Report, we recommend that the State implement, at minimum, the remedial measures listed below.

## A. Short-Term and Immediate Measures

1. Contact the National Institute of Corrections (NIC) to request technical assistance to develop and implement a strategy and timeframe to assess conditions in GDC prisons that need immediate attention.

2. Seek technical assistance from NIC to conduct a comprehensive strategic planning analysis to address systemwide violence and sexual abuse in Georgia's prisons and implement a long-term strategic plan with periodic progress assessments and anticipated outcomes. The strategic plan should address the deficiencies and factors identified in this Findings Report and should analyze data and trends available across GDC's divisions. The strategic plan should include, but should not be limited to, the following:

    a. Develop a comprehensive reporting and analytic strategy to enable GDC to use data to manage the corrections system and individual prisons.

    b. Use data and analytics to develop and implement an improved dashboard to assist GDC central office and prison management in determining where to focus their attention.

    c. Review GDC divisions to assess the information and data maintained and ensure it is shared appropriately with other divisions in managing their areas, i.e., Field Operations and OPS.

    d. Assess the long-term viability of the prison facilities across the system, and develop a long-term plan for the appropriate use, maintenance, and renovation of all prison facilities in the GDC system.

    e. Assess current population needs and projected population trends to identify incarcerated persons who could be moved from prisons to lower-security facilities or local oversight.

Staffing and Supervision

3. Assess the skills, qualifications, and training of facility and GDC leadership, and provide ongoing professional development for all personnel in supervisory and leadership positions.

4. Within reasonable time frames, properly screen, hire, and fully train sufficient COs to staff all mandatory posts in all GDC facilities, and to bring all GDC facilities within 90% of currently allotted posts (i.e., 10% or lower CO vacancy rate).

    a. GDC should consider all feasible immediate steps to ensure coverage of all mandatory posts, including training and assigning as temporary supplemental correctional security staff personnel from other agencies to provide adequate staffing and supervision to the prisons until GDC sustainably and consistently can staff its own prisons with full-time, permanent COs and supervisory security staff.

    b. GDC also should consider the feasibility of temporarily or permanently reassigning staff from facilities with lower vacancy rates and lower violence levels to facilities with higher vacancy rates and higher violence levels.

5. Ensure every mandatory post is filled. Declare and document emergencies any time a mandatory post in any prison is not staffed.

6. Ensure that correctional staff conduct regular security rounds, on an irregular, unannounced schedule, at appropriate time intervals, in all living areas. Ensure that all such rounds are appropriately documented, and that the documentation is reviewed on a regular basis by facility leadership and GDC leadership. Deficiencies in complying with these requirements should be addressed immediately.

7. Ensure that correctional staff conduct and document all required counts. Ensure that all official counts include verification of the identity of every incarcerated person with their picture identification card and that they are living at their assigned bed. Deficiencies in complying with these requirements should be addressed immediately.

8. Assess the feasibility of aligning low-risk, nonviolent incarcerated persons to minimum-security facilities or to other forms of supervision. In doing so, the State should consult with not only GDC but also with other State agencies to achieve any feasible population realignment (e.g., Board of Pardons and Parole).

Incident Response, Reporting, and Investigations

9. Develop and implement a plan to ensure that all incidents are timely, accurately, and thoroughly documented in incident reports, facility reports, and all reports collecting or summarizing incidents to regional and central office leadership.

10. Implement a quality assurance program that includes complete, interdisciplinary morbidity/mortality reviews of all deaths, attempted suicides, and other critical incidents; is adequately maintained; examines for patterns and trends; and identifies and corrects systemic deficiencies.

Classification and Housing

11. Conduct a review of restrictive housing unit practices and remedy all noncompliance with GDC SOP 209.06 Administrative Segregation (effective February 19, 2021) and applicable legal standards including PREA.

12. Revise GDC's classification and housing procedures and practices to avoid subjecting victims to housing conditions that deter reporting of violence or sexual abuse, including placement in segregation, isolation, or restrictive housing, when they seek assistance or protection from harm.

13. Ensure that housing classification audits are conducted at least once per month in all prison housing units, to ensure that every incarcerated person is living at their assigned bed location. Ensure these audits are documented, that the documentation is reviewed by facility leadership and GDC leadership, and that all necessary remedial actions are promptly taken.

Contraband and STG Management

14. Implement weekly searches of all housing units and congregate areas; require written documentation of all search results. Require daily searches of the interior of the perimeter, the yard, and congregate feeding and recreation areas before and after each use by incarcerated persons, and searches of visiting rooms (including restrooms) before and after every visiting period, with the results of these searches documented. Analyze search results for patterns and trends and promptly implement plans to address any patterns or trends discovered.

15. Assess GDC's contraband management program and develop and implement methods of detecting and preventing the introduction of illegal drugs and other contraband being brought into the facilities. Include recommended measures in GDC's screening policy and practices and in contraband-related incident response and investigations.

16. Provide adequate medical treatment, using evidence-based treatment, for all incarcerated people detoxifying.

Facility Conditions

17. Identify all physical-plant deficiencies requiring repair, remediation, or replacement. The review should include, but should not be limited to, all locks, doors, plumbing fixtures, windows, fencing, electrical fixtures, metal furniture, hardware, walls, and ceilings. Develop and implement a prioritized task list for physical-plant repairs identified and a timeline for completion of all required repairs.

18. Identify all non-operational fire safety equipment and systems in all Georgia prisons, and develop and implement a prioritized task list for repairs identified and a timeline for completion of all required repairs.

19. Ensure that all prisons can remove incarcerated persons from cells during normal movement and during emergencies while maintaining cell-door security.

20. Perform and document fire safety inspections to ensure that all fire safety equipment is operational.

21. Ensure, in all prisons that will remain open for more than one year, that sufficient, appropriately located, working cameras are in place as needed. All video footage should be retained for 90 days unless an assault on an incarcerated person or staff or other incident occurs in an area surveilled, in which case the video should be preserved until the matter is fully investigated and prosecuted or dismissed by authority of the Commissioner. Any out-of-service video equipment should be replaced within 72 hours.

Sexual Safety

22. Conduct appropriate, documented investigations of every allegation of sexual abuse consistent with GDC policy and PREA Standards.

23. Assess GDC's PREA compliance and other sexual safety practices and develop and implement immediate and long-term remedies, with timetables and expected outcomes, to address the sexual safety issues in Georgia's prisons.

24. Immediately and on an ongoing basis, ensure all incarcerated persons receive quality, timely, confidential PREA-compliant initial risk screenings and follow-up screenings in a private office and that the screening information is used in the classification of each incarcerated person.

25. Ensure that all screening and housing policies, procedures, and practices are PREA-compliant and ensure the following:

    a. Use risk-screening information to inform housing, bed, work, education, and program assignments, with the goal of keeping separate those individuals at high risk of being sexually victimized from those at high risk of being sexually abusive.

    b. Obtain information about incarcerated individuals' stated and perceived LGBTI status and other vulnerabilities, and document and use this information to make individualized classification and housing decisions to ensure the safety of those individuals and others.

    c. Ask all incarcerated individuals who identify as or appear to be transgender, gay, lesbian, bisexual or intersex about their own views with respect to housing and safety and document that information in the individual's file. When making housing determinations, give serious consideration to the incarcerated person's own views related to safety.

d. Make individualized, case-by-case determinations about how to ensure the safety of each incarcerated individual. All housing and bed assignments of any individual known to be transgender, gay, lesbian, bisexual or intersex should be documented along with all relevant information considered in making that housing assignment, including the individual's own views with respect to housing and safety.

e. Consider whether to assign transgender and intersex individuals to a women's or men's facility on a case-by-case basis, taking into consideration factors including but not limited to gender identity, diagnosis, appearance, transition status and vulnerabilities. Document all factors used to determine whether to house a transgender or intersex individual in a women's or men's facility, giving serious consideration to the individual's own views with respect to housing and safety.

f. Refrain from housing transgender or intersex individuals in men's or women's facilities based solely on external genitalia.

g. When making cell assignments for LGBTI individuals, consider whether a potential cellmate is a validated member of an STG.

h. When making housing assignments for LGBTI individuals, consider all known STGs and members of STGs in the housing unit and consider the potential risk of harm they pose to the individual based on LGBTI status.

i. Following a report of sexual abuse or sexual assault, separate the victim from the alleged perpetrator, placing a victim in segregation only as a last resort, after an assessment has been made of all available alternatives, and a determination has been made that there is no available alternative means of separation from likely abusers.

    i. Document this assessment of all available alternatives and the reason those alternatives could not be pursued prior to placing a victim in segregation.

    ii. Revisit the determination to place any such individual in segregation at least every 30 days, and if the decision is made to continue the segregation placement, again document the assessment of all available alternatives and the reason those alternatives are unavailable. Any victim placed in segregation should be placed in a designated protective custody unit.

26. Ensure that all phones in Georgia's prisons are in working order and that all incarcerated persons can report PREA violations by phone to the PREA hotline as needed.

27. Provide correctional staff at all levels additional PREA training on preventing, detecting, and responding to sexual abuse of incarcerated persons, and that includes pre- and post-testing to verify staff competency.

28. On an ongoing basis, incarcerated persons should be provided additional education on their rights to be free from sexual abuse and sexual harassment and to be free from retaliation for reporting such incidents, and information about GDC policies and procedures for responding to incidents.

29. Conduct formal classification reviews of every incarcerated person for sexual-safety issues and ensure that potential predators are separated from potential victims.

## B. Violence: Long-Term Measures

<u>Strategic Assessment and Plan Development and Implementation</u>

30. Conduct a thorough review of all relevant GDC, and individual facility, policies and procedures. Based upon the review, GDC should promptly make appropriate changes to its systemwide and facility-specific policies and procedures.

31. Ensure that all prison staff receive appropriate, regular, evidence-based training on all existing and revised policies, including annual in-service trainings for all staff.

32. Ensure that all senior leadership staff receive appropriate training on operating corrections systems and prisons.

33. Develop and implement an early-warning system designed to effectively identify potentially problematic staff, including those with repeat allegations of rule violations or misconduct, as early as possible.

<u>Staffing and Supervision</u>

34. Conduct a systemwide staffing study and ensure that CO staffing and supervision levels in all GDC facilities are appropriate to adequately supervise incarcerated persons.

    a. Review all GDC facility PREA staffing plans, and make all appropriate revisions to the staffing plans.

b. Ensure that housing areas are adequately supervised, through direct supervision, whenever incarcerated people are present.

c. Ensure all Georgia prisons are staffed consistently at levels required by facility PREA staffing plans.

d. Reduce prison populations and close housing units where there are inadequate staff to operate safe and secure prisons.

35. Collect and analyze data on all GDC staff recruitment, hiring, and separations to identify and remedy reasons for staff attrition and turnover, and implement appropriate improvements.

36. Establish and maintain competitive base starting salaries, salary and promotion employee ladders, and benefits packages for employees.

37. Ensure security staff are appropriately trained for all security duties they are tasked with performing, including but not limited to:

a. Appropriate response to and documentation of incidents of harm to incarcerated persons.

b. Conducting and documenting counts.

38. Ensure shift supervisory staff have access to prison video surveillance system to monitor and verify correctional staff are fulfilling required responsibilities and to monitor conditions in the prisons as needed.

39. Develop and implement a strategy to use technology at the prisons to supplement staff supervision, including improving camera surveillance systems, strategic camera placement, increased and enhanced monitoring of camera surveillance systems, and analytics to identify problem areas.

<u>Incident Response, Reporting, and Investigations</u>

40. Provide remedial training on correctional procedures, incident response, and incident reporting to all correctional staff.

41. Ensure that incarcerated persons are able to report incidents of harm and other misconduct and that such reports are promptly reviewed and investigated.

42. Ensure that staff promptly and adequately report and appropriately investigate every fight, disturbance, serious assault, homicide, suspicious death, incident involving contraband or any serious injury, sexual-abuse allegation, extortion attempt, and other serious incident.

a. Ensure that GDC policies and procedures address institutional plans to coordinate actions taken in response to incidents among staff, first responders, medical and mental health practitioners, investigators, and facility and GDC leadership.

b. Ensure that GDC policies and procedures provide, with specificity, the required contents of incident reports, and the required procedures for making notifications related to incidents.

c. Ensure that GDC policies and procedures outline, in detail, the types of incidents that must be investigated, and the types of incidents that must be subject to critical incident debriefings, reviews, and root-cause analyses, and should provide what those debriefings, reviews, and analyses must include. Staff, including investigations staff and facility, regional, and central-office leadership staff, should be appropriately trained on all relevant incident reporting and investigation policies.

43. On a quarterly basis, conduct a systemwide audit of incident reports and investigations to assess any discrepancies, inconsistencies, trends, policy violations, violations of PREA, or violations of other legal standards in reporting, investigation, and documentation of incidents. Implement remedial measures to correct any identified issues.

44. Ensure that all investigations are timely, thorough, and unbiased regardless of the viability of any potential criminal charges, and that appropriate after-action reviews and corrective actions are taken.

a. Prepare complete and detailed reports summarizing the findings and any recommended corrective actions.

b. Include, at a minimum, interviews of the complainant and the alleged perpetrator, attempts to identify and interview potential witnesses, and reviews of camera footage, relevant documents, and other physical evidence.

c. Document investigator consideration of all such evidence, and, where any such evidence is unavailable or not considered, include an explanation.

d. Review for criminal violations, staff policy violations, root-cause analyses, critical-incident debriefings or reviews, and discipline of incarcerated persons.

45. Ensure all staff conducting investigations, including but not limited to facility-based SART team members, are appropriately trained, including training information specific to LGBTI individuals, and that adequate written guidance is provided to such individuals through policy or otherwise.

46. Develop and implement a quality-control process to ensure that investigations are appropriate, thorough, and timely.

47. Develop and implement systemwide incident mapping, identifying for certain incident types (assaults, use of force, sexual abuse, etc.) participants (staff and incarcerated persons), times, dates, locations, and other pertinent factors to identify trends.

48. Develop and implement an effective grievance process, including reasonably effective access to obtain and submit grievances via paper form or electronically. If a grievance is filed against a staff member, allow for submission options that are neither seen by, nor referred to, the staff member who is the subject of the complaint.

49. Ensure that grievances are not denied based on minor processing errors by the incarcerated person attempting to grieve an issue, if there is any evidence the complaint has merit.

<u>Classification and Housing</u>

50. Ensure that GDC has, and is following, policies and procedures for an appropriate, objective classification system that ensures incarcerated persons are housed based on their risk and needs and are protected from unreasonable risk of harm.

51. Review and make appropriate revisions to all facility housing and stratification plans to ensure incarcerated persons are housed and supervised appropriately.

52. Ensure the NGA tool and all other automated systems used in classification and housing of incarcerated persons have been validated and appropriately re-validated on a regular, periodic basis or as needed due to any relevant changes that may affect classification and housing.

53. Develop and implement quality-assurance processes to ensure the classification and housing system is effective.

    a. Conduct annual classification audits to ensure the NGA output is consistent with relevant documentation and classification needs of the incarcerated population.

b. Review and assess critical incidents to determine whether failures in classification, housing, or STG management contributed to the incident. Promptly correct any identified systemic or local deficiencies.

54. Ensure that GDC has sufficient qualified, trained staff to conduct initial classification and timely, appropriate re-classification for every incarcerated person on an ongoing basis. Ensure all classification reviews are appropriately documented. Conduct annual audits to ensure such reviews are timely and thorough, and promptly implement any improvements necessary to correct any deficiencies found.

55. Conduct a thorough analysis to determine the number of incarcerated persons who are threatened or at risk of harm in their current housing, to identify patterns and trends.

56. Develop and implement interventions that ensure incarcerated persons are reasonably safe in their assigned housing, without placement in restrictive housing except in exigent or emergency circumstances. Ensure incarcerated persons receive required due process and documentation regarding placement and retention in restrictive housing units.

57. Conduct monthly classification housing audits to enforce cell assignments in all prison housing units, and to ensure incarcerated persons are housed safely. At a minimum, such audits should include a manual review of a sampling of incarcerated persons' files; determine and document whether and, if any, which incarcerated persons were not living in their assigned beds; and track, review, and analyze the results and remedy any deficiencies identified.

58. Develop and implement a plan to prevent incarcerated people from entering housing units other than the ones to which they are assigned.

59. For people housed in restrictive housing units, ensure appropriate opportunities for daily recreation and sufficient time out of cell.

<u>Contraband and STG Management</u>

60. Assess the effectiveness of GDC's contraband-management policies, procedures, and practices, and develop and implement a strategic plan for detecting and reducing the amount of contraband throughout GDC facilities.

61. Conduct a study to determine if the NGA tool is appropriately classifying and housing affiliated and non-affiliated incarcerated persons.

62. On a regular basis, conduct random drug testing of incarcerated persons for all illegal substances identified as possessed and used by persons in GDC custody. Each incarcerated person should be tested at least every six months, the testing should be documented, and the results reviewed by GDC administrators. Ensure GDC drug testing policies and procedures have safeguards to protect incarcerated persons' privacy and prohibit harassment.

63. Ensure that GDC has an effective substance abuse disorder program.

64. Evaluate the effectiveness of GDC's STG management policies, procedures, and practices, and develop and implement a strategic plan to manage incarcerated persons who are affiliated with gangs and STGs and to protect all incarcerated persons from harm related to gang and STG activity. Sound STG-management policies and procedures should include the following:

    a. Provide graduated housing with increased programs and privileges based on positive programming and consequences for non-compliance associated with gang-related behaviors.

    b. Enable an incarcerated person to engage in reintegration from a restrictive housing unit where placement was associated with STG activity.

    c. Support and educate incarcerated persons who choose to disavow and/or disengage from gang activity, including an instruction to them that providing information on STGs or STG members and their activities is not a condition for disavowing and/or disengaging from STGs.

    d. Weaken STG organization and communication through intelligence and behavior-based management strategies. Curtail the ability of STGs to participate in crimes that transcend from prison into the community.

    e. Provide programs designed to promote social values and behaviors in preparation for incarcerated individuals' return to the community.

65. Ensure adequate systems are in place and functioning for screening and re-screening of staff applicants and employees on a regular basis for risk factors (STG associates, drug use, financial problems, etc.).

<u>Facility Conditions</u>

66. Install alarms on all primary doors and gates that annunciate a loud sound and bright lights and send alerts to designated staff when they open without staff authorization.

67. Develop and implement a preventative maintenance and housekeeping plan and schedule to ensure the prompt and ongoing identification and repair of all maintenance issues. Ensure adequate supervision of incarcerated persons to prevent unnecessary damage to facilities.

Public Transparency

68. Take measures to ensure public transparency and external oversight of GDC prisons and the protection of incarcerated persons in GDC's custody from harm.

## C. Sexual Safety: Long-Term Measures

69. Ensure GDC complies with PREA and its implementing regulations, the National Standards to Prevent, Detect, and Respond to Prison Rape (28 C.F.R. §§ 115 et seq.).

70. Enforce a "zero tolerance" policy on sexual abuse in all GDC facilities.

71. Retrain all staff on GDC policies regarding sexual abuse, and ensure that all staff who conduct PREA risk screenings receive adequate training to do so, including training regarding the special vulnerabilities of LGBTI individuals.

Investigations

72. Ensure all PREA allegations are investigated in a timely and thorough fashion.

73. Ensure notifications regarding all PREA allegations are timely sent to the centralized PREA unit, and the status of each such PREA investigation is centrally tracked and documented at least monthly.

74. Ensure that SANE nurses respond timely to sexual abuse allegations in all cases where GDC learns of the allegation.

75. Ensure that investigations into sexual abuse allegations examine whether policy violations or violations of PREA regulations have occurred in addition to assessing whether potential criminal conduct has occurred.

76. Ensure that investigations into sexual abuse allegations consider potential administrative or other remedies including but not limited to personnel action, trainings, counseling referrals, and housing or classification changes for incarcerated persons.

77. Apply a preponderance-of-the-evidence standard for PREA investigations in determining whether an allegation is substantiated and in considering potential remedies, with the sole exception of criminal charges.

78. Establish guidelines, for both SART and OPS investigations, for timely and thorough investigations, and develop a process for monitoring those timelines and the completeness of those investigations.

79. Develop and implement a policy for administrative review of all SART investigations, including accountability measures for local facility staff. Supervisory sexual assault investigators should review and sign off on all investigations and shall have the authority to order additional investigation.

80. Ensure that corrective administrative action – including but not limited to personnel action, trainings, counseling referrals, and housing or classification changes – is taken at the individual facility level and otherwise based on the findings of PREA investigations.

Use of Data

81. Implement an electronic data system or systems to track allegations of sexual abuse by incarcerated individuals and by staff, as well as any adverse actions taken against staff members in relation to those allegations.

82. Collect, consolidate, analyze, track, and use data to evaluate trends in reports of sexual abuse, PREA investigation outcomes, and discrepancies in reporting or documentation related to PREA, and consider and implement appropriate corrective actions to reduce the risk of harm suggested by such trends.